IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA


UNITED STATES OF AMERICA        . DOCKET NO.5:09-HC-2083-BO
        Petitioner              . ELIZABETH CITY, NC
                                . JUNE 6, 2011
V.                              .
                                . 18 U.S.C. 4248
CLYDE M. HALL,                  .
        Respondent.             .
. . . . . . . . . . . . . . . .


TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE TERRENCE W. BOYLE
JUDGE, UNITED STATES DISTRICT COURT


APPEARANCES:

FOR THE UNITED STATES:    JOSHUA B. ROYSTER, ESQUIRE
                          MICHAEL JAMES, ESQUIRE
                          ASSISTANT U.S. ATTORNEY
                          800 FEDERAL BUILDING
                          310 NEW BERN AVENUE
                          RALEIGH, NC  27601-1461



FOR THE RESPONDENT:       SUZANNE LITTLE, ESQUIRE
                          JOSEPH CRAVEN, ESQUIRE
                          PUBLIC DEFENDER'S OFFICE
                          150 FAYETTEVILLE STREET MALL
                          SUITE 450
                          RALEIGH, NC  27601



COURT REPORTER:       MS. SANDRA A. GRAHAM, CVR

Proceedings recorded by stenomask, transcript produced from
dictation.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

I-N-D-E-X

EXAMINATION OF THE WITNESSES

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **DR. DALE ARNOLD** | | | | |
| BY MR. ROYSTER | 7 | | 71 | |
| BY MS. LITTLE | | 47 | | |
| **DR. LELA DEMBY** | | | | |
| BY MR. JAMES | 72 | | 109 | |
| BY MR. CRAVEN | | 102 | | |
| **CLYDE HALL** | | | | |
| BY MR. CRAVEN | 111 | | 189 | |
| BY MR. JAMES | | 149 | | |
| **DR. LUIS ROSELL** | | | | |
| BY MS. LITTLE | 198 | | 261 | |
| BY MR. ROYSTER | | 240 | | |

CLOSING BY ROYSTER  262

CLOSING BY LITTLE  266

EXHIBITS

| NUMBER | DESCRIPTION | INT | REC |
|---|---|---|---|
| **GOVERNMENT'S** | | | |
| COMPLETE BINDER | | 4 | 4 |
| [1] | ARNOLD CURRICULUM VITAE | 8 | |
| [2] | 3/14/11 EVALUATION REPORT | 48 | 48 |
| [3] | 4/28/11 EVALUATION REPORT | 48 | 48 |
| [4] | DEMBY CURRICULUM VITAE | 75 | |
| [5] | 2/28/11 EVALUATION REPORT | 78 | |
| [6] | DR. ROSELL CURRICULUM VITAE | 200 | 205 |
| [7] | 4/8/11 EVALUATION REPORT | 210 | 210 |

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 2 of 271

[13]     RELAPSE PREVENTION PLAN              26

[26]     2/14/06 RAMIREZ MEMO                 166

[28]     4/16/08 McAVOY JUDGMENT              175

[44]     DRAWN PICTURE OF PUBESCENT GIRL      100

[45]     DRAWN PICTURE OF PUBESCENT GIRLS     98

[46]     DRAWN PICTURE OF PUBESCENT GIRL      99

[47]     COPY OF PHOTO OF THREE GIRLS         98

[48]     COPY OF PHOTO OF GROUP OF GIRLS      99

[49]     COPY OF PHOTO OF GIRL IN WATER       99

[54]     CONFISCATION OF CONTRABAND           155

[57]     PHOTO SEIZED IN SHAKEDOWN            153  155

[58]     PHOTO SEIZED IN SHAKEDOWN            154  155

[59]     PHOTO SEIZED IN SHAKEDOWN            154  155

[60]     HAND DRAWING FROM SHAKEDOWN          154  155

[66]     7/29/05 POLYGRAPH                    181

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 3 of 271

1    **THE COURT:**  This is the Hall case, and we are ready to

2    start trial?

3        **MS. LITTLE:**  That is correct, Your Honor.

4        **MR. ROYSTER:**  Yes, Your Honor.

5    **THE COURT:**  Is there a statement from the Government?

6        **MR. ROYSTER:**  There is.  Just one thing before we get

7    started, Your Honor.  You can see that I have placed a

8    notebook at your desk and I have also handed those out.

9    Respondent's counsel and Government's counsel has worked

10   together to determine the exhibits that we want to include

11   in that notebook, so it is presented to The Court in that

12   we have stipulated to the authenticity and admissibility of

13   those exhibits.  And we just ask that when the Government

14   begins its case that The Court accept those exhibits into

15   evidence.

16       **THE COURT:**  I will.

17       **MR. ROYSTER:**  Thank you, Judge.

18                   OPENING STATEMENT BY MR. ROYSTER

19       Judge, as you know, this is a civil commitment case

20   under 18 U.S.C. 4248.  Clyde Hall is the Respondent.  He is

21   45 years old.  The burden is on the Government to show by a

22   clear and convincing evidence that Mr. Hall is a sexually

23   dangerous person.  To do so Your Honor knows the Government

24   must show that Mr. Hall has engaged in or attempted to

25   engage in sexually violent conduct or child molestation and

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 4 of 271

1    is sexually dangerous to other; that is, he suffers from

2    serious mental illness, abnormality or disorder, a result

3    of which he would have serious difficulty refraining from

4    sex or violent conduct or child molestation.

5        Your Honor, in 1989 when Mr. Hall was 21 years old he

6    was convicted of unlawful sexual conduct and gross sexual

7    misconduct.  The offense conduct for these two convictions

8    involved two separate occurrences of child molestation.  In

9    the first instance Mr. Hall had the ten-year-old daughter

10   of a friend help him while he masturbated.  In the second

11   instance Mr. Hall got into bed with a ten-year-old girl,

12   touched her vagina with his hands and mouth and had her

13   touch his penis with her hands and mouth.

14       While he was incarcerated from June of '89 to November

15   '91, he was on supervised -- he was incarcerated from June

16   1989 to November '91.  He was then on supervised release

17   for a period of time.  During that time he participated in

18   sex offender treatment.  In 1999 when he was 33 years old

19   he was convicted of an act injurious to a child.  At the

20   time of the offense Mr. Hall was living with a girlfriend

21   and her ten-year-old daughter.  He showed the ten-year-old

22   daughter and her friend drawings of unclothed females that

23   he intended to be pictures of the ten-year-old girls.  He

24   also admitted that he showed the ten-year-old child

25   pornography while she sat on his lap, and he fondled her

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 5 of 271

1    over and under her clothing. During the investigation of

2    this offense, Your Honor, numerous pictures of child

3    pornography were located on the computer Hall used in the

4    home. After he served his time on the state offense, he

5    was ultimately arrested and convicted federally for the

6    possession of child pornography. While incarcerated he

7    again participated in sex offender treatment at Butner. He

8    was released from BOP in April of 2004 and then he

9    participated again in additional sex offender treatment.

10    In July 2005, while he was on supervised release, he failed

11    a polygraph with respect to whether he had touched the

12    sexual organs of a minor since on probation. When

13    confronted about this he stated that when he masturbates he

14    masturbates to victims of his prior offenses approximately

15    45 percent of the time.

16        In February of 2006 his supervised release was

17    revoked. He reported that he again viewed pornography and

18    had sex with an AA participant. In June he was released on

19    BOP custody. The following January 2007 he absconded from

20    probation. He was ultimately found, charged and convicted

21    for failing to register as a sex offender. Since being

22    certified in June of 2009 he has been found making copies

23    of sexually suggestive and explicit photos on multiple

24    occasions. He has attempted to obtain magazines that have

25    been rejected by the BOP including a magazine known as Teen

1     Vogue.  During multiple shakedowns photographs and drawings

2     of women and children have been located in his property.

3     In July 2010 pictures were found of children in bathing

4     suits along with drawings of prepubescent girls traced from

5     pictures, but with their clothing removed and their

6     genitals showing.

7         You will hear testimony, Your Honor, from Dr. Dale

8     Arnold and Dr. Lela Demby.  They have evaluated and

9     interviewed Mr. Hall.  You are familiar with these

10    witnesses from the Timms trial.  They both diagosed Mr.

11    Hall with pedophilia and antisocial personality disorder.

12    They conclude that he meets the criteria for civil

13    commitment under 18 U.S.C. 4248.

14        Judge, at the conclusion of our case we would ask that

15    you find that the Government has met its burden by clear

16    and convincing evidence that Mr. Hall is a sexually

17    dangerous person and should be committed pursuant to 18

18    U.S.C. 4248.  Thank you, Judge.

19       **THE COURT:**  All right.  Do you want to make a

20    statement now or wait?

21       **MS. LITTLE:**  We are going to reserve, Your Honor.

22       **THE COURT:**  You can call your first witness.

23       **MR. ROYSTER:**  Thank you, Judge.  We call Dr. Dale

24    Arnold.

25        **DR. DALE ARNOLD, GOVERNMENT'S WITNESS, SWORN**

1  <u>DIRECT EXAMINATION</u>

2  **BY MR. ROYSTER:**

3  Q.  Good morning, Dr. Arnold.

4  A.  Good morning.

5  Q.  Dr. Arnold, what is your occupation?

6  A.  I'm a forensic psychologist.

7  **THE COURT:**  I think everybody was in the courtroom for

8  the last trial, and I can take judicial notice of Dr.

9  Arnold's curriculum vitae and his background.  He was

10  qualified as an expert witness in the previous trial and

11  allowed to express his opinions as a forensic psychologist.

12  He is a Ph.D. in psychology and has extensive training.

13  And I incorporate by reference that background and

14  curriculum vitae and resume that you have put in, and I

15  will allow him to express his opinions in this trial.

16  **MR. ROYSTER:**  Thank you, Judge.

17  Q.  Dr. Arnold, if you could, just identify Exhibit [1] in

18  the notebook as an updated copy of your resume, for the

19  record.

20  A.  Yes, it is.

21  Q.  Dr. Arnold, during the course of your practice, have

22  you evaluated sex offenders?

23  A.  Yes.

24  Q.  How many have you evaluated for civil commitment?

25  A.  In the state of California approximately 340 or

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 8 of 271

1       thereabouts.

2       Q.   Is that for initial commitment or to keep them

3       committed.

4       A.   That's for initial commitments.

5       Q.   And in what other states have you done initial civil

6       commitment evaluations?

7       A.   Washington state.

8       Q.   And how many have you conducted there?

9       A.   Approximately 20.

10           **THE COURT:**  Are these people in the general civil

11      population, or are these prisoners?

12      A.   They are prisoners.

13      **BY MR. ROYSTER:**

14      Q.   Dr. Arnold, of those initial reviews, how many of the

15      340 in California did you find met the criteria under the

16      California law?

17      A.   It's in the sixties.  It's about 19 percent of those I

18      evaluated I found to met criteria.

19      Q.   And what about for Washington?

20      A.   It's about 45 percent.  So about nine of those twenty

21      I found to meet criteria.

22      Q.   Dr. Arnold, during the time that you have been

23      conducting evaluations in California, has the law changed?

24      A.   Yes.

25      Q.   Could you tell The Court how that changed, just

1    briefly, and what effect it had on the number of reviews
2    that you were doing?
3    A.   Prior to 2006 it was required that an individual have
4    two or more sexually violent offenses against two or more
5    victims.  And in 2006 Jessica's Law was passed, and they
6    reduced that to only having to have one predicate offense.
7    And the effect of that was to greatly open up the number of
8    prisoners eligible for evaluation for civil commitment.
9    Q.   And so since that law changed, how many initial civil
10   commitments have you evaluated?
11   A.   Over 200.
12   Q.   And of those how many did you find met the criteria?
13   A.   Less than ten percent.  It's about nine percent that I
14   found to meet criteria.
15   Q.   Dr. Arnold, have you ever testified for the defense --
16   for a respondent?
17   A.   Yes.
18   Q.   And how did that come about?
19   A.   In two ways.  On a couple of occasions I was contacted
20   by the public defender's office and asked to do an
21   evaluation and subsequently support my opinion in court.
22   And on a couple of other occasions when I did an evaluation
23   that was referred by the Department of Mental Health, I
24   found that person not to meet the criteria for civil
25   commitment, but my peers did find the person to meet

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 10 of 271

1     criteria.  So as a result I was then called to testify for

2     the Respondent.

3     Q.  Dr. Arnold, during the course of your practice have

4     you been involved in sex offender treatment?

5     A.  Yes.

6     Q.  Can you tell The Court when and what your involvement

7     was.

8     A.  From approximately 1995 to 1999 I was involved in

9     providing treatment in two different contexts.  One was for

10     a military sex offender treatment program at a military

11     confinement facility.  The second was at Atascadero State

12     Hospital where people who were civilly committed because of

13     their sexual crimes were being treated.

14     Q.  Approximately how many individuals have you -- sex

15     offenders have you treated?

16     A.  Around 250.

17     Q.  Dr. Arnold, is it important for the sex offenders when

18     they are participating in treatment to be truthful?

19     A.  Yes.

20     Q.  And why do you say that?

21     A.  It helps to design the treatment that is appropriate

22     for them and recognize what their high risk factors are for

23     future reoffense and to develop a relapse prevention plan

24     that will help them manage those factors in the future.

25     Q.  Is it typical in the beginning in sex offender

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO  Document 74  Filed 06/30/11  Page 11 of 271

1    treatment to get a less than full disclosure?

2    A.    Yes.

3    Q.    Does that generally change during the course of the

4    treatment?

5    A.    Usually over the course of treatment somebody becomes

6    more and more open and honest about their different sexual

7    interests.  For example, we used to give a test called the

8    Multiphasic Sex Inventory.  And initially it would look

9    like they didn't have much deviance.  But if we were to

10    repeat the test halfway through treatment, then it would

11    look like they were much more deviant.  And it's not that

12    they had changed; it's just that they were becoming more

13    open and honest.

14        **THE COURT:**  But that's true of all antisocial

15    behavior.  I mean, I encounter people who are being

16    sentenced every day of the work year, and most people

17    aren't candid about it.  They think they're there for some

18    reason other than their own conduct.  The most constant

19    theme is, I was with the wrong crowd.  And my answer is,

20    you are the wrong crowd.  They were with you.  You're a

21    federal felon.  But it's not -- people aren't usually

22    willing to take personal responsibility for their lives.

23    A.    Right.  And not initially.  And over time they tend to

24    take a little bit more in the course of treatment.  That's

25    one of the goals.

1  **BY MR. ROYSTER:**

2  Q.   Dr. Arnold, a little bit different question.  Is it

3  typical for sex offenders to be inconsistent or dishonest

4  during the course of their treatment?

5  A.   I would say it's sort of -- it goes like this.

6  So it flows where there is increased honesty, decreased

7  honesty, but over time they tend to disclose more and be

8  more consistently honest about what they had engaged in.

9  It's less common to admit, say, a crime ten years ago and

10  describe it very specifically and then, you know, nine

11  years to the present, then deny the crime and then admit

12  the crime.  That would show that their prior disclosures

13  aren't very meaningful because they are sort of

14  consistently inconsistent.  And if that's the case it makes

15  it more difficult to provide effective treatment in the

16  community.

17  Q.   Dr. Arnold, you have been conducting evaluations for

18  civil commitment for the United States Department of

19  Justice; is that right?

20  A.   Yes.

21  Q.   How many of these evaluations have you been asked to

22  do?

23  A.   Ten.

24  Q.   How many -- well, how many have you been asked to do,

25  total?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 13 of 271

1  A.   Actually, I've been asked to do twelve evaluations,

2  and I have completed ten.

3  Q.   And of those ten that you have completed, how many

4  have you found met the criteria?

5  A.   I found six of the ten to meet the criteria.

6  Q.   And one of the evaluations that you have conducted

7  relates to Mr. Clyde Hall; is that right?

8  A.   Yes.

9  Q.   And what is your opinion as to whether Mr. Hall meets

10  the criteria for civil commitment?

11  A.   I believe he does.

12  Q.   Dr. Arnold, how did you go about conducting your

13  evaluation of Mr. Hall for civil commitment?

14  A.   I reviewed just under 3,000 pages of documentation

15  that's related to his social history, his sexual history,

16  his criminal history, substance abuse history.  So a well-

17  rounded review of the records.  And then I had the

18  opportunity to interview him for a little more than four

19  hours on April 4th.

20  Q.   And you mentioned some of the records, but could you

21  give The Court an idea of some of the other records that

22  you reviewed that were part of the discovery?

23  A.   Yeah.  These were presentencing reports.  These

24  included sex offender treatment notes about his progress in

25  treatment; evaluation reports from sex offender treatment,

1    institutional reports, things like that.

2    Q.   Did you also review homework assignments that he did

3    during his sex offender treatment?

4    A.   Yes.

5    Q.   And did you review records related to his history of

6    sexual conduct?

7    A.   Yes.

8    Q.   If you could, at this time summarize the basis of your

9    opinion that he meets the criteria.

10   A.   Essentially I found in 1989 he was convicted of two

11   counts of essentially child molestation that involved a

12   girl who was nine or ten years old at the time.  And it

13   involved pretty extensive sexual contact in that it was

14   oral copulation of her genitalia and her orally copulating

15   him.  So I found that he was convicted of that.  I also

16   found that in 1999 he was found to have presented to eight-

17   year-old girls drawings of them in the nude and talking to

18   them.  And he told me he was sexually interested in them.

19   And he has been inconsistent in reporting whether or not he

20   actually did molest them or not.  But the victim reported

21   that she had orally copulated him and that he had fondled

22   her.  And at the same time he was collecting child

23   pornography and showing them child pornography.  So he

24   served a sentence for several months, and then after the

25   completion of that sentence was arrested for the federal

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 15 of 271

1    charges of possessing child pornography in September of

2    1999 and ultimately convicted of that in January of 2000.

3    Q.   Okay.  Continue on with the rest of that.

4    A.   And then based on the evaluation I find that he

5    suffers from a serious mental disorder.  And the serious

6    mental condition consists of the combination of pedophilia

7    and antisocial personality disorder.  And I think that

8    affects him in two ways.  One is I think that it diminishes

9    his ability to make choices about his conduct or to go with

10    what he plans to do.  And I also think it affects the

11    actual choices he has.  Because he has a sexual interest in

12    children, that's an ongoing influencing factor in his life.

13    And his response to it has been inconsistent in terms of

14    his ability to control those urges.

15    Q.   Doctor, as we move further with your testimony, would

16    it assist you to review a chronology or a time line of the

17    events during the course of before his certification?

18    A.   Yes.

19    **MR. ROYSTER:**  Your Honor, if you will allow I would

20    like to put those up.

21    **THE COURT:**  Go ahead.

22    **MS. LITTLE:**  Your Honor, just for the record, we

23    agreed to a time line but without the editorials that are

24    included in this one, so we would note our objection, for

25    the record.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 16 of 271

1        **THE COURT:** All right. Overruled.

2        **MR. ROYSTER:** Judge, for your reference I have

3    included copies of this in your notebook if there are any

4    issues with seeing it, just the way the witness needs to

5    see it as well.

6        **THE COURT:** Okay.

7            (Poster boards set up)

8    Q.   Dr. Arnold, can you see this?

9    A.   Not well.  I thought I might have a paper copy.

10       **THE COURT:** Step down and get in front of it, and you

11   can testify there.

12   A.   Okay.

13           (Witness leaves the witness stand to stand in front of

14   the poster boards.)

15   Q.   Dr. Arnold, while you are down here, if you would,

16   just go ahead and lay out for The Court the information

17   that is on the chart there, for the record, as well.

18   A.   Okay.  Essentially -- it says in 1989 he was convicted

19   of these charges related to the first child I mentioned

20   about.  Her name is Joy.  Those offenses were actually

21   committed in 1987 and so it was two years before he was

22   convicted.  He then went to confinement for two years and

23   was released.  But prior to his release he had some sex

24   offender treatment that he engaged in.  And then he

25   continued to engage in that upon parole.  And he did pretty

1    well and was discharged from parole in 1995.

2         And starting in September of '96 he established a

3    relationship with a woman who had a seven-year-old

4    daughter.  He realized in January 1998 he was sexually

5    attracted to her daughter who was, at that time, age seven.

6    And then he started to fantasize about having sexual

7    contact with her and masturbating to those fantasizes.  And

8    then eventually molested her the following year after he

9    had lived with them for about three months.  You want me to

10   keep going?

11   Q.   Just keep on going.

12   A.   At the same time he was in possession of child

13   pornography.  He began treatment at Butner in March of

14   2001.  He completed that in October of 2002, ultimately

15   being released in April 2004.  He was out in the community

16   for about 22 months before he was returned to confinement

17   for having multiple instances of violating the rules of his

18   halfway house.  It was also noted in approximately July --

19   June or July of 2005 that about 45 percent of the time he

20   was masturbating to memories of his prepubescent victims,

21   showing an ongoing interest in children.

22        After his return to confinement for four months, he

23   was placed back in the community and remained in the

24   community for approximately six or seven months before

25   absconding parole supervision.  And then ultimately he was

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 18 of 271

1     arrested and convicted of failure to register as a sex

2     offender.

3     Q.   And have you also -- while you are there, have you

4     also reviewed information relating to his post

5     certification?

6     A.   Yes.

7     Q.   And would reviewinig information related to that

8     assist in your testimony as well?

9     A.   Yes.

10     **MR. ROYSTER:**  Okay.  If you would go ahead and put

11     that chart up.

12     And just, for the record, again, Your Honor, I have

13     included a copy, a hard copy, for your notebook.

14     **THE COURT:**  Okay.

15     **MS. LITTLE:**  Your Honor, just for the record, same

16     objection to this exhibit as well.

17     **THE COURT:**  Overruled.

18     Q.   All right, if you could, Dr. Arnold, just tell The

19     Court the information, for the record, what's on this --

20     information related to since he has been certified.

21     A.   Since being certified for civil commitment as a sex

22     offender, Mr. Hall has continued to engage in behavior that

23     I think represents serious difficulty.  He has possessed

24     pictures of prepubescent children.  He has also

25     consistently gotten materials related to sexual

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 19 of 271

1    preoccupation, so this would be erotica of adult females.

2    Also, very important to me, is he requested a magazine

3    called Teen Vogue magazine.  And in my opinion -- he had

4    described to me how he had previously groomed the child to

5    become a victim of his probably by telling her -- because

6    she had been a prior victim of child sexual abuse.  And he

7    told her that you know, men want to love you, you're

8    beautiful; and he would continue to build her up and make

9    her feel good about herself.  And part of it that he did

10   that is he knew about her past issues and wanted to make

11   her feel better and closer to him which would then give him

12   an opportunity to sexually molest her.  And then in this

13   phase of his life, facing civil commitment and knowing the

14   consequences, getting a Teen Vogue magazine, which talks

15   about the latest fashions, what's important to teenagers,

16   the whole social milieu of a teenage culture, I think gives

17   him material that he can then use later on to groom another

18   child for sexual abuse.  And so that concerns me greatly.

19   And I notice that Mr. Hall recently admitted that that is

20   high risk for him and that is something he should not have

21   engaged in.

22   Q.   When you say he recently admitted, what do you mean by

23   that?

24   A.   He did depositions last week, and he admitted that

25   that was a bad choice on his part.  And that's a little bit

1  different from in April when I interviewed him and him

2  having defended that choice. And what's most concerning

3  about that is he had been through treatment while he was in

4  confinement and then while on supervision and when while he

5  was in confinement in the BOP and then while on supervision

6  in the community. So he has been through extensive therapy

7  and for him not to know that possessing Teen Vogue magazine

8  is not a good idea I think is a real concern.

9  Q.   You can go ahead and head back to the stand. Thanks.

10      (Witness resumes the stand.)

11 Q.   Dr. Arnold, if you could, tell The Court how you went

12 about determining whether he had serious mental illness

13 abnormality disorder and whether it causes him to have

14 serious difficulty refraining from reoffending.

15 Just walk through that process.

16 A.   Okay. That's again reviewing all the data available

17 to me. So that would include all those different areas of

18 his sexual histories, psychiatric history, how he has

19 responded to these sanctions in the past. In other words

20 once a person is sanctioned for illegal sexual conduct, how

21 do they respond to that? So all of those things I

22 considered, including his substance abuse history. And

23 finally it's my opinion that he suffers from both

24 pedophilia and antisocial personality disorder, and those

25 two conditions together will make it -- give him serious

1    difficulty refraining from sexually violent conduct in the
2    future.
3    Q.    You previously mentioned that you interviewed Mr.
4    Hall.  Is that right?
5    A.    Yes.
6    Q.    How long did that interview take place?
7    A.    About four hours and twenty minutes.
8    Q.    And did the information that you obtained during the
9    course of that interview also assist you in reaching your
10   conclusions?
11   A.    Yes.
12   Q.    I want to talk for a moment about your diagnostic
13   conclusions, one of which was pedophilia.  First of all,
14   just tell The Court what pedophilia is under the definition
15   that you are using.
16   A.    Okay.  That's a deviant sexual interest, and it's
17   basically for a period of six or more months.  The person
18   has recurrent fantasies, urges or behaviors that involve
19   sexual contact with a prepubescent child.  Secondarily,
20   they have either acted upon those urges or they are
21   distressed by those urges.  And then third, the person is
22   at least 16 and more than five years older than the child.
23   Q.    And what is the basis of your opinion that he meets
24   that definition of pedophilia?
25   A.    Mr. Hall told me that before his first offense he

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 22 of 271

first became aroused with children when he was on a roller

coaster ride at a fair.  And what had happened is, in the

course of that roller coaster ride he happened to be next

to a prepubescent girl who placed her hand on and held his

leg while they were on the roller coaster.  And he said he

found that sexually exciting.  And that was the first time

he realized he had some sexual interest in children.  And

it was just a few months later that he had identified the

mother of Joy, who was his 1987 victim.  And he began to

engage in a relationship with that woman befriending her

for the purpose of having sexual contact with the child.

He said he had intended to do it for at least two months

before the offense and then he committed that offense while

he was intoxicated because he was in a state of grief

having lost an infant child.

     And I'm a little lost on what the original question

was.

Q.   Well, the original question was the basis for your

diagnosis of that theory you talked about.

A.   So that was the onset, and that's important because I

don't always get that information of, you know, when a

person realizes they are sexually attracted to children.

     So then he is sanctioned by going to prison.  He is on

supervision.  He gets treatment.  He is in the community.

He establishes a correspondence relationship with a woman

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 23 of 271

1    who, at the time, has actually a six-year-old child.  And

2    he starts that in September of '96.  And then in

3    approximately June of '97 he meets her face to face for the

4    first time and sees her children.  At the time that they

5    are corresponding he is also living with another sex

6    offender who is recommending to him that he disclose his

7    sexual offense history.  And so in the fall of that year,

8    of '97, he tells this woman about his history of being a

9    sexual offender.  And it was especially important because

10   she was corresponding with him about how difficult it was

11   having a daughter who had been sexually abused by her prior

12   partner.  So she was saying -- she was talking about all

13   the distress in her life because of her child's sexual

14   abuse, taking the child to counseling.  He discloses, I'm

15   also a sex offender.  She doesn't communicate with him for

16   some time.  Ultimately they rekindle their relationship

17   about two months later, in December or January.  And he

18   convinces her that he is cured and he is no longer at risk

19   for sexual reoffense.  Apparently there is an ice storm in

20   New York and he brings them some supplies because they

21   don't have electricity.  And he told me it was at that

22   moment that he realized he was sexually attracted to her

23   daughter who was at that time seven years old.

24        And he continued to develop that relationship, moving

25   into their home in October of '98 when he began to continue

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 24 of 271

1    to have sexual fantasies of her, ultimately molesting her

2    and collecting child pornography and showing that to her.

3        So there are two elements.  One is sexual arousal to

4    children.  Two, the callousness involved in that.  Because

5    he had heard firsthand of all the difficulty prior sexual

6    abuse had caused them, and he disregarded that, you know,

7    in order to meet his own sexual needs.

8        **THE COURT:**  Is he in a sexual relationship with the

9    adult mother?

10   A.   For the purpose of getting at her daughter.  He wasn't

11   interested in her.

12       **THE COURT:**  For a pretextual reason?

13   A.   Yes.

14   **BY MR. ROYSTER:**

15   Q.   Okay.  Go ahead.

16   A.   So since then he is, obviously, back in Butner.  He

17   gets more sex offender treatment.  He is out in the

18   community.  He is asked a polygraph question of have you

19   touched the genitals of any minors recently.  He fails that

20   question.  And in response to the failure to that question

21   he explains, well, I've been masturbating to my victims

22   about 45 percent of the time.  So keep in mind this is his

23   third sex offender treatment program at that time.  And he

24   has already written several years ago that one of his risk

25   factors is masturbating to deviant fantasies and he's doing

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 25 of 271

1    it.  And they only detect it because of a polygraph.

2         And then there is ongoing possession of pictures of

3    minors and ongoing sexual preoccupation following that.

4    Q.   Dr. Arnold, you referenced a release plan, I believe,

5    or some type of plan?

6    A.   Yeah, in 2002 he wrote a release plan after his

7    treatment at Butner.

8    Q.   And if you will take a look at Exhibit [13], and I

9    would just ask, is that the release plan that you are

10   referring to?

11   A.   Yes.

12   Q.   What is that document?  What is Exhibit [13]?

13   A.   This is essentially a person's plan to avoid sexually

14   reoffending in the future.  So in treatment one of the

15   first things you are told is that there is no cure for your

16   condition.  Instead it is about managing your risk factors.

17   So what we have to do is find out what those risk factors

18   are and teach you effective coping strategies to manage

19   those.

20   Q.   Is Mr. Hall exclusively attracted to prepubescent

21   children?

22   A.   No, he's not.

23   Q.   And why do you say that?

24   A.   Mr. Hall is -- his whole life essentially he has been

25   quite sexually promiscuous.  He was actually sexually

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 26 of 271

1    abused when he was about nine years old by a sixteen year

2    old babysitter.  And then he began engaging in --

3        **THE COURT:**  Female?

4    A.    Female, yeah.  And he began engaging in sexual contact

5    with his peers when he was around eleven or twelve years

6    old.

7        **THE COURT:**  Females?

8    A.    Females and males.  This is where he is a little

9    inconsistent.  For example, he told Dr. Rosell he didn't

10   have any sexual interest in males.  In approximately March

11   of this year, 2011, he told me he had five or six males he

12   had had sexual contact with.  And then last week during a

13   deposition he estimated 50 or 60 males he had had sexual

14   contact with.

15       **THE COURT:**  Throughout the course of his life?

16   A.    Correct.

17       **THE COURT:**  Not just at one period?

18   A.    Throughout his life.  He also talked about he had

19   functioned as a prostitute from about the ages of roughly

20   16 to 20.

21       **THE COURT:**  A male prostitute?

22   A.    Correct.  Having both female and male customers.  Also

23   he talked about sexually exploiting teenages who were ages

24   13 to 16 in his homework assignments.  He now claims he

25   didn't do that.  At that time he claimed that they would be

1    in need of either shelter or food, and he would hold that

2    over their head in an effort to have -- and he would trade

3    sex for that kind of thing.

4         Also, while he was in confinement in Maine, he coerced

5    both a female correctional officer and a female inmate into

6    having sexual contact with him because he had discovered

7    they had been bringing drugs into the institution and/or

8    having sex with other people.  So he basically blackmailed

9    that he would tell what they were doing unless they also

10   had sex with him.  And since then he has just been a very

11   sexually promiscuous person.  He at one point estimated at

12   least a thousand partners.  To me he estimated around five

13   hundred.  To Dr. Rosell he estimated about a hundred.  So

14   there's obviously some big inconsistencies in that.  But

15   most often it is five hundred or more.

16   Q.   You mentioned that he was able to recall the first

17   time he was sexually attracted to a child with the Ferris

18   Wheel incident.  Is that typical or atypical?

19   A.   It's a little unusual to be able to have an

20   understanding of when they were first aroused to children.

21   Q.   And why is that significant?  Or was it significant to

22   you?

23   A.   To me it just helps to understand sort of the onset of

24   the condition, what was going on at the time.  He basically

25   paired sort of an exciting situation with sexuality.  And

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 28 of 271

1    then, you know, he knew at the time that it was wrong to

2    have sexual contact with children, and he overcame that

3    knowledge and then targeted a girl to have sex with fairly

4    quickly.

5    Q.   Do individuals with pedophilia have different methods

6    of obtaining victims?

7    A.   Yes.

8    Q.   And can you give The Court some examples?

9         **MS. LITTLE:**  Objection.  Relevance.

10        **THE COURT:**  Overruled.

11   A.   In some instances a pedophile might just go to, say, a

12   public place or a park and surreptitiously molest a child,

13   You know, obviously a more severe case if somebody kidnaps

14   a child and takes them to some other remote location to

15   have sex with them.

16        And then Mr. Hall is a little different.  He

17   establishes a relationship with the mother of a child to

18   gain access to that child so he can have sexual contact

19   with them.

20   Q.   Let's talk for a minute about your diagnosis of

21   antisocial personality disorder.  And I know The Court is

22   aware of what that disorder is.  So if you would, just

23   state your basis or bases for your diagnosis that he has an

24   antisocial personality disorder.

25   A.   The first one we look at is if the person had a

1    history of conduct disorder in childhood.  Mr. Hall

2    described having about 30 fights when he was in elementary

3    school, being suspended about ten times.  In junior high

4    school he estimated being suspended about another ten

5    times.  He had instances where he was referred to

6    behavioral specialists because he had a "smart mouth".  He

7    also had instances where he hit a teacher.  So there are

8    clear instances of conduct disorder.  And then over time he

9    had four or five arrests before his first arrest for a

10    sexual offense that involved assault.  And also theft by

11    deception.  He faked a time card or something like that.

12        So that's part of it is, you know, not being compliant

13    with rules and laws.  Another part is being callous or

14    indifferent to the needs or emotional responses of other

15    people.  So being able to inflict harm to others and not

16    having, you know, basically remorse for that.

17    Q.  Dr. Arnold, doesn't a large portion of the prison

18    population have this disorder?

19    A.  Yes.  It's estimated sixty to seventy percent of the

20    prisoners would have -- would meet the criteria for a

21    disorder like this.

22    Q.  Well, what makes Mr. Hall different from any of the

23    rest of them?

24    A.  The key thing is the combination of having the deviant

25    sexual interest in children and then having the antisocial

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 30 of 271

1    personality disorder that interferes with his ability to
2    comply with supervision.  And it interferes with his
3    ability to benefit from treatment.
4    Q.   And I guess I want to make sure that you state how to
5    interact -- how pedophilia and antisocial personality
6    disorder, how do they interact with one another and affect
7    his overall risk of reoffending?
8    A.   The pedophilia addresses what he is sexually
9    interested in and what he is at risk of committing.  The
10   antisocial personality disorder addresses how effective he
11   can be at controlling those urges.  To the extent that a
12   person is more severe in their antisocial personality
13   disorder, their ability to control their urges will be
14   reduced over time.
15   Q.   Have you diagnosed him with any other conditions, Dr.
16   Arnold?
17   A.   I listed, for the record, that he -- he does have a
18   history of alcohol dependence.  He has a history of
19   marijuana dependence, and he has a history of cocaine
20   abuse.  And I don't see any evidence that he has used any
21   of those substances since 1988.
22       **THE COURT:**  Did you score him on the Static-99?
23   A.   Yes.
24       **THE COURT:**  What did he score?
25   A.   He gets a score of six, which I actually found him --

1    **THE COURT:**  That's a borderline score?

2    A.   Technically a six is in the high range, but I actually

3    adjusted that score because of his current age.  And it is

4    a moderate high score.  So it's a score of five after I

5    adjusted it because of his current age.

6    **THE COURT:**  That's a moderate score?

7    A.   Moderate high.  You have moderate low and moderate

8    high.

9    **THE COURT:**  And what would a four be?

10   A.   It's also -- four and five are moderate high, and then

11   three and two are moderate low.

12   **THE COURT:**  So is there a bright line below which you

13   wouldn't find a person to have a serious difficulty?

14   A.   In general I would say the borderline range is four or

15   five.  That's fairly borderline.  And most often I would

16   find the person not to have serious difficulty below a

17   four.  And, frankly, four and five is very borderline in

18   terms of whether I'm going to see them as having serious

19   difficulty.

20   **BY MR. ROYSTER:**

21   Q.   Dr. Arnold, while we're on that topic, we're going to

22   get to the other actuarials, but while we're on that topic,

23   tell The Court why you scored the age the way that you did.

24   Because first, that's not the way you're supposed to score

25   it, is that right?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 32 of 271

1    A.   Correct.

2    Q.   How should you have scored it, and why did you do it

3    differently?

4    A.   Technically you're supposed to score the Static- 99R

5    at the time when they are released from their most recent

6    sexual crime.  Mr. Hall was actually 39 years old when he

7    was released from his most recent sexual crime.  So

8    technically he gets a score of six.  However he is

9    currently 45 and within this month he is going to be 46.

10   And I need to take his current age into consideration in

11   terms of his risk.  And by -- if he had been 40 at the time

12   he was released he would get a minus one on age.  And so I

13   went ahead and gave him that credit of having a minus one

14   on age, because I felt that was more appropriate.

15   Q.   And on that actuarial there was another topic that you

16   had a question about with respect to a prior conviction.

17   Is that accurate?

18   A.   Right.  There are items for having been convicted of

19   nonsexual assault.  On average those individuals tend to

20   reoffend more often with sexual crimes because it goes to

21   criminality.  And Mr. Hall has been arrested for assault on

22   at least three separate occasions, and he admits to these.

23   But he was actually, from what I could tell from the rap

24   sheet, was never actually "convicted" of it.  Therefore, he

25   could not get a score for that.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 33 of 271

1    Q.   With respect to the substance dependence that you

2    talked about earlier, how does that affect his overall

3    risk, if at all?

4    A.   I saw his deposition from the other day, and he

5    essentially tried to claim that because he was intoxicated

6    in 1987 is why he committed that offense.  However, his

7    other known offense he was not intoxicated at all.  So I

8    don't think it explains his sexual deviance.  But if he

9    were to be intoxicated on any substances that would

10   increase his risk.  But since he has been abstinent for

11   such a long time I don't see that as a serious risk factor,

12   and I didn't consider that when I thought about serious

13   difficulty.

14   Q.   Dr. Arnold, what is the basis for your opinion that

15   Mr. Hall's pedophilia and antisocial personality disorder

16   are serious and qualify as a serious component for the

17   disorder, illness or abnormality?

18   A.   The pedophilia gives the aim or what he is sexually

19   interested in.  The antisocial personality disorder affects

20   his ability to control that condition.  One of the other

21   scales I rated him on was the Psychopathy Checklist, which

22   was quite high for him.  What it is indicative of is if he

23   -- he knows what he should do.  Is he able to do what he

24   ought to do?  And he seems repeatedly unable to do what he

25   ought to do.  And that's both in confinement and in the

1    community.  So he was out there for about 22 months and
2    repeatedly violating the rules, repeatedly given cautions
3    and then finally when they found a bunch of pornography in
4    January of '06, among other things they went ahead and
5    revoked him for four months, put him back out.  He is out
6    for about six or seven months and then he absconds
7    supervision.  So I think his ability to comply with
8    community supervision and his ability to manage his sexual
9    urges is impaired.
10   Q.    Are there levels of severity for pedophilia?
11   A.    There can be.  It's not officially in the manual that
12   way.  But you can have an individual who notices that they
13   are sexually interested in children and in their own mind
14   they are thinking I need to be careful and so I am going to
15   avoid contact with children.  A person who is a bit more --
16   a bit more interested in chidren might seek out treatment
17   before they ever actually act upon it.  And then others may
18   repeatedly act upon it even though they have been
19   sanctioned for it.
20   Q.    What is your opinion as to the level of severity for
21   Mr. Hall?
22   A.    I think he is in the high range.  And it's because of
23   -- you know, if you have an individual who has lots of
24   access to sexual contact with women and men and if he has
25   had, say, 500 partners, you would think that his

1    masturbatory life would be mostly focused around adults.

2    But to be spending 45 percent of your time masturbating to

3    two prepubescent girls with that type of sexual history and

4    also being interested in adults, I think is a big concern.

5    And the fact that he still had pictures of children when he

6    was already certified and in the BOP is a concern.  And his

7    ongoing interest in materials like Teen Vogue, I think is a

8    real big concern.

9    Q.   You mentioned a psychopathy checklist.  Is that also

10   known as the PCL-R?

11   A.   Yes.

12   Q.   What is that?

13   A.   It's just -- of all of the inmates in prison if we say

14   60 or 70 percent meet the diagnosis for antisocial

15   personality disorder, 15 to 25 percent would meet the

16   criteria for severe range of psychopathy.  So it's just a

17   very small group of antisocials who are more severe.  And

18   people who tend to be more callous on average than the

19   average antisocial.  They tend to have less ability to

20   control their behavior, engage in planning to prevent

21   negative consequences and actually follow up on those plans

22   to prevent the negative consequences.

23   Q.   What I was getting at though is, what is the

24   psychopathy checklist?  Is that an instrument you use to

25   measure it or what?

1  A.   Yes.  It's a rating scale.  It has 20 items.  You can
2  get a score from zero to 40.  For those individuals rated
3  at 30 or above, that would be considered the severe range.
4  Twenty (20) to 30 is the moderate range.  And Mr. Hall, I
5  rated him at a score of 31.
6  Q.   Is this checklist, the PCL-R, is that something that
7  is generally relied upon by individuals in your field to
8  measure levels of psychopathy?
9  A.   It's generally relied upon, and it is considered
10  important because it has been associated with risk for
11  sexual recidivism.  And also nonsexual recidivism.
12        **THE COURT:**  Did he have a GAF test?
13  A.   No.
14  Q.   Dr. Arnold, how did you go about reaching your
15  conclusion that he would have serious difficulty refraining
16  from reoffense -- reoffending?
17  A.   Essentially, I did both a clinical analysis and then I
18  did an analysis with all the risk tools available to me
19  that have at least a moderate degree of accuracy.  And so I
20  am looking at his behavior over time clinically, and
21  looking at these scales to see if that is consistent with
22  that.  And most of the scales place him in the moderate to
23  moderate/high range.  His high score on the PCL-R is
24  concerning, because those individuals, when that is paired
25  with sexual deviance, tend to reoffend more often that

1    people that don't have that combination.

2        And then I also looked at a -- sort of a checklist

3    that's called the Sexual Violence Risk-20. So those are 20

4    items you can look at that are different from the

5    actuarials in the sense that they don't give you risk

6    estimates and they don't give you percentiles, but they

7    just say here's a list of things that should be considered

8    when you are doing a risk assessment. If you see items on

9    this list that you consider are critical, then that person

10   may be a high risk for reoffense. So, for example, I think

11   his relationship history is critical because he has failed

12   to establish and maintain a stable relationship and he has

13   a history of using relationships in order to manipulate the

14   families so he can have sexual contact with the child. I

15   think the psychopathy is a critical variable because that

16   goes to his stability. His sexual deviance is a critical

17   variable because he is sexually interested in children.

18   Q.   Why do you do all that to -- I mean you're talking

19   about actuarials and checklists. Why do you do all that

20   stuff to do your evaluation?

21   A.   Basically to be as comprehensive as I can to form a

22   well-founded opinion. These are high stakes, and it is

23   important to be as accurate as possible.

24   Q.   And I know during the Timms trial there was some

25   discussion about actuarials so I won't go into it with a

1    lot of detail on those at this point, but if you could,

2    just tell The Court how they are useful overall.  How do

3    you find them useful for your evaluation?

4    A.    Research has shown that these items are associated

5    with risk for recidivism.  When you get a final score on an

6    actuarial those people who have higher scores tend to

7    reoffend at higher rates.  So it gives you some confidence

8    in reaching the opinion if the person is a low, medium or

9    high risk.  Or if they have serious difficulty refraining

10   from sexually violent behavior in the future.

11   Q.    Are there weaknesses for the actuarials?

12   A.    Yes.

13   Q.    Tell The Court about the weaknesses for these

14   actuarials.

15   A.    Their percentile or the percents of recidivism -- for

16   example on the Static-99R the group recidivism rate that I

17   associated Mr. Hall with, about 35 percent, which are

18   convicted of a new crime after ten years.  But that can't

19   tell me precisely what Mr. Hall's risk is.  It just gives

20   me a ballpark idea of people that had a similar score, what

21   their rates were.  But then I have to look at these other

22   variables.  So we are limited in terms of our precision of

23   what we can say about an individual.

24   Q.    What actuarials did you use in evaluating Mr. Hall?

25   A.    The Static-99 Revised, the Static-2002 Revised and the

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 39 of 271

1    Minnesota Sexual Offender Screening Tool-Revised.

2    Q.    And I believe you have already testified why you use

3    those actuarials, but just, for the record, do they give

4    you a percentage of whether Mr. Hall will actually

5    reoffend?

6    A.    No.

7    Q.    Should they be used in that way?

8    A.    No.

9    Q.    And why not?

10   A.    Again, because they give you group estimates, so they

11   just -- that group of individuals reoffend at a certain

12   rate.  They don't tell you what an individual will do.

13   Q.    So if they don't do that, why bother with them?

14   A.    Because it is important to understand his relative

15   risk compared to other people, to get kind of a ballpark

16   idea of he is low, medium or high.  So it is a useful

17   instrument to triage.  Just like insurance companies would

18   identify, you know, if you happen to be a male who is 16

19   years old your rates are going to be higher than a female

20   who is 16 years old.  If you happen to have had, say, an

21   arrest for possessing alcohol, your rates are going to be

22   even higher.  If you have prior accidents, your rates are

23   even going to be higher.  So on average the best bet for

24   the insurance company is to recognize this person is a

25   relatively higher risk that groups of individuals that

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 40 of 271

1   don't have those same factors.

2   Q.   You have already testified about the Static-99R.  How

3   did you score him or rate him on the Static 2002R?

4   A.   The same scoring issue came up with age, so his actual

5   score, I believe, is seven where I gave him a score of six

6   because I gave him credit for being in his forties.

7   Q.   And where does that come out?  Is that moderate,

8   moderate/high?

9   A.   It's moderate.

10  Q.   Now, why would you use both the 99R and the 2002R?

11  Don't they kind of cancel one another out?

12  A.   Research has actually shown if you get different

13  findings on those two instruments that the group recidivism

14  rates fall in the middle.  So if one happened to be high

15  and one happened to be low, the group recidivism rate would

16  fall halfway between.  And in this case they both were very

17  consistent.  The group estimates for ten years for both of

18  them were in the thirties.

19  Q.   And what was the score on the MnSOST-R?

20  A.   I believe it was a five.

21  Q.   And where does that put him?

22  A.   That associated him with a group of individuals twenty

23  percent of whom had been arrested for reoffense

24  after six years.

25  Q.   Now, you mentioned -- I believe you mentioned that you

1    used an instrument known as the SRA-FV?

2    A.    Yes.

3    Q.    What is that and why did you use it?

4    A.    That's an instrument that helps to structure

5    psychological factors or dynamic factors that are

6    associated with risk of recidivism that aren't fully

7    accounted for within the Static-99R or other actuarials.

8    So it's additional information that should be considered

9    and it structures how you consider that extra information.

10   Q.    What are the weaknesses of this instrument?

11   A.    It only has one validation sample.  And although it

12   has several -- there are several studies that show these

13   kinds of factors predict above and beyond the actuarials,

14   how to combine the findings of this instrument with the

15   actuarials, there is only one validation sample that shows

16   that it did improve predictive accuracy.

17   Q.    What are the strengths of using this instrument?

18   A.    It helps to structure your clinical judgment.

19   Q.    Now, why did you actually use it?  Did it assist you

20   in any way with the other actuarials?

21   A.    Specifically with the Static 99, there are different

22   sample types that he can be compared to.  If you compare

23   him to the routine sample norms, the estimate for this

24   score is about eleven percent.  If you compare him to the

25   high risk estimates with the five year rate, it's around

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 42 of 271

1    twenty-five percent or so.  That's the five year, not the

2    ten year rate.  So it matters what sample type you compare

3    him to.  And so we have been instructed to select a sample

4    type based on two different issues.  One issue is how much

5    was this person preselected.  In other words before I got

6    to him, is he just the next guy who is in line at the

7    Department of Corrections that I'm evaluating as a routine

8    person, or has there been some selection before I got

9    there.  And in this case over 29,000 sex offenders in the

10   BOP were reviewed, and he is one of 124 who were certified.

11   So less than one-half, about half percent of all those who

12   were reviewed are the ones that I am actually looking at.

13   So there was a lot of selection that occurred before I saw

14   him.  So that's one reason I would say the high risk norms

15   are appropriate, because of the selection.

16        Secondly, not only should that be considered, but

17   whether or not he has current dynamic factors that are

18   associated with sexual recidivism.  Things like sexual

19   preoccupation, relationship problems or resistance to

20   rules.  Those things should be considered, because if they

21   are all absent, then maybe you should use, you know, a

22   lower norm group.

23   Q.   You indicated that you were instructed to use --

24   What did you mean by that when you say instructed?

25   A.   I'm sorry.  These are the researchers who are

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 43 of 271

1    associated with the Static-99 and the Structured Risk

2    Assessment - Forensic Version.  I actually first got

3    training on the Structured Risk Assessment back in 2000 and

4    then on the Forensic Version in 2009, but it wasn't

5    actually ready to be used until December of 2010 where they

6    did have a validation sample, and so that's when I started

7    to use it.

8    Q.   And you mentioned that you also considered clinical

9    factors.  Tell The Court about the clinical factors that

10   you considered and how it affected your analysis.

11   A.   These would be things like I know if he has

12   participated in treatment, and typically I would find that

13   that helps mitigate a person's risk.  But in Mr. Hall's

14   case, even though he has been in treatment at least three

15   or four separate times, it seems not to be making a good

16   impact on his ability to refrain from this kind of behavior

17   or be fantasizing about this kind of behavior.  Just as an

18   example, when he was depositioned last week, he was

19   initially asked if he had sexual contact with a child in

20   1999, and he said no.  And then further on during the

21   deposition when he was asked if he had fondled her he said

22   that he had fondled her on the outside and under her

23   clothing.  So he did, in fact, sexually molest her.  He's

24   even -- it's like he doesn't even understand what that

25   means when he was asked about it.  And for a person who has

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 44 of 271

1    been through this much treatment, he should at least be

2    able to answer that kind of a question very accurately.

3    Q.   On the prior assessment and treatment, is that -- is

4    that considered a protective factor?

5    A.   In general, if a person seems to have benefited from

6    treatment in such a way that they are now managing their

7    risk factors effectively.

8    Q.   What is a protective factor?

9    A.   It's something that helps to reduce a person's risk

10   for recidivism.

11   Q.   And in the course of that treatment or some of his

12   treatment -- and you've talked about this before -- the

13   relapse prevention plan.

14   A.   Yes.

15   Q.   Can you tell The Court how your review of that and

16   your other review of the records affected your evaluation,

17   if at all, with respect to this factor.

18   A.   I thought he had a good relapse prevention plan

19   written in 2002.  I thought it identified some important

20   factors that most people would want to pay attention to.

21   But his ability to carry through with that plan is poor.

22   And it has been repeatedly poor over time.

23   Q.   Other than sex offender treatment, what other clinical

24   factors did you consider?

25   A.   I considered what his plans were for the future.  And

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 45 of 271

1    I considered -- this was a really unusual case for me

2    because he is going to be on supervision for 25 years, and

3    I took that into consideration quite seriously.  Because I

4    think that on average people are less likely to offend

5    under supervision than if they are not being supervised,

6    especially for such a long period of time.  But I also had

7    to consider how is he doing under supervision.  And the

8    last two times he was out he did quite poorly.  And then

9    even now after being certified he is still engaging in

10   these high risk behaviors of the Teen Vogue magazine, the

11   pornography and things of that sort.  So as a result I

12   still think he has serious difficulty refraining, even

13   though he'll be on supervision.

14   Q.   Did you consider that -- you've testified about

15   inconsistencies in the records with respect to his prior

16   sexual history.  Did you consider those as part of your

17   analysis?

18   A.    Yeah.  I mean, not only is he sexually interested in

19   children, but he has been sexually exploitative and doesn't

20   seem to recognize that as well.  For example, like he says,

21   I never raped anybody.  But if you are blackmailing

22   somebody, that's a form of sexual coercion that he seems

23   not to recognize.  And, again, that's something that he has

24   talked about in treatment, but he doesn't seem to

25   understand it or really comprehend the seriousness of it.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 46 of 271

1    Q.   We talked earlier about whether he is exclusively

2    interested in children.  You said that he was not but yet

3    you say he is likely to reoffend.  Reconcile those two for

4    me.  How is that significant, if at all.

5    A.   If a person is diagosed with pedophilia nonexclusive

6    type, that means they are both interested in adults and

7    children, and just because they are getting plenty of sex

8    with adults doesn't mean they don't also have an enduring

9    interest in children.  And I think that is evidenced quite

10   clearly with Mr. Hall with his admission that in 2005 45

11   percent of his time, of masturbatory time, focues on

12   prepubescent children, even though that doesn't include the

13   majority of his sexual partners.

14       **MR. ROYSTER:**  Can I have just a moment, Your Honor.

15       **THE COURT:**  Yes.  (Pause)  Is that it?

16       **MR. ROYSTER:**  Yes.  Thanks, Judge.

17   Q.   Dr. Arnold, in Mr. Hall's case there appear to be two

18   victims --

19   A.   Yes.

20   Q.   -- for hands-on offenses.  But yet you say he still

21   meets the criteria.  Why do you say that with respect to

22   there being two victims.

23   A.   A couple reasons.  Having had only two detected

24   victims doesn't correspond to the amount of time that he

25   spent fantasizing about having sexual contact with

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 47 of 271

1   children. And I did notice that he was in the community

2   roughly from about 1991 to 1999 before he sexually

3   reoffended. And he didn't begin to -- at least from what

4   he tells me -- plan that new offense until about 1997, is

5   when he became sexually interested in that child.

6       So the fact that he was able to be sex offense free

7   for such a long period of time is normally an indicator

8   that the person probably won't reoffend. But for him then

9   to start to fantasize about the seven year old girl in

10  January of '98 and then keep doing that in spite of his

11  roommate telling him, you know, this is high risk for you;

12  you need to be careful of this. And then ultimately

13  sexually offending against her concerns me greatly.

14      **MR. ROYSTER:** Judge, I don't have any other questions

15  for Dr. Arnold. I would just point out for the record that

16  a copy of his report is Exhibit [2], and the addendum to

17  his report, which was information subsequent to his

18  interview, is identified as Exhibit [3].

19      **THE COURT:** Yeah, they will be received.

20      **MR. ROYSTER:** Thank you, Judge.

21      **THE COURT:** Do you want to ask him any questions?

22      **MS. LITTLE:** Yes, Your Honor.

23                    CROSS-EXAMINATION

24  **BY MS. LITTLE:**

25  Q.   Dr. Arnold, your current practice is limited to sex

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 48 of 271

1    offender assessments?

2    A.   Yes.

3    Q.   And are you under contract with the State of

4    California and the State of Washington to provide those

5    assessments?

6    A.   Yes.

7    Q.   And have you provided training and risk assessments in

8    sex offender cases to District Attorney's offices and Navy

9    counsel?

10    A.   Yes.  Well, you say Navy counsel?

11    Q.   Wasn't it Navy counsel.  Whoever in the Navy you

12    provided training.

13    A.   Oh, treatment providers.  I went to the clinic and

14    provided training on how to go about providing different

15    kinds of treatment and different kinds of risk assessment.

16    Q.   Have you ever provided any training to defense counsel

17    on risk assessment in sex offender cases?

18    A.   I haven't been asked to do that yet.

19    Q.   What is the number of individuals that are currently

20    committed or detained in the State of California under

21    their sexual violent offender laws?

22    A.   I'm pretty rough on my numbers.  I think that

23    approximately 800 have been committed, but there's probably

24    closer to 1,200 who are being detained.

25    Q.   There's about 1,200 being detained currently?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 49 of 271

1    A.    Yeah.  But I'm telling you those are very rough

2    numbers.  It's been awhile since I've had those.

3    Q.    How many have been released post commitment, if you

4    know?

5    A.    Probably in the neighborhood of a hundred, 150.

6    Q.    Now, you have testified in sex offender commitment

7    proceedings about 200 times; is that correct.

8    A.    Although it's been 200, about 200 times, it's actually

9    on 105 cases, because sometimes I've had to testify

10    repeatedly on the same case.

11    Q.    And of those times, there has only been about one or

12    two you've actually testified as a defense expert; isn't

13    that correct?

14    A.    Since 2006 it's been one or two, but since 1998 it's

15    been about ten.

16    Q.    You indicated when you were talking about Mr. Hall's

17    diagnosis that he had sexual contact with males, and you

18    indicated -- is this correct -- this was primarily when he

19    was living on the streets at the age of 16 supporting

20    himself as a prostitute.  Isn't that correct?

21    A.    In that time frame but also while he was incarcerated

22    in Maine.

23    Q.    But the bulk of his sexual contact with males was

24    during that time when he was -- as a prostitute living on

25    the street?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 50 of 271

1    A.    Yeah, I think that's probably true.

2    Q.    Now, the DSM instructs the evaluator that the

3    diagnosis don't necessarily mean anything about control or

4    lack of control to a particular individual's behavior.

5    Isn't that correct?

6    A.    That's true.

7    Q.    And you have diagnosed substance abuse in remission.

8    And you testified that substance abuse would increase his

9    risk of sexual reoffending, Mr. Hall's risk of sexual

10    reoffending.  Isn't that correct?

11    A.    Right.  But I actually didn't consider that as part of

12    my opinion in terms of serious difficulty, because I don't

13    have enough evidence that he is likely to engage in

14    substance abuse in the near future.

15    Q.    You are aware, are you not, that he has been substance

16    abuse free for about 23 years?

17    A.    Since 1988.

18    Q.    And you are aware that he, at his own volition,

19    decided to stop using both alcohol and drugs; isn't that

20    correct?

21    A.    Yes.

22    Q.    And it wasn't at the direction of the probation

23    officer.  It was he, himself, who made that determination

24    to stop using drugs and alcohol?

25    A.    It's a combination, because when he was initially

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 51 of 271

1    paroled in Maine, he was told to attend a substance abuse

2    treatment program.  So they had encouraged him to do so,

3    but he has continued to do so even when he wasn't on

4    supervision.

5    Q.   Okay.  So he has shown an ability to control at least

6    that behavior?

7    A.   Yes.

8    Q.   Now, there is no consensus in the field that

9    antisocial personality disorder has a volitional element,

10   is there?

11   A.   You would have to take it on a case by case basis, and

12   I think that's the recommendation in the field is that you

13   have to consider that individual's expression of antisocial

14   personality.  That just knowing a person has antisocial

15   personality on its own doesn't tell you about the

16   volitional control.

17   Q.   You testified that his antisocial personality

18   diminishes his ability to control his behavior and control

19   his pedophilia urges.  Isn't that correct?

20   A.   Yes.

21   Q.   But he actually controlled the risk urges while he was

22   on 29 months of supervised release.  Isn't that correct?

23   A.   He did not engage in any sexual acts with children

24   while he was on intensive supervision.  That's true.

25   Q.   But he was living in the community during that 29

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 52 of 271

1    months?

2    A.    Yeah, I would just clarify that during the bulk of

3    that period of time he was actually in a halfway house, and

4    he was highly supervised.

5    Q.    Correct.  But he was going to work, going through

6    communities, riding a bus?

7    A.    Yes.

8    Q.    Typical things where he would subject himself to the

9    community and children while he was in the halfway house on

10   supervised release.  Isn't that correct?

11   A.    Yes.

12   Q.    There are studies, are there not, that individuals

13   with antisocial personality disorder and pedophilia can

14   control themselves and not reoffend.  Isn't that correct?

15   A.    I'm not sure what study you are referring to.

16   Q.    Do you remember being asked in your deposition if

17   there was -- if somebody who was diagnosed with that dual

18   diagnosis that they could control themselves?

19   A.    Yeah, that would be an opinion.  As far as I know

20   there's -- I mean, I don't know if there is a study that

21   says that one way or the other way.

22   Q.    So that's just your opinion?

23   A.    Sure.

24   Q.    That a person with this dual diagnosis can control

25   their pedophilia urges?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 53 of 271

1    A.   Right.  You would have to consider that person in

2    their life history context.

3    Q.   And are there any studies you are aware of of the rate

4    of reoffending by individuals with this dual diagnosis?

5    A.   You know, it's indirectly, because the studies on the

6    actuarial risk scales have found that the two factors that

7    are most associated with risk for sexual recidivism are

8    sexual deviance on one hand and on the other hand

9    criminality or antisociality.  And it's those two factors

10    that when combined render a person most at risk for

11    reoffending.  So those are factor analytic studies on the

12    actuarial instruments that suggest that.

13    Q.   If somebody who is a bank robber and they also have

14    suffered from antisocial personality disorder, they would

15    have a greater likelihood of robbing a bank again.  Is that

16    true?

17    A.   Sure.  I don't know if they are turned on to bank

18    robbing though.  It's a little bit different.

19    Q.   Now you used three actuarial instruments to aid in

20    your assessment.  There was the Static-99R, the 2002R, and

21    the Minnesota Test (MnSOST-R).  These tests have only

22    moderate predictive accuracy in terms of predicting sexual

23    recidivism.  Isn't that correct?

24    A.   Yes.

25    Q.   And you scored the 99R at moderate high and the 2002R

1    at moderate risk.  Mr. Hall was seen as moderate high risk

2    and moderate risk on the 2002R.  Were you -- did you

3    compare him to only a high risk sample on those when you

4    were considering?

5    A.    I first considered what sample is most accurate to

6    represent his risk.  And then in my report I only listed

7    the results of the high risk sample, that's true.

8    Q.    Do you typically only use the high risk sample when

9    you are evaluating someone?

10   A.    No.  I have used all -- I have used the routine

11   sample.  I have used the preselected for treatment sample.

12   And I have used the non -- there's one that's called

13   nonroutine, which combines those who are high risk in

14   treatment and then there's the high risk/high need group.

15   And so I have used all four.  And it is depending upon the

16   level of preselection and the degree to which the person is

17   showing these dynamic risk factors associated with risk for

18   recidivism.

19   Q.    The high risk sample, the majority of those

20   individuals that make up that sample group, they didn't

21   have time in the community, did they -- without a sexual

22   reoffense.

23   A.    I would imagine that -- in other words at any given

24   time a person could come in and out -- let me think that

25   through for just a minute.

1       Do you mean post index sexual offense.  Is that what
2   you're saying?
3   Q.   Yes.
4   A.   That would probably be true.
5   Q.   And what about preindex?  I'm sorry.  Withdraw that
6   question.
7   A.   Okay.
8   Q.   And what about in that high risk group, did that
9   sample also include people that had 25 years of supervised
10  release?
11  A.   No, not that I'm aware of.
12  Q.   You scored the MnSOST-R as a moderate risk.  The score
13  was a four (4), isn't that correct?
14  A.   Yes.
15  Q.   And anything less than a four (4) is low risk?
16  A.   That's true.
17  Q.   You indicated on Direct Exam that four (4) to five (5)
18  is a borderline score on the Static-99 and that typically
19  people under four (4) you may not find meet the criteria
20  for commitment.  Isn't that correct?
21  A.   Yes.  It's highly unusual if I find somebody in that
22  score range to meet the criteria for commitment.
23  Q.   These actuarial scores do not predict whether Mr. Hall
24  will recidivate?
25  A.   Correct.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 56 of 271

1    Q.   They only predict within a group that's like him,

2    what's the percentage of recidivism rate?

3    A.   Right.

4    Q.   And, again, that group -- are you aware if that group

5    includes people that have had time in the community post

6    their index offense?

7    A.   If at all, in limited number of cases.  I don't think

8    that -- not that I'm aware of.

9    Q.   Now, when you had your scores -- and I want to direct

10    your attention to your report.  That would be tab number 2.

11    A.   Okay.

12    Q.   Would you turn to tab number 2?

13    A.   Yes.

14    Q.   And on page 10, which the Bates stamp number on there

15    is 2209.

16    A.   I'm there.

17    Q.   All right.  You list -- in there you've got a table

18    that shows your Static 99R, your Static 2002R and your

19    MnSOST-R.  And then -- and so you've got your scores in one

20    column, risk category and then you've percentile rank.

21    A.   Yes.

22    Q.   So, for instance, on the Static 99R you list a

23    percentile rank of 90 percentile.

24    A.   Right.

25    Q.   That ranking does not predict risk of reoffending,

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 57 of 271

1  does it?

2  A.   It does not.  That's just a relative index of compared

3  to other sexual offenders how often do people get a score

4  this high.  And so it does not at all talk about his risk

5  for sexual recidivism.  It only talks about his score in

6  comparison to other sexual offenders.

7  Q.   So in other words on the Static 99R 90 percent of the

8  individuals like Mr. -- 90 percent of the individuals

9  scored the same score as Mr. Hall?

10  A.   Well, put differently -- no, that's not quite

11  accurate.  It's ten percent of the individuals got a score

12  higher, and 90 percent got a score of five or below.

13  Q.   But this score doesn't relate to his risk of

14  reoffending?

15  A.   It does not.  In fact, I mentioned that in the text

16  above that to try to make that clear, that it doesn't

17  indicate whether or not he is at risk.

18  Q.   So it's really not essential in terms of this table?

19  A.   Well, it's actually important I think in comparing the

20  instruments.  For example, knowing that he is at the 90th

21  percentile for the Static 99R and at the 87th percentile

22  for the Static 2002R kind of gives you an idea of how

23  consistent are these instruments in looking at his -- you

24  know, how they index his overall scores or his overall

25  risk.  How consistent are they?  And then you will notice

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 58 of 271

1    the MnSOST-R, 63rd.  So, you know, that would give me some
2    caution, generally, because I would want to consider --
3    that looks like that is a bit lower and I wonder why.  And
4    I would, in my own mind, have to reconcile some of those
5    differences.
6    Q.   It could be just -- the differences could be based
7    just on the test, the Static 99R and the 2002R were
8    developed by the same people.  Isn't that correct?
9    A.   Yes, they are.  They do have different items though.
10   Q.   I'm sorry?
11   A.   They have some different items.
12   Q.   So the actuarial instruments used in these evaluations
13   do not assess dangerousness of an individual?
14   A.   They help anchor a risk assessment.  They help give
15   you -- because in any kinds of testing we do, whether it's
16   intellectual testing or achievement testing, you kind of
17   want to get an idea of how is this guy compared to the
18   general population or the general group of people we are
19   interested in.  You want to have that general idea.  And so
20   it is useful in that regard.
21   Q.   But it's just a general idea; it doesn't tell you
22   specifically he will be dangerous or that he will reoffend?
23   A.   No.  That's my opinion based on the clinical
24   assessment of the case.
25   Q.   Now, one of the criticisms of these actuarial tests is

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 59 of 271

1  that there is no differentiation between types of sex

2  offenders like pedophiles, rapists.  Isn't that correct?

3  A.   Yes.

4  Q.   And, again, the actuarial instruments do not take into

5  account supervision.  Is that correct?

6  A.   Yes, that's correct.

7  Q.   Or prior time in the community, they don't take that

8  into account either, without any reoffense?

9  A.   Actually, the Static 2002R does have an item on there

10 where it considers how well the person did in the community

11 prior to their release.  And in this case Mr. Hall was

12 given the benefit of a zero on that item.  And so that is

13 something that is taken into consideration in the Static

14 2002R.

15 Q.   And that's because he did not have a sexual reoffense

16 during that time.

17 A.   Right.  From being released in '91 until his arrest in

18 January of '99, he wasn't arrested.

19 Q.   Now, you said you also looked or used the Psychopathy

20 Checklist-Revised.  That is not a risk assessment

21 instrument, is it?

22 A.   The findings on the scale are used as -- higher scores

23 on that instrument are associated with increased risk.

24 Q.   But it doesn't give you a risk assessment?

25 A.   It doesn't give you a percentile or a percentage of

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 60 of 271

1    offenders who reoffend, but certainly it's that kind of

2    thing.  It does not.

3    Q.   And the Psychopathy Checklist is really an instrument

4    used to evaluate a psychopath, correct?

5    A.   I wouldn't necessarily say a psychopath.  It just

6    gives you an idea -- in my mind it helps me determine how

7    severe somebody's antisocial personality is.  And when they

8    are high on the psychopathy checklist I would say their

9    antisocial personality tends to be more severe.

10   Q.   Now, in your original report dated March 14, you used

11   the SRA - Forensic Version.  And it appears you used that

12   to validate your decision to place him in the high risk

13   need sample group in the Static test.  Is that why you used

14   it?

15   A.   I used it to structure my judgment about these kinds

16   of items like sexual preoccupation, relationship skills and

17   supervision.  And that in turn, that finding, does help to

18   support which sample type to use.  Because there is one

19   study that does show that it differentiates even with a

20   high risk sample that when they have low scores even with a

21   high Static 99 they reoffend at the rates that are more

22   consistent with the routine sample.  And when they have

23   high scores as a group they reoffend at rates that are more

24   consistent with the preselected high risk sample.  So it

25   does help to support that opinion.

1    Q.   But that's reoffending in a general term.  It doesn't

2    distinguish reoffending for sex offenders though?

3    A.   No, that's for sex offending.  In fact, not only is it

4    sex offending, but it restricted that sample to hands-on

5    sexual offending.  So they did not have any non hands-off

6    sexual offending in that sample.  So that is actually a

7    benefit of that instrument.

8    Q.   But the SRA-Forensic Version had only one validation

9    study done.

10   A.   That's true.

11   Q.   And that SRA-Forensic Version was developed from the

12   Bridgewater sample of sex offenders that were incarcerated

13   from 1959 to 1984.  Isn't that correct?

14   A.   Yes.

15   Q.   And that was in Bridgewater, Massachusetts?

16   A.   Yes.

17   Q.   And those were the only people that were used in that

18   study for the basis of that study.  Isn't that correct?

19   A.   Yes.

20   Q.   And, again, are you aware during -- that group of men

21   that were in that study, did they have any time in the

22   community without sexual reoffense?

23   A.   Not prior to their index offense, as far as I know.

24   Q.   And did any of those individuals in that group from

25   1959 to 1984 have 25 years of supervision if they were

1    released?

2    A.    I would think not.

3    Q.    And that study, that SRA-Forensic Version has not been

4    published for peer review; is that correct?

5    A.    It hasn't been published yet.  It has been presented

6    at multiple conferences.

7    Q.    Now, you said that in addition to these instruments

8    you also looked at some clinical factors.  And you stated

9    on Direct Exam you considered his prior sex offense

10   treatement did not project his behavior.  But, in fact, he

11   was on supervised release for almost 29 months without any

12   new sex offense.  Isn't that correct?

13   A.    I don't think that's an accurate characterization of

14   how he did on supervised release.  I mean, he was out 22

15   months and he was revoked, out for four months and then he

16   was out again.  But he had multiple parole violations in

17   that context, including sexual parole violations and then

18   ultimately absconded supervision altogether.  So just

19   because he was in the community for a period of time -- I

20   mean, actually he did worse this time than he did when he

21   was released back in 1991 where he didn't even have one

22   revocation.

23   Q.    But he had no hands on sex offenses with children

24   during that 29 months; isn't that correct?

25   A.    That's true.

1  Q.   And his last hands-on sex offense with a minor was

2  back in 1999, isn't that correct?

3  A.   Yes.

4  Q.   Now you testified on Direct you thought Mr. Hall had a

5  good release plan -- the RPP you referred to it -- when he

6  was discharged from the Bureau of Prisons.

7  A.   I thought it addressed the issues that most commonly

8  need to be addressed relative to risk factors that a person

9  wants to manage.

10      **MS. LITTLE:**  Court's indulgence.

11 Q.   If you would turn to the next report, which is tab 4.

12 A.   Actually, is it tab 3?

13 Q.   Yes, I apologize; it's tab 3.

14      And, for the record, that is tab 3 in the exhibit

15 book, and the beginning Bates stamp number is 2574.

16      In this report you had the opportunity to interview

17 Mr. Hall before you authored it and you also used another

18 instrument, the SRV-20 in forming the basis of your

19 opinion, isn't that correct?

20 A.   Yes.  It's the SVR-20.

21 Q.   I'm sorry?

22 A.   It's the SVR-20, not SRV.

23 Q.   I apologize.

24 A.   I know, all these acronyms.

25 Q.   And the SVR-20 does not predict rate of recidivism,

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO  Document 74  Filed 06/30/11  Page 64 of 271

1    does it?

2    A.    It doesn't give you percentage rates, but it has been

3    shown to be equally predictive of sexual offender

4    recidivism in the studies that have been done, meaning that

5    if a person was rated low, medium or high, that did predict

6    future recidivism in that those rated in the high range

7    reoffended at higher rates than those who rate in the low

8    range.

9    Q.    And there are some limitations on this instrument, the

10   SVR-20, such as factors that are included in it that have

11   been shown to not relate to risk of reoffending by sex

12   offenders.  Isn't that correct?

13   A.    Right.  One of those would be child sexual abuse.  And

14   I actually asked the author about that because of my own

15   concerns of including those kinds of risk factors that

16   haven't statistically been associated with risk for sexual

17   recidivism.  And his response was that it is included

18   because for some individuals it is an important factor.

19   For example, if a person was repeatedly sexually abused,

20   that could be the very factor that motivates them to commit

21   crimes in the future.  So it's still a consideration even

22   though it wasn't a statistically significant factor in the

23   1996 meta-analysis.

24   Q.    Well, one of the other factors we list in here is

25   denial.  But denial has been shown that there is no

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 65 of 271

1    correlation with recidivism.  Isn't that correct?

2    A.    I'm not sure denial is actually in there.

3    Q.    Well, if you look at the top of page 16 of your

4    report, Extreme minimization/denial.  And you gave him a

5    yes on that.

6    A.    Yeah, I mean that would be a clinical factor that is

7    important for consideration, because to the extent that --

8    you know, for example, with Mr. Hall he did sexually

9    exploit two women while he was in prison, and he doesn't

10   see that as sexual exploitation.  I think that's important.

11   He did molest a child back in '99 but when asked directly

12   about it he says he didn't, but when asked about did you

13   touch her, you know, vaginal area or on her legs, then he

14   admits that he did that.  I think he needs to have a better

15   understanding of what sexual molestation is and what kinds

16   of things he needs to avoid.  So in that extent, it is

17   clinically relevant.

18   Q.    He did plead guilty to both of the sex offenses, is

19   that correct?

20   A.    He did.  Actually, but he didn't admit to molesting

21   the child.  He did not plead guilty to sexual molestation.

22   Q.    But he pled guilty to a misdemeanor sex offense?

23   A.    Correct.

24   Q.    And in his RPP he admitted to those particular

25   offenses.  Isn't that correct?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 66 of 271

1   A.   Although he did, when I talked with him he denied

2   having touched the children and then last week he admitted

3   again that he did touch the child.  So he is very

4   inconsistent on that, surprisingly so.  I think that's

5   surprising.

6   Q.   But in his test it says, Extreme minimization/denial

7   and you gave him a yes on that?

8   A.   Right.

9   Q.   And substance abuse as well, again, there is a

10  history, according to Mr. Hall is that he has been

11  free of substance abuse, has not abused substances for 23

12  years.

13  A.   Although I put a yes to that, I think you will notice

14  that next to it is a minus.  And what that means -- you

15  have to rate the item for what it is.  So if he does have a

16  history of substance abuse you have to, you know, it's

17  either true or it's not true or there is mixed information.

18  So he gets a yes because it's true.  He gets a minus next

19  to it because it hasn't been a recent problem.

20  Q.   And, in fact, wouldn't that be one of those factors

21  that his ability to control the substance abuse, wouldn't

22  that be something that would be more positive?

23  A.   Yes, I think it's positive.  But the reality of the

24  scale, it's either there or it's not, so he gets a yes, but

25  you give him the benefit of putting a minus next to it

1  saying it's not a recent problem.

2  Q.   And the SVR-20, again, does not take into account

3  individuals that have been in the community without a

4  hands-on offense for a period of 29 months, correct?

5  A.   True.

6  Q.   And it also does not take into consideration

7  individuals that have got 25 years of supervision at their

8  release?

9  A.   That's true.

10      **THE COURT:**  All right.  We will take our recess and

11  return at two o'clock.

12          (Lunch recess)

13      **THE COURT:**  Do you have any other questions?

14      **MS. LITTLE:**  A few more, Your Honor.

15      **THE COURT:**  Go ahead.

16  Q.   Mr. Hall spent 19 months in the Bureau of Prisons SOTP

17  program, isn't that correct?

18  A.   Yes.

19  Q.   And are you familiar with the treatment program in the

20  BOP SOTP program?

21  A.   Only in general terms from what I've read in the

22  materials I have reviewed.

23  Q.   So you don't know if, in fact, in that SOTP program

24  that people are encouraged to participate, do you?

25  A.   If they are encouraged to participate?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO  Document 74  Filed 06/30/11  Page 68 of 271

1    Q.   Correct.

2    A.   It's my understanding they are.

3    Q.   But you don't have any firsthand knowledge of that,

4    correct?

5    A.   That's correct.

6    Q.   And do you have any firsthand knowledge if in that

7    program that the participants are required to tell the

8    truth and be honest?

9    A.   Although I don't know about that program specifically,

10   in general that is something that is obviously desirable.

11   Q.   I'm asking you about that program.

12   A.   No.

13   Q.   Do you have any firsthand knowledge of that program,

14   the BOP SOTP program, that participants are encouraged to

15   take responsibility for their actions?

16   A.   Nothing beyond what I've already -- not specifically.

17   Q.   You testified on Direct that there were ranges of

18   pedophilia and that Mr. Hall would be placed in the high

19   range, isn't that correct?

20   A.   Yeah, I guess I would call that in terms of severity

21   like mild, moderate or severe.

22   Q.   All right.  And is there any empirical data or studies

23   that suggest there are degrees of pedophilia?

24   A.   Well, within the diagnostic issue itself, you can have

25   exclusive and nonexclusive, and that's one way to look at

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 69 of 271

1  severity.  But in terms of what I said, that's just my
2  opinion based on experience.
3  Q.   So there are no studies to back up your opinion, isn't
4  that correct?
5  A.   Except for what I just mentioned about exclusive
6  versus nonexclusive.
7  Q.   And if Mr. Hall is considered -- you consider him a
8  severe pedophile, wouldn't you assume that he would offend
9  when he was released and could offend.
10  A.   It increases the chance he would.
11  Q.   None of the actuarial scores that you calculated for
12  Mr. Hall were higher than 36 percent for a ten year period,
13  were they?
14  A.   Thirty-six percent as a group were charged or
15  convicted after a ten year period; that's right.
16  Q.   And that's the highest score you found, was the 36
17  percent?
18  A.   That's right.
19  Q.   And his plans for the future, is that related to his
20  current mental disorder?
21  A.   To some extent, yes.  Relative to the diagnosis of
22  antisocial personality and his ability to comply with
23  supervision.
24  Q.   You stated that you took into account his 25 years of
25  supervised release in rendering your opinion.  Did you

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 70 of 271

1    review the specific conditions of his supervised release,

2    that 25 year period?

3    A.   I believe I did.  I looked at the judgment, and I

4    think the conditions were listed behind that, from the

5    judgment from 2008.

6    Q.   And those conditions of supervised release are fairly

7    onerous, wouldn't you agree?

8    A.   Yes.  They are, I believe very similar, if not the

9    same, to the conditions he had when he was last in the

10   community.

11   Q.   Did you know that for a fact?

12   A.   No, I can't say that for a fact.  That's my

13   impression.

14   Q.   And isn't it correct that close supervision generally

15   reduces recidivism?

16   A.   I don't think that's been -- well, that's actually an

17   issue of debate in the literature.  In my personal opinion,

18   I believe it does.

19   Q.   You believe it does?  Close supervision does reduce

20   recidivism?

21   A.   Yes.

22   Q.   That's your belief?

23   A.   Yes.

24        **MS. LITTLE:**  Your Honor, I have no further questions.

25        **THE COURT:**  Any redirect?

1      **MR. ROYSTER:**  Just briefly, Your Honor.

2                        REDIRECT EXAMINATION

3      **BY MR. ROYSTER:**

4      Q.   Dr. Arnold, you testified on cross that Mr. Hall had

5      not been -- that there was no hands-on sexual offense

6      during the time he was in the community the last pardon; is

7      that right?

8      A.   Yes.

9      Q.   But you don't actually know if he committed a sex

10     offense against a child, do you?

11     A.   I don't.

12     Q.   You are just saying that he wasn't convicted or

13     arrested?

14     A.   He wasn't attempting in any way that I am aware of.

15     Q.   But there was evidence from the polygraph that he

16     failed that he had touched the sexual organs of a child, is

17     that correct, while on supervision?

18     A.   Yes.

19     Q.   And you indicated -- well, first of all how long, if

20     you know, was he in the community beforehand, before he

21     committed the sex offense, between the 1989 conviction and

22     the 1999 conviction?  How long was he in the community?

23     A.   About seven years.

24     Q.   And with respect to the Release Prevention Plan, did

25     he follow that Release Prevention Plan?

1    A.    No.

2          **MR. ROYSTER:**  No other questions; thank you.

3          **THE COURT:**  All right.  Thank you.  Thank you, Doctor.

4

5    A.    Thank you.

6          **THE COURT:**  Mr. James.

7          **MR. JAMES:**  Thank you, Judge.

8                Your Honor, at this time the United States calls

9    Dr. Mary Lela Demby.

10         **MR. ROYSTER:**  Judge, while she is coming to the stand,

11   if I could just during this time move into evidence all the

12   exhibits that we talked about.

13         **THE COURT:**  They're received.

14         **MR. ROYSTER:**  Thank you, Judge.

15         **DR. LELA DEMBY, GOVERNMENT'S WITNESS, SWORN**

16         **THE COURT:**  Good afternoon.

17         **MS. DEMBY:**  Good afternoon, Your Honor.

18         **THE COURT:**  With this witness you can go ahead and do

19   the preliminaries, and I will accept her credentials.

20         **MR. JAMES:**  Thank you, Judge.

21                      <u>DIRECT EXAMINATION</u>

22   **BY MR. JAMES:**

23   Q.    Dr. Demby, your full name is Mary Lela Demby; is that

24   correct?

25   A.    Yes, sir.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 73 of 271

1    Q.    And what is your profession?

2    A.    I'm a clinical psychologist currently employed as a

3    sex offender forensic psychologist.

4    Q.    What is your educational background?

5    A.    I received my Bachelor's in Sociology, Princeton

6    University, in 1988.  And I received my Doctoral Degree in

7    Psychology at the University of North Carolina, Chapel Hill

8    in 2001.

9    Q.    Are you a licensed psychologist?

10   A.    I am.

11   Q.    In which state?

12   A.    North Carolina.

13   Q.    And when were you licensed?

14   A.    2003.

15   Q.    In what area of psychology do you specialize?

16   A.    Forensic psychology, in particular the evaluation and

17   assessment of sex offenders.

18   Q.    And since when have you been doing that?

19   A.    I'm sorry?

20   Q.    Since when have you been doing that?

21   A.    I've been doing that since 2006.

22   Q.    And are you a member of any professional associations?

23   A.    I am.  I am a member of the Association for the

24   Treatment of Sexual Abusers, also known as ATSA.  And I'm a

25   member of Division 41 of the American Psychological

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 74 of 271

1    Association, also known as the -- I'm sorry -- American

2    Psychology-Law Society.

3    Q.   Is Exhibit [4] a copy of your curriculum vitae setting

4    forth your training and education?

5    A.   Yes, it is.

6        **MR. JAMES:**  Your Honor, we would ask that Dr. Demby be

7    recognized as an expert in the field of forensic

8    psychology.

9        **THE COURT:**  I recognize Dr. Demby as being an expert

10   forensic psychologist and qualified to express her opinions

11   in this case.

12       **MR. JAMES:**  Thank you, Your Honor.

13   Q.   Dr. Demby, you've been working at FCI Butner as a sex

14   offender treatment psychologist, is that correct?

15   A.   I was working in that position from 2003 to 2006.

16   Q.   And then in 2006 is that when you joined the

17   Department of Health and Human Services?

18   A.   I joined the Department of Health and Human Services

19   in 2009.

20   Q.   I'm sorry.  In 2006 what did you begin doing?

21   A.   I became a sex offender forensic psychologist.

22   Q.   Okay.  And then in 2009 you began working with the

23   Department of Health and Human Services as a Lieutenant

24   Commander?

25   A.   Yes.  I was commissioned into the U.S. Public Health

1    Service.

2    Q.    And you went back to working at Butner right after

3    that; is that correct?

4    A.    Yes.  The very next day.  Essentially I just converted

5    from civil service to uniform service.

6    Q.    Now, have you previously conducted sex offender

7    forensic psychological examinations?

8    A.    Yes.

9    Q.    Approximately how many?

10   A.    With regard to the Adam Walsh Law?

11   Q.    Yes, that's correct.

12   A.    Approximately 970.

13   Q.    And of the 970 how many were weeded out, in other

14   words they were released, no longer in the Adam Walsh

15   program.

16   A.    Maybe between 920 and 940.  There are about 20 that I

17   can't track, but certified individuals, those were 30.

18   Q.    Now are those 30 in the Maryland Unit?

19   A.    Yes, they are.

20   Q.    And, for the record, what is the Maryland Unit?

21   A.    The Maryland Unit is known as the commitment and

22   treatment program.  It is a single housing unit at the

23   Federal Correctional Institution in Butner, Butner, North

24   Carolina that houses individuals who are certified and

25   awaiting commitment proceedings or who have been civilly

1    committed to treatment by a Federal Court.

2    Q.   And of those numbers on how many have you performed a

3    full indepth forensic evaluation?

4    A.   Of the number in the CCT currently?

5    Q.   That's correct.

6    A.   Twenty-five (25).

7    Q.   Now, you have previously testified as an expert in at

8    least two different Federal Courts, is that correct?

9    A.   Yes.

10   Q.   Now, were you tasked with evaluating the Respondent,

11   Clyde Hall?

12   A.   I was.

13   Q.   Was that to determine whether he met the criteria

14   under the Adam Walsh Act or 18 U.S.C. 4248?

15   A.   Yes.

16   Q.   And what were the specific issues you were tasked to

17   examine?

18   A.   I was asked to determine if he had engaged in sexually

19   violent conduct or child molestation, to determine if he

20   suffered from a serious mental disorder as a result of

21   which he would have serious difficulty refraining from

22   sexually violent conduct or child molestation.

23   Q.   Now, let's preview your findings for The Court as to

24   those issues.  The first issue, did you find whether or not

25   he had, in fact, engaged in that conduct?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 77 of 271

1    A.    I did.

2    Q.    And as the second issue, did you, in fact, determine

3    whether or not he had in fact -- currently suffering from a

4    serious mental disorder, abnormality or illness?

5    A.    I did.  I determined that he suffered from several

6    mental disorders.

7    Q.    And as a third question, and as a result of those

8    disorders, did you, in fact, determine whether he would

9    have serious difficulty in refraining from sexually violent

10   conduct or child molestation?

11   A.    I did.  It was my opinion he would have serious

12   difficulty.

13   Q.    And did you, in fact, prepare a report?

14   A.    I did.

15   Q.    And Exhibit Number [5], is that, in fact, your report

16   or your findings?

17   A.    Yes.

18   Q.    Now, with regard to issue number one, how did you

19   determine issue number one.

20   A.    Review of the official records and --

21        **MR. CRAVEN:**  Your Honor, objection.

22        **THE COURT:**  Overruled.

23        **MR. CRAVEN:**  We have stipulated to the existence of

24   the previous conviction.

25        **THE COURT:**  Okay.  Overruled.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO  Document 74  Filed 06/30/11  Page 78 of 271

1    A.    I reviewed the official records, which included

2    indictments and judgments and commitment orders, prior

3    treatment records where admissions were made and further

4    details were provided.  And I had an interview with Mr.

5    Hall back in 2008, and we discussed some of those offenses

6    as well.

7    Q.    All right.  With regard to your interview with Mr.

8    Hall, tell The Court what happened in the course of that

9    interview.

10   A.    We had -- typically what happens when I notify

11   individuals that they are being reviewed for initial

12   certification or initial evaluation under the Adam Walsh

13   Law, we have a Notice of Evaluation, and everyone that is

14   referred to a forensic -- sex offender forensic

15   psychologist at Butner gets an appointment.  We usually do

16   those in a group, so I'll put five or six inmates at a time

17   on an appointment slot.  And I go over the notice with them

18   word for word and they can elect to sign or decline.  I

19   tell them it's not an admission of guilt, but in that form

20   it spells out that you will be reviewed, that the

21   information may or may not lead to certification under the

22   Adam Walsh Law.  The evaluation could entail interviews,

23   testing, looking at past records.  And you have the right

24   to participate in an interview.  I tell them if there is

25   something that you feel is not accurately reflected in the

1  records, then this is your chance to let me know.  However,

2  everything that you tell me will go in my report, and it

3  will be written, and it will be sent to our certification

4  panel in D.C. who will make the ultimate decision whether

5  or not to certify you and keep you past your release date.

6  I went through this information with Mr. Hall, and he

7  elected to participate in an interview, and we had that

8  interview.  At the end of that he declined a second

9  interview.

10  Q.  What was the date of that interview, do you recall?

11  A.  April 19th or 13th.

12  Q.  Isn't in fact the date of the actual interview is

13  April 14?

14  A.  That sounds accurate.

15  Q.  April 14, 2009?

16  A.  Yes.  It's on my handwritten interview notes I've

17  taken.

18  Q.  Okay.  Now, tell The Court, what did he say to you in

19  the course of that interview?

20  A.  May I refer to my notes?

21  Q.  Yes.

22  A.  I'm not sure what exhibit it is.

23  Q.  Sure.  I'll tell you.  Your notes are Exhibit Number

24  [70].

25  A.  Okay.  I began asking Mr. Hall, noting that he had

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO  Document 74  Filed 06/30/11  Page 80 of 271

1     been in treatment several times and so we reviewed his

2     three periods of sex offender treatment. And he described

3     his first period of sex offender treatment with Dr. Russell

4     Mote. He gave me those dates, May 1989 to November 1st, so

5     he was -- again, while he was incarcerated most of the

6     year. He went until he obtained work release six months

7     before, and again he saw Dr. Mote for about a year from

8     1992 to 1993 when he switched to Dr. Brennan. He explained

9     that Dr. Mote stopped treating him because of Dr. Mote's

10     medical issues. And he had about a ten month break until

11     Dr. Brennan picked up his services from 1994 until August

12     of 1995. He said that he stopped treatment because his

13     probation had run out and he couldn't afford to continue

14     the sex offender treatment. Then he entered SOTP, sex

15     offender treatment program, whie incarcerated at FCI-

16     Butner, signed in for that program from April of 2001, and

17     he finished that program in November 2002. In June 2004 he

18     was on supervised release and had treatment with a Nancy

19     Linquist in Elizabethtown, New York. And he ended that

20     treatment in March 2005 when his probation officer moved

21     him from Westport, New York to Albany, New York. So after

22     11 months he had no job and the area was only 18 miles from

23     his crime scene. He was volunteering and doing landscaping

24     at the hotel he was living in in Westport. He put in for a

25     district change to Akron, Ohio where his mother lived, but

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 81 of 271

1    that fell through.  So he next entered treatment in June of

2    2005 with Dr. Hamill in Albany, New York.  He said Dr.

3    Hamill did an evaluation, and he was with him until

4    February 2006.  He said there was a lull in treatment

5    because he was violated in February of 2006 for four months

6    referring to his return to prison.  He was released in June

7    of 2006 and a Bates stamp has obscured some of my

8    handwriting, but I believe that says he started treatment

9    again with Dr. Hamill, again in August of 2006.  So he has

10   resumed treatment again.  It went until January 2007 when

11   he decided to abscond from probation.  He was gone for

12   three weeks and headed to New Orleans, Louisiana for work.

13   And after they caught him he was in the Albany County Jail

14   for 15 months, from March 2007 to April 2008.  He was

15   sentenced to 32 months and then to FCI Petersburg for 10

16   months before he came to Butner.

17   Q.   Did he ever explain to you while he felt he could

18   abscond, he could just leave The Court's jurisdiction?

19   A.   That was not discussed in our interview, but I've read

20   other reports of interviews where he did offer an

21   explanation.

22   Q.   Now, during the course of that interview that you went

23   through with him you asked him about information in his

24   PSR, is that correct?

25   A.   Yes.

1  Q.   Now, according to the last paragraph on that page he

2  mentioned that he was attracted to girls?

3  A.   Yes.

4  Q.   And what age did he reference?

5  A.   He said, my attraction to girl, yes, that is true.

6  And I'm highly attracted to women.  When I was looking at

7  child pornography it was girls 12 to 13 years old up to

8  adults.  So I asked him what about prepubescent girls, and

9  he said those were mixed in with the stuff I printed but

10  didn't get to look at.

11  Q.   All right.  And with regard to his use of

12  manipulation, turn to the next page.  Did he explain to you

13  how he manipulated a female corrections officer?

14  A.   Well, I asked him about the portrayal of some of his

15  sexual behavior as rape of adult women.  It was noted he

16  had supposedly raped two women.  And he said he had written

17  a Relapse Prevention Plan for the SOTP, was given to Dr.

18  Hamill the way he wrote it up.  And when in prison the

19  first time there were two females.  One was a correctional

20  officer, the other was an inmate.  He walked into a staff

21  bathroom and these two women were engaged in sexual

22  activity, specifcally the female inmate was giving oral sex

23  to the female correctional officer.  They stopped, got

24  dressed and the correctional officer told him -- said gave

25  me fair warning that if I told she could make it hard on

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 83 of 271

1  me.  So I learned how to manipulate and do the same to her,

2  make it hard for her, so I got to be a part of that

3  situation for nine to ten months.  The CO -- correctional

4  officer, excuse me -- let me and the female inmate get it

5  on in the staff bathroom.  So I then asked him did he have

6  sex with the correctional officer, and he said yes.

7  Another female looked out because she had a job in that

8  area and Mr. Hall and the female were both orderlies,

9  inmate orderlies.

10     So I asked what stopped it, and he said he went on

11  work release program.  After his release he found out where

12  the correctional officer hung out.  He started going there

13  and they resumed sexual relations for about a year until

14  she moved.  So I explained to him the RPP.

15  Q.  What is the RPP?

16  A.  Relapse Prevention Plan.  How I manipulated the

17  situation by threatening to tell her boss to meet my sexual

18  needs and get what I wanted.  This is what they meant by

19  forcible rapes.

20  Q.  All right.  Now, did you have a second interview with

21  him?

22  A.  I did not.

23  Q.  And do you know why not?

24  A.  Mr. Hall declined the second interview.

25  Q.  Now with regards to the second issue before The Court,

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 84 of 271

1    does Mr. Hall currently suffer from a serious mental
2    illness, abnormality or disorder, you have stated that you
3    have found he does.  Tell The Court, what were those
4    findings and how did you reach those findings?
5    A.    Well, I found that -- I diagnosed Mr. Hall with
6    pedophilia, sexually attracted to females, nonexclusive
7    type, for very similar reasons to what has been testified
8    to earlier.  I also diagnosed him with alcohol dependence,
9    cannabis dependence and cocaine abuse.  At the time of my
10   report, I specified those as in a controlled environment.
11   Q.    What does that mean.
12   A.    It means that the person has not -- has been kept in a
13   restricted, highly structured environment where the
14   substances were not available and thus they had not had a
15   chance to remain sober in an unstructured, unsupervised
16   environment.  That's the information I had at that time.
17   Subsequent to some of the testimony I have heard this
18   morning, I would consider changing those to in remission.
19   But that would not alter my ultimate opinion in any way.
20   It's more a degree of intensity.
21   Q.    Now, with respect to --
22   A.    Oh, I'm sorry.  And I also diagnosed him with
23   antisocial personality disorder.
24   Q.    What was your basis for that diagnosis -- impression?
25   A.    The basis would be -- a personality disorder is a

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 85 of 271

1    chronic longstanding pattern of interacting with one's
2    environment that causes serious impairment or difficulty in
3    one or more important spheres: occupational, relationship,
4    legal.  And Mr. Hall has a decades long pattern of
5    violating the rights of others and violating social norms
6    to the point that it causes serious difficulty for himself,
7    as in legal sanctions and loss of work and loss of
8    relationships.
9    Q.   Now, I know that you have testified that with regards
10   to your findings your impression, number one, pedophilia,
11   but, just for the record, what is pedophilia?
12   A.   Pedophilia is a recurrent intense pattern of sexual
13   attraction towards prepubescent children that either the
14   person has acted on or they have recurring urges, fantasies
15   or thoughts about it.
16   Q.   And why did you find that Mr. Hall suffers from
17   pedophilia?
18   A.   Well, he has multiple convictions for hands-on
19   offenses of young children.  And while awaiting his
20   proceedings after his post certification he continued to
21   collect child erotica, and he was found to be in possession
22   of drawings of nude children, which is a very significant
23   indicator that he continues to have deviant arousal to
24   children.
25   Q.   Now, are you familiar with the reports, forensic

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 86 of 271

1  reports, from Dr. Dale Arnold and Luis Rosell?

2  A.  I've reviewed them, yes.

3  Q.  And did they also find that the Respondent had the

4  same diagnostic impression with regards to pedophilia?

5  A.  I believe they did.

6  Q.  And antisocial personality disorder?

7  A.  Yes.

8  Q.  Now, with regard to actuarials, did you use actuarials

9  in making your determination as well?

10  A.  I used one.

11  Q.  Which one did you use?

12  A.  The Static-99R.

13  Q.  And, for the record, what is the difference between

14  the Static-99R and the Static-99?

15  A.  The most basic difference is the Static-99R takes into

16  account the effect of age, advancing age, reducing ones

17  likelihood of reoffending in the future.  The Static-99R,

18  as having been testified to earlier, also includes

19  preselected samples that you can use to further refine your

20  decision about which group of sex offenders to compare the

21  individual that you are currently assessing.

22  Q.  And with regard to the -- why is it called static?  Is

23  that because it's something that doesn't change?

24  A.  Generally, yes.  There are factors that are

25  historical.  Once they are they always are, and those

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 87 of 271

1    cannot be changed.  Those have the most empirical research

2    behind them.  They have been researched for the longest

3    time.  However, we also know that there are dynamic or

4    changeable factors that need to be taken into account when

5    looking at someone's risk for reoffense.  And those are not

6    taken into consideration by the Static-99R.

7    Q.   Is that why you would use a separate or different risk

8    assessment tool?

9    A.   Yes, sir.

10    Q.   Now in this case you, in fact, used the SVR-20?

11    A.   I did.

12    Q.   And what were your findings with regards to the SVR-

13    20.

14    **THE COURT:**  Did you say what your Static-99 score was?

15    A.   I did not, sir.  It was a five, moderate/high risk.

16    **THE COURT:**  The same as Dr. Arnold?

17    A.   Yes, sir.

18    **BY MR. JAMES:**

19    Q.   With regard to the SVR-20, what were your findings?

20    A.   My findings were that some -- the sum total of risk

21    factors that were present in Mr. Hall's history, he had

22    eleven factors that I considered to be exacerbating, seven

23    factors that were considered not to be exacerbating,  And

24    because I did not have a recent interview or information

25    about his plans for release, there were two factors that I

1     just did not assess.  I just left them out.

2          **THE COURT:**  What score did you give him on that?

3     A.  I did not score him because some of the factors --

4     even though there are 20 factors on it, one factor can be

5     so clinically significant that it outweighs the rest.  It's

6     really an individual assessment as you look at each

7     individual person.  His score -- he had more exacerbating

8     factors than not exacerbating factors, but I don't look at

9     the numbers as much as which ones are ones that have more

10    clinically significant weight, because of the individual's

11    history.  One of the things I really had to take into

12    account was Mr. Hall's Relapse Prevention Plan, which is

13    very thorough and very good on paper, but then when -- when

14    he has a chance to put the treatment knowledge that he has

15    gained into effect, he has not been able to do so.  Very

16    strong indicators of current sexual deviance as in the

17    material that is being confiscated while in the Maryland

18    Unit, I believe weighs more heavily than as having been

19    talked before in this instance -- what didn't I --

20         **THE COURT:**  Dr. Arnold gave him a 32?

21    A.  That's on the PCL-R, the Psychopathy Checklist.

22         **THE COURT:**  Oh, this is a different test?

23    A.  Yes.  This is the SVR-20.

24    **BY MR. JAMES:**

25    Q.  Why is psychopathy important with regard to your

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 89 of 271

1    assessment of Mr. Hall?

2    A.   Well, antisocial personality disorder is common in a

3    prison setting.  However, as Dr. Arnold had also testified,

4    only between 20 to 25, some people say 30 percent, of your

5    antisocial personality disorder population.  So you've

6    already got only only 60 percent of your prison population,

7    so only 25 percent of that 60 percent qualifies for a

8    psychopathy, especially above the cut-off range.

9         Psychopathy is a more severe form where you have even

10   more callousness, more disregard for the rights of others,

11   a lack of ability to understand how your actions can hurt

12   or affect other people, even more so than your 60 percent

13   of prison inmates who would qualify for antisocial

14   disorder.

15        There has been research -- now, some people will

16   contest.  There is a debate whether or not you can treat

17   psychopaths.  Some people feel that you can.  I am one of

18   those that feels that need a different type of treatment.

19   You have to take into account that the way they interpret

20   and interact with the world is very different from someone

21   who is not high on the psychopathy scale.  However,

22   psychopathy in combination with sexual deviance has been

23   shown to increase the likelihood of the risk of reoffense,

24   and certainly it is contraindicated that you should take

25   this person's self-report or their word without checking

1    the official record.  And when there is a difference you
2    should go with the official record rather than their self-
3    report.  And so it indicates that you should really more
4    look at the official record and look at the evidence that
5    you have in front of you.
6        **THE COURT:**  You said a little while ago that you have
7    screened over 900 people.
8    A.   Yes, sir.
9        **THE COURT:**  And that something like 30 were culled out
10   of the screening.  Was that the right comparison?
11   A.   I've screened over 900 -- about 970 total screenings.
12   Of those 50 went to a full forensic evaluation.
13       **THE COURT:**  Okay.  And 30 of those or 25 or 30 of
14   those were captured in the program for certification?
15   A.   They were certified, yes, sir.
16       **THE COURT:**  Of the 30 or 25 or 30 that were certified,
17   did you do a Static-99 pretty much on all of them?
18   A.   Yes, sir.
19       **THE COURT:**  And what are the -- are all of them with
20   scores of five or above?
21   A.   No.  For instance, I had one individual who ended up
22   not being certified because the state still had a detainer
23   on him; he still had a pending charge.  He scored a two.
24   He was convicted of five rapes and murders.  He was a
25   serial murderer, but until he was five rapes and one

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 91 of 271

1     attempted -- I'm sorry five murders and one attempted

2     murder -- his last victim got away -- he had never been --

3     had a legal problem before, had never been sentenced

4     before.  This was his first time being caught doing

5     anything even remotely wrong.  So he was an extreme outlier

6     of someone who had been married, had maintained a job, had

7     lived in the same place.  One of his victims was his

8     neighbor across the street.

9     **THE COURT:**  So it isn't a fail safe test?

10    A.  It is not, which is why you have to look at the

11    individual and his characteristics and what raises his

12    risks more than someone else.  Because, like I said, that

13    individual was a two.

14    **THE COURT:**  So the person who is a serial

15    rapist/killer who has maintained a fascade of

16    respectability wouldn't be shown up by the test at all?

17    A.  Correct.  And this gentleman had a high degree of

18    impulse control.  And so he didn't make mistakes.  He

19    didn't leave victims alive, and he was friends with the

20    police department.  But the Static assumes that you are

21    like most, criminals who have been convicted --

22    **THE COURT:**  It's looking for the stereotype?

23    A.  The factors that most predict.  But people can be

24    exceptions to the rule.

25    **THE COURT:**  They can deviate from the norm?

1    A.    Yes, sir.

2         **THE COURT:**  So it's just -- it can't be used as a

3    bright line?

4    A.    I think that's a legal determination.

5         **THE COURT:**  Well, maybe it can be in a reverse way.

6    If you have a high score then it's a good indicator, but

7    the fact that you have a low score doesn't mean you are not

8    within the scope of certification.

9    A.    Correct.  An individual can be outside of the factors

10   that -- there's only ten factors that the Static-99

11   assesses.  And if you --

12        **THE COURT:**  So the highest score you could get would

13   be a ten?

14   A.    I believe a 12.

15        **THE COURT:**  A 12, okay.

16   A.    You know the scores six and up are all -- once you get

17   above six it's so -- the numbers of people who score seven,

18   eight and nine are so rare the researchers aren't -- six

19   and up is in the high category.

20        **THE COURT:**  Thank you.

21   **BY MR. JAMES:**

22   Q.    Dr. Demby, because the Static-99 is an actuarial, you

23   used other risk assessment tools, and you've talked about

24   the SVR-20, is that correct?

25   A.    Yes, sir.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 93 of 271

1  Q.  And did you also look at -- and there has been

2  testimony about the Hare Psychopathy test?

3  A.  Yes.  That was included as part of the SVR-20.

4  Q.  Now, with regard to Mr. Timms specifically --

5      **THE COURT:**  This is Mr. Hall.

6      **MR. JAMES:**  My apologies, Judge.  As The Court knows

7  this was a recent trial.

8      **THE COURT:**  Yes, I understand.

9  Q.  With regards to Mr. Hall specifically, let me ask you

10  about his -- since he has been detained pursuant to the

11  Adam Walsh Act, has he been a model detainee?

12  A.  I guess I would have to ask your definition of model

13  detainee.

14  Q.  Let me rephrase the question.  Since he has been

15  detained and certified, has he, in fact, committed other

16  violations?

17  A.  He has been sanctioned for a number of violations

18  inside the BOP, yes.

19  Q.  Now, you referenced a release plan that he had once

20  prepared, is that correct?

21  A.  Yes.

22  Q.  And this was at his last stay at BOP back in 2002 when

23  he went into the SOTP program?

24  A.  Correct.

25  Q.  And as part of that program, the SOTP program -- and,

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 94 of 271

1    for the record, what does that stand for?

2    A.   Sex Offender Treatment Program.

3    Q.   Now, that's a voluntary program, is that correct?

4    A.   Yes.

5    Q.   And participants are expected to disclose the truth?

6    A.   Yes.

7    Q.   And at the end of that program they're supposed to

8    present a release plan, is that correct?

9    A.   Yes.  They craft a Relapse Prevention Plan to go to

10   their probation officer, their treatment provider, and

11   other individuals as deemed significant in their reentry

12   into the community.

13   Q.   Now, I want to turn you to Exhibit Number [13], the

14   Relapse Prevention Plan that was prepared by Mr. Timms --

15   Mr. Hall.  All right.  Please turn to page number 8.  He

16   makes reference to precursors, is that correct?

17   A.   There's distant precursors and immediate precursors.

18   Q.   Now in one of these precursors does he make reference

19   to sexual arousal to children?

20   A.   Yes.  He identified as an immediate precursor,

21   feelings of sexual arousal to children.

22   Q.   Now, would you turn to page number 9?  And does he, in

23   fact, make reference to entitlement issues?

24   A.   He does, under contextual precursors which are ongoing

25   precursors.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 95 of 271

1    Q.   And what is an entitlement issue?

2    A.   Entitlement is when you feel that you are -- I was

3    getting ready to use the word entitled -- that the world

4    owes you things that maybe other people don't get to have.

5    Q.   Okay.  Now, turning your attention to page number 11,

6    the same plan, Mr. Hall indicated -- when you go down eight

7    lines -- he says, "I showed the children pornography making

8    it look like it was a natural act."

9    A.   Yes.

10   Q.   Do you see that?

11   A.   Yes.

12   Q.   And in fact there is a portion in this Relapse

13   Prevention Plan that talks about lapses, is that correct?

14   A.   Yes.

15   Q.   And in it he makes reference to types of pornography,

16   is that correct?

17   A.   Are you referring to a particular page?

18   Q.   Yes.  Page 15 of that plan where it begins, lapses.

19   Bates number 772; that's where it begins.

20   A.   I'm with you.

21   Q.   And if you'll go to the next page, 773, purchasing

22   adult pornography.

23   A.   Yes, I'm there.

24   Q.   And you see under that, making my own pornography

25   (drawing).

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 96 of 271

1    A.    Yes, sir.

2    Q.    Now, I want to talk to you about -- that was a plan

3    that was prepared by Mr. Hall during his first time in the

4    SOTP program back in 2002.  Is that correct?

5    A.    Yes.

6    Q.    I want to talk to you now about his conduct

7    since he has been a civil detainee.  Are you aware of items

8    that were found in his possession with regard to -- looking

9    back on the chart here -- August 16, 2010, Teen Vogue

10   magazine?

11   A.    Yes, I'm aware of that.

12   Q.    And were you also aware of a shakedown that occurred -

13   - there were a number of shakedowns.  Would you go back to

14   the shakedown on July 8, 2010?  If you turn to --

15        **THE COURT:**  A shakedown in the unit is when they sweep

16   your personal area and your person to see if there is any

17   contraband?

18   A.    Correct.  And also the common areas.  In this

19   particular unit they are also looking for materials that

20   have been brought in.

21        **THE COURT:**  That's what I mean by contraband.  To them

22   it's contraband.

23   A.    Yes.

24        **THE COURT:**  It's things you're not permitted to have.

25   A.    Yes, sir.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 97 of 271

**BY MR. JAMES:**

Q.   Now, one of the things that Mr. Hall was in possession

of was a Parenting -- a picture from Parenting.com dated

June 2010.  And during a shakedown in July 2010, a hand

drawing was found, is that correct?

A.   Yes, sir.

Q.   First look at Exhibit Number [47].  We're going to put

it up on the screen, Your Honor, so The Court can see.

Now, Exhibit Number [47] that is from the Parenting

magazine -- Parenting.com, is that correct?

A.   Yes.  I believe the magazine is probably Parenting

magazine.

Q.   Okay.  And that was dated June 2010?

A.   Yes.

Q.   And next to it is Exhibit [45].  That is a hand

drawing, is that correct?

A.   It is.

Q.   And, for the record, I want you to describe the

drawing vis a vis the actual photograph.

A.   The drawing is -- well, the photograph is of three

young prepubescent girls in two-piece swimsuits who are

holding water guns, Super Soaker type guns, and posed kind

of in a Charlie's Angels type of trio pose.  The drawing

has been essentially traced.  It follows the outlines of

the girls' bodies.  However, the girls are now depicted

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 98 of 271

1    nude without any clothing except for their shoes.  They are

2    still holding the Super Soaker guns, but their genitalia

3    have been drawn into the picture.

4    Q.   Now, I want to turn your attention to Exhibit Number

5    [48] and Exhibit Number [46].  Describe for the record,

6    what is Exhibit Number [48]?

7    A.   Exhibit Number [48] was, again, a picture torn out of

8    a magazine.  It depicts young prepubescent girls in

9    leotards.  Some of the girls are sitting -- not cross-

10   legged -- they're sitting on the floor.  One girl is

11   squatting in the floor, and you can see from the front that

12   essentially her crotch is exposed, but it is covered with a

13   leotard.

14   Q.   Now, also for the record, describe Exhibit Number

15   [46].

16   A.   Exhibit Number [46] is a picture, again, that appears

17   to be traced.  It follows the outlines of the girl who is

18   squatting in the photograph.  However, except for her shoes

19   and apparently socks, she is now nude, and her vulva has

20   been drawn into the picture.

21   Q.   And these were all found after he had been certified?

22   A.   Yes, sir, during a shakedown of the Maryland Unit.

23   Q.   Now, did there come a time in which you had an

24   opportunity to look at Exhibit Number [49]?

25   A.   Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 99 of 271

1   Q.   And describe Exhibit Number [49].

2   A.   Forty-nine [49] is a young girl, again prepubescent,

3   standing in a body of water also wearing a swimsuit.

4   Q.   Now, look at Exhibit Number [44] and describe that to

5   The Court.

6   A.   Forty-four [44] is again a drawing that follows the

7   outlines of the picture on the left.  The girl has now been

8   placed in a different type, almost a corset article of

9   clothing, nude otherwise and, again, her genitals have been

10  drawn in.

11  Q.   Again, this was found while he was in the Maryland

12  Unit?

13  A.   Yes, sir.

14  Q.   Now, there has been some testimony with regard to

15  pedophilia and antisocial personality disorder.  Can you

16  tell The Court how in any way you believe they interact in

17  Mr. Hall's case.

18  A.   In Mr. Hall's case or anyone that has any social

19  personality disorder, in order to get the disorder you have

20  already demonstrated kind of a lifelong chronic penchant

21  for doing what you want to do regardless of the fact that

22  you might have been sanctioned or penalized for those

23  actions before and you continue to do what you want to do.

24  So already you have a willingness to violate the rights of

25  others, to break laws and do whatever it is you are

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 100 of 271

1  inclined or wanting to do at that time.  When you then add
2  pedophilia to the mix and you've got a history of already
3  committing hands-on offenses, there's more likelihood that
4  the antisocial personality disorder will make you less
5  inclined to not do what you want to do.  Because you've
6  already got that inclination, you've already got your
7  deviant sexual attraction to children, and you've already
8  had hands-on offenses that were not deterred by the
9  previous legal sanctions that you had suffered before.

10       **MR. JAMES:**  No other questions, Your Honor.

11       **THE COURT:**  I have a question or two.

12       Have you had any experience dealing with parole and
13  analyzing or examining people in a parole system as opposed
14  to the Federal system here.  We don't have parole except
15  for some very rare DC codefender cases.

16  A.   I have evaluated under Adam Walsh some of the DC
17  codefenders.

18       **THE COURT:**  But that's under Adam Walsh.  But have you
19  had any professional experience in psychological testing of
20  criminal inmates who might be in a parole setting?

21  A.   I have not done those evaluations myself.

22       **THE COURT:**  Are you familiar with that methodology at
23  all?

24  A.   I have reviewed evaluations that have been done in the
25  community for individuals on parole and coming up for

1    parole.

2        **THE COURT:**  It seems to me that there is an unspoken

3    similarity between what Federal courts are called on to do

4    under the Adam Walsh Act and what parole commissions do

5    under state laws in which parole is a tail end part of the

6    incarceration process.  If a person is in custody and they

7    have a certain number of years of sentence but they are

8    eligible for parole, periodically or at least somewhere

9    they will hit a threshold and they will be evaluated for

10   parole.  And my understanding is that in doing that one of

11   the goals is to try to predict recidivism and predict

12   whether or not you will be successful on parole or if you

13   should continue to be detained, not unlike what we are

14   doing here at all.

15   A.   I think there are similarities.

16       **THE COURT:**  And there is a body of psychiatric and

17   psychological information and testing that I think is

18   routinely used to try to forecast whether a person coming

19   up for parole is going to be a good candidate or a poor

20   candidate, like these tests that you are talking about.

21            Is there any overlap as far as you know?

22   A.   Overlap in the testing procedures?

23       **THE COURT:**  Yes.  Are these the kinds of tests, the

24   ones that you are using, that would be used by someone in

25   your profession if they were going to do a profile for a

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 102 of 271

1    parole commission or a parole office?

2    A.   Well, I think the PCL-R would definitely be one that

3    could be used in both situations.  The difference would be

4    if you are looking at someone who is a violent offender

5    with no sexual offenses versus these tests that are

6    specifically tailored to a sex offender population.

7         **THE COURT:**  Okay.

8    A.   Some of the research does combine in sex offender

9    recidivism.  Even in the Static-99 at that previous

10   sentencing date you have factors that look at criminality

11   in general and how much that will contribute to the

12   likelihood of reoffense.

13        **THE COURT:**  So all of your testing is channeled in the

14   direction of identifying sexual deviance, not necessarily

15   criminal recidivism?

16   A.   Well, that was the task under 4248 is looking at the

17   likelihood, risk of reoffense of sexually violent conduct

18   or child molestation sexual offenses.  So, yes, all of my

19   tests are that.

20        **THE COURT:**  All right. Well, thank you.  Do you have

21   any cross?

22        **MR. CRAVEN:**  Yes, Your Honor, thank you.

23                          <u>CROSS-EXAMINATION</u>

24   **BY MR. CRAVEN:**

25   Q.   Dr. Denby, you have two reports in this case, a June

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 103 of 271

1  '09, Forensic Pre-Certification Report and then you have an

2  updated report from February 2011, is that right?

3  A.   Yes.

4  Q.   And isn't it true that in your updated report it is

5  stated that Mr. Hall was an active and often insightful

6  participant in psychotherapy process group?

7  A.   That was stated in his SOTP Discharge Summary, I

8  believe.

9  Q.   And you put that in your report, didn't you?  If you

10  care to check if you would look at Page 7 of 22 of your

11  updated report, which is Tab 5.

12  A.   I'm sorry, what was the page number?

13  Q.   Page 7 on your report, Bates page 2184.

14  A.   Yes.

15  Q.   You put that in your report, didn't you?

16  A.   Yes.  I put a very long quote from the discharge

17  summary in there.

18  Q.   It goes on to say in your report, doesn't it, that Mr.

19  Hall often provided helpful feedback to other group members

20  and occasionally appeared to actively receive feedback

21  himself.  You put that in there, didn't you?

22  A.   Yes.  That's the first half of that paragraph.

23  Q.   And isn't it also true that in your updated report you

24  state that the treating therapist concluded that Mr. Hall

25  has made progress in his ability to identify triggers that

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 104 of 271

1    led to his sexual contact with underage children?

2    A.    And you are where?

3    Q.    Slightly down from --

4    A.    "He did show improvement in his ability to control his

5    anger, and appeared to help other individuals in process

6    group and other treatment activities.  However, contrary to

7    his stated desire for treatment, Mr. Hall repeatedly

8    demonstrated little effort to change beliefs and behaviors

9    associated with his past molestation of children."

10    Q.    That's not the question I asked.  But if I can draw

11    your attention to Bates page 2185, it's page 8 of 22 of

12    your report.  About halfway down the page, "The treating

13    therapist concluded that Mr. Hall had made progress in his

14    ability to identify triggers that led to his sexual contact

15    with underage children."  You put that in your report,

16    didn't you?

17    A.    Yes, I did.  But I would like to point out, this is a

18    different psychologist.

19    Q.    I understand.

20    A.    Okay.  And he gave him an even chance (50:50) of

21    successful integration into the community.

22    Q.    With respect to diagnoses made under the DSM, Dr.

23    Demby, isn't it true that the DSM manual itself makes no

24    judgment about a person's ability or inability to control

25    that particular diagnosis?

1    A.   Correct.

2    Q.   When Mr. James was asking you questions on Direct, you

3    talked about two actuarial tools that you used, the Static-

4    99 and the Static-99R.  Is that right?

5    A.   Yes.

6    Q.   And essentially the 99R revises and replaces -- as it

7    takes into consideration age, it revises and replaces the

8    Static-99, correct?

9    A.   Yes.

10   Q.   But you left the Static-99 test in your report, isn't

11   that right?

12   A.   Correct.

13   Q.   So as you stated earlier you scored Mr. Hall as a five

14   on the Static-99R, isn't that right?

15   A.   Yes.

16   Q.   And isn't it true that in your report you compare Mr.

17   Hall to -- at a rate of 5 on the test that you compare Mr.

18   Hall to a preselected for treatment group and that group

19   was found to sexually reoffend at a rate of 16 percent in

20   five years and 23 percent in ten years.  Is that true?

21   A.   That's one of the groups I compared him to.

22   Q.   And so isn't it true, then, that as compared to that

23   preselected for treatment group that Mr. Hall was aligned

24   with a group that did not sexually reoffend at a rate of 84

25   percent in five years and 77 percent in ten years?

1  A.   As a group that is correct.

2  Q.   And in your report you go on to compare Mr. Hall to

3  the high risk mean sample which reoffended at a rate of 25

4  percent in five years and 36 percent in ten years, correct?

5  A.   Yes.

6  Q.   So isn't it true then that when you compare Mr. Hall

7  to that high risk mean group he is aligned with a group

8  that did not reoffend at a rate of 75 percent in five years

9  and 64 percent in ten years?

10  A.   As a group, yes.

11  Q.   Now the Static-99R does not take into consideration a

12  strict condition period of 25 years of supervised probation

13  like Mr. Hall has, does it?

14  A.   The Static-99R does not.

15  Q.   Nor does it take into consideration Mr. Hall's 29

16  months on supervised release without sexually reoffending,

17  does it?

18  A.   The Static-99R does not.

19  Q.   Do you know of an actuarial tool that does?

20  A.   Well, when you look at the SVR-20 and it looks at

21  failure on supervised release -- well, technically -- let

22  me rephrase that.  Because the SVR-20 is not an actuarial

23  tool, so the actuarials do not.

24  Q.   Now on Direct Examination by Mr. James you testified

25  that regarding the Relapse Prevention Plan that Mr. Hall

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO  Document 74  Filed 06/30/11  Page 107 of 271

1  wrote that it looked good on paper, correct?

2  A.  I'm not sure those were my words, but --

3  Q.  And essentially that it looked good on paper but that

4  he wasn't able to follow through with it, is that right?

5  A.  For some reason he did not follow through with it.

6  Q.  But he did follow through with it, did he not, for 29

7  months?  There was no sexual reoffense?

8  A.  I'm not sure.  Apparently when he was in the community

9  corrections placement, also in his Relapse Prevention Plan

10  he talked about his problems with authority and following

11  rules, so he did not follow those parts of his Relapse

12  Prevention Plan.  And right now I am not entirely sure when

13  he was violated for possessing pornography.

14  Q.  You don't know of a sexual reoffense for Mr. Hall

15  while he was out on release, do you?

16  A.  He was not convicted or charged with any sexual

17  reoffense.

18  Q.  Mr. James in questioning you, you mentioned that you

19  had testified in two prior Section 4248 Adam Walsh cases,

20  is that right?

21  A.  Correct.

22  Q.  One being the Timms trial before Judge Boyle a couple

23  weeks ago?

24  A.  Yes.

25  Q.  And the other in Oklahoma sometime in 2007, is that

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 108 of 271

1  right?

2  A.   In January 2007, yes.

3  Q.   Now, you recall your deposition a few weeks ago in my

4  office when I asked you about whether or not you had

5  testified in any civil commitment proceeding before, and

6  you did not recall that you had?

7  A.   I did not.

8  Q.   But you recall now going to Oklahoma and testifying in

9  a 4248 case?

10 A.   Yes.

11 Q.   Do you also recall in that case the Respondent's name

12 was Carl Dowell?

13 A.   Yes.

14 Q.   D-O-W-E-L-L.

15 A.   Yes.

16 Q.   Do you recall that you opined in that case that he met

17 the criteria for commitment?

18 A.   Yes.

19 Q.   You also recall, don't you, that Mr. Dowell had a

20 combined length of 44 months on release where there had

21 been no sexual reoffense?

22 A.   Correct.  No sexual reoffense but multiple violations.

23 Q.   And Mr. Dowell was --

24     **MR. JAMES:**  Objection, Judge, to the relevance.  As to

25 the particulars of the Dowell case the fact that in a prior

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 109 of 271

1    case the witness testified with regard to findings.  It has

2    no relevance as to her testimony now with regard to Mr.

3    Hall.

4        **THE COURT:**  I'll let it in for impeachment purposes.

5    Q.  Dr. Demby, ultimately The Court did not find that Mr.

6    Dowell did not meet the criteria for commitment and did not

7    side with your opinion, isn't that right?

8    A.  That is correct.

9        **MR. CRAVEN:**  No further questions, Your Honor.

10       **THE COURT:**  Is that all for this witness, or do you

11   have any follow-up?

12       **MR. JAMES:**  I just have a few.

13       **THE COURT:**  Okay.

14                    <u>REDIRECT EXAMINATION</u>

15   **BY MR. JAMES:**

16   Q.  Dr. Demby, on cross-examination -- and I'm taking you

17   back to your report.  Would you turn to page 7 of your

18   report, Exhibit Number [5], Bates number 2184.  On cross-

19   examination counsel sought to elicit favorable information

20   with regard to Mr. Hall from portions of your report with

21   the reference that Mr. Hall was an active and often

22   insightful participant in the psychotherapy group process.

23   I want to direct your attention now to that very same

24   report, the first sentence in the very next paragraph.

25   Read what that states.

1  A.   That sentence states, "Mr. Hall made only minimal

2  progress in treatment while in the SOTP due to avoidance of

3  accountability and responsibility for his sexually deviant

4  behavior, and a lack of effort to address and change

5  behaviors directly associated with his sexual victimization

6  of children."

7  Q.   And with regard to -- along that same line, turn to

8  page 11 of your report.  Go to the first full paragraph,

9  not the indented paragraphs.  That paragraph beginning,

10  "Mr. Hall was. . ."

11  A.   Yes.

12  Q.   If you look at the last sentence of that paragraph,

13  what does that state?

14  A.   "In February 2006 his release was revoked, and he was

15  sentencted to four months of incarceration in the BOP

16  (Bureau of Prisons), six months at the community

17  corrections center, and 30 months of supervised release."

18  Q.   And the sentence before that, what does that state?

19  A.   "Mr. Hall did not adjust well and was cited for

20  numerous violations including aggressive and belligerent

21  behavior toward staff and sexual contact with other

22  residents."

23  Q.   And with regard to the questions about the Dowell

24  case, is it true that The Court ruled and found that you

25  were a well-qualified witness?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 111 of 271

1   A.   Yes.

2   Q.   And The Court did not find you as being untruthful in

3   any manner?

4   A.   Correct.

5        **MR. JAMES:**  Thank you, Your Honor.

6        **THE COURT:**  Thank you.  You can step down.  Do you

7   rest?

8        **MR. ROYSTER:**  Your Honor, the United States rests.

9        **THE COURT:**  Do you want to call your first witness.

10       **MR. CRAVEN:**  Your Honor, we're ready.  We would ask

11  Clyde Hall to take the stand.

12                  **CLYDE HALL, RESPONDENT, SWORN**

13                     <u>DIRECT EXAMINATION</u>

14  **BY MR. CRAVEN:**

15  Q.   Good afternoon, Mr. Hall.  Would you please state your

16  name for the record?

17  A.   My name is Clyde Malcolm Hall, Jr..

18  Q.   How old are you, Mr. Hall?

19  A.   Forty-five (45) years of age.

20  Q.   Where were you born?

21  A.   Los Angeles, California.

22  Q.   Is that where you grew up?

23  A.   No, I grew up in Portland, Maine.

24  Q.   I'm having a little trouble hearing you, so if you

25  don't mind, speak up.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 112 of 271

1          **THE COURT:**  Well, I'm glad, because I am, and I'm

2     closer.  I started to look for a hearing aid.

3     Q.   Mr. Hall, are you nervous?

4     A.   Very.

5     Q.   Are you okay to keep testifying?

6     A.   Yes.

7     Q.   Just let me know if you're not.  So you were born in

8     California.  Where did you grow up?

9     A.   I grew up in Portland, Maine.

10    Q.   What did your parents do for a living?

11    A.   My mom on occasion did work for shoe companies as a

12    sewer/stitcher.  And my dad was an auto mechanic with the

13    City of Portland.

14    Q.   Your mother worked in a factory setting?

15    A.   Yes.

16    Q.   And your father was a mechanic?

17    A.   Yes.

18    Q.   How far did you go in school?

19    A.   I graduated from high school.

20    Q.   Any college?

21    A.   Two quarters of Stratham Technical College in

22    Stratham, New Hampshire.

23    Q.   Describe, if you would, Mr. Hall, your childhood and

24    upbringing.

25    A.   Very emotionally abusive and physically abusive.  My

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 113 of 271

1    dad was a physical tryant and a rageoholic.

2    Q.   Did you have siblings?

3    A.   I have three younger brothers, yes.

4    Q.   Was your dad abusive to all of you or just you or --

5    A.   Two other of my brothers, the next two down the line.

6    Q.   Help me understand how that was for you.  Were you hit

7    with fists, did this happen monthly, yearly?

8    A.   Every day or just about every day my dad usually used

9    his fist.  I mean if you took a look at my face I have

10   scars from where he hit me with two by fours and stuff like

11   that.

12   Q.   At about what age did that start happening to you?

13   A.   I only recollect from age seven on up, but my mom told

14   me from the age of two.

15   Q.   That sounds pretty bad.  Did it happen consistently

16   until you left home?

17   A.   Even a little after I left home, yes.

18   Q.   Tell me about -- explain what that means.

19   A.   After my dad had kicked me out at age 16, there was

20   times that I would pop by the house visiting my mom, and

21   there was times that he would come home early or

22   unexpectedly, and we got into several very hardcore verbal

23   confrontations where he literally uses his fist on me.  And

24   that's why the cops were called and stuff like that.

25   Q.   Was this abuse of you and your brothers connected at

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 114 of 271

1    all toward drinking and drugs or was it other reasons?

2    A.   Just his own reasons.  My dad never drank until just

3    before he died.  It was basically whenever he felt like it.

4    Q.   You said he kicked you out of the house at age 16.

5    What happened?

6    A.   My father always took the ways of -- the way

7    apparently his father had taken on him.  You've got to be

8    out there, work, do what you need to do, get out of the

9    house.  And when I rebelled then he started to hit me

10   physically and a lot of emotional words.  And then he

11   kicked me out saying that I was no son of his.

12   Q.   In addition to that physical abuse was there any

13   sexual abuse in your home?

14   A.   No, not from my mom and dad and brothers, no.

15   Q.   From anybody else?

16   A.   Outside the house when I was nine years old, yes.

17   Q.   What happened?

18   A.   My best friend's oldest sister and I had sexual

19   contact when I was nine.

20   Q.   How long did that go on?

21   A.   Approximately about eleven months.

22   Q.   Did you tell anybody about it?

23   A.   No.

24   Q.   Why not?

25   A.   At the time I thought it was macho and a right of

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 115 of 271

1    entrances to manhood.

2    Q.    Now, when you left the house at age 16, what happened

3    next in your life?

4    A.    I had -- I was exiting a well-known crack house and an

5    individual had grabbed me and wanted my money and my drugs,

6    and when I didn't give it to him, he sexually assaulted me.

7    Q.    And you were how old at that time?

8    A.    I was 16.

9    Q.    And where was this; where were you living at the time?

10   A.    I was still in Portland, Maine at the time.

11   Q.    And who was -- was the person who assaulted you a man,

12   woman?

13   A.    A man.

14   Q.    An adult?

15   A.    Yes, 42 years of age.

16   Q.    And you were 16?

17   A.    Yes.

18   Q.    Did you report that to the police?

19   A.    No.

20   Q.    Why not?

21   A.    Degraded, dirty.  There was many times that I just

22   didn't bother, because I didn't think anybody would believe

23   me and that maybe people thought that I would be -- you

24   know, I'm queer, fag, I've heard it all before.  So I

25   didn't say nothing.

1   Q.  Take me, Mr. Hall, to the time of your first sex crime

2   conviction in 1987.  That was in May, wasn't it?

3   A.  Yes.

4   Q.  And how much time did you do for that?

5   A.  I spent two years and about one or two months.

6   Q.  And that was in the Maine State Prison or the

7   Department of Corrections?

8   A.  Yes.  It was Maine State Prison, Windham, Maine, Maine

9   Correctional Center.

10   Q.  When you finished doing that time were you out on some

11   type of probation or supervised release?

12   A.  I was out on regular probation, yes.

13   Q.  And did you have to participate at that time in sex

14   offender treatment?

15   A.  Yes.

16   Q.  Your next sex offense conviction was in 1999.  Where

17   did that happen?

18   A.  Upstate New York.

19   Q.  How did you get from Maine to upstate New York?

20   A.  Just traveling back and forth because of getting into

21   a relationship with a woman that lived in upstate New York.

22   Q.  And that was a misdemeanor charge.  And how much time

23   did you get for it?

24   A.  One year.

25   Q.  And help me get this right.  You were in the New York

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO  Document 74  Filed 06/30/11  Page 117 of 271

1    State Department of Corrections for that year?

2    A.   Not with the Department of Corrections, but county

3    jail.

4    Q.   You just stayed in the county?

5    A.   Yes.

6    Q.   And before you were released, the Feds decided to

7    indict you on child pornography charges, correct?

8    A.   Yes.

9    Q.   And how much time did you get for that?

10   A.   I got 63 months incarceration and three years of

11   supervised release.

12   Q.   Where did you do your federal time?

13   A.   Four different locations in the Federal BOP.

14   Q.   Where?

15   A.   The first place was Raybrook, New York.  The second

16   place was Butner, North Carolina.  The third place was

17   Otisville, and the fourth place was Petersburg.

18   Q.   When you were in the BOP, did you work?

19   A.   Yes.

20   Q.   What did you do?

21   A.   When I was up at Raybrook, the first six months I

22   stayed in the plumbing shop.  And then I went over to the

23   landscape crew because I wanted to be outside and work crew

24   there.

25   Q.   Are you certified as a plumber?

1    A.   No, but had I gained knowledge in that field.

2    Q.   Do you have enough skill to actually work in that

3    field, or no?

4    A.   I can become an apprentice, yes.

5    Q.   And the other thing you did was landscaping?

6    A.   Yes.

7    Q.   How much plumbing and landscaping work did you do up

8    there?

9    A.   Landscape I was always outside either mowing,

10   trimming.  And in the wintertime I was part of one of the

11   emergency snow crew which I was snow blower person that on

12   the perimeter fence.

13   Q.   Was all the landscaping work done inside the fence or

14   outside the fence or both?

15   A.   Inside the fence.

16   Q.   Now while in the BOP you participated in the SOTP or

17   the Sex Offender Treatment Program, didn't you?

18   A.   Yes, I did.

19   Q.   Tell us about that.

20   A.   At first I thought it was going to be okay when I

21   joined in, but there was a lot of hardships between a

22   couple of the staff members, including the director of the

23   program.

24   Q.   Was that a -- excuse me, I didn't mean to interrupt.

25   A.   I was finished.

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 119 of 271

1    Q.   Was that a voluntary program?

2    A.   Yes.

3    Q.   So it was your decision to participate?

4    A.   Yes.

5    Q.   If you would, Mr. Hall, in the binder that is front of

6    you, let me draw your attention to -- and I believe it's

7    Tab Number 73.  Are you there?  Can you tell me what that

8    is?

9    A.   That is the sex offender treatment form, consent form.

10   Q.   And it appears, Mr. Hall, on the first two pages to be

11   initialed by you and then to be signed by you on the third

12   page?

13   A.   Yes, it is.

14   Q.   Are those your initials and your signature?

15   A.   Yes.

16   Q.   Let me draw your attention to the bottom of the first

17   page.  The last sentence before numbers one, two and three

18   starts with the primary goals.  Can you read that?

19   A.   You want all three or just the third one?

20   Q.   I'll tell you, read from starting with the primary

21   goals and stop after you have read number 3.

22   A.   Primary goals?

23   Q.   That's okay.  Let me help you.  Down at the bottom of

24   the first page it states that, "The primary goals in every

25   inmate's treatment are:

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 120 of 271

1    1.   Admission of guilt and/or remorse for the sexual

2    crime(s) committed

3    2.   Complete acceptance of responsibility for the sexual

4    crime(s) committed

5    3.   Identification and recognition of deviant sexual

6    arousal and sexual offense pattern(s)"

7         Does that ring a bell with you as to what you signed

8    up for?

9    A.   Yes.

10   Q.   And if I could also draw your attention to the last

11   page, the third page of that document, the second to last

12   paragraph states, "As mandated by law, mental health

13   professionals are required to report any incident or

14   suspicion of child abuse or neglect, past or present, to

15   child protective and law enforcement agencies in the

16   jurisdiction where the abuse occurred.  Although admitting

17   to unreported crimes may result in additional criminal

18   prosecution, the SOTP strongly encourages all of its

19   participants to be completely honest about the extent of

20   their sexual deviance and sexual offense history.

21   Providing self-incriminating information is not an interest

22   of the Sex Offender Treatment Program and you will not be

23   pressured to provide such information."

24        Is that what you signed?

25   A.   Yes.

1   Q.   Is that how -- tell me what your thoughts are on those

2   two provisions?

3   A.   The first provision, the admission of guilt and

4   remorse for sexual crimes committed, I had done that.  I

5   never denied what I've done.  Complete acceptance of

6   responsibility for sex crimes committed, for the most part

7   I have done that.

8   Q.   What do you mean, for the most part?

9   A.   There was still things that I was still trying to work

10   out and work on and how to accept my situation.  At that

11   time I was still reluctant to say, yeah, I did this and

12   stuff like that.

13   Q.   When you say, at the time, this is roughly 2001, 2002,

14   is that right?

15   A.   Correct.

16   Q.   Turning your attention again to the third page where

17   it states, you will not be pressured to provide such

18   information, tell me what your thoughts are on that?

19   A.   We were very very much pressured to admit even crimes

20   that we did not commit by the director and a couple of his

21   staff members.

22   Q.   How did that happen?  Explain that to me.

23   A.   As for my own situation, I had -- I mentioned before

24   that I had written that RPP about four times.  And each

25   time I had written -- the first time I had written it they

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO  Document 74  Filed 06/30/11  Page 122 of 271

1    stated that -- to my recollection -- that it did not fit my
2    crime status as a child sex offender.  And I had -- they
3    gave it back to me and said, we want more information.
4    When I started writing over again, it kept on -- the second
5    and the third plan came back at me basically with the same
6    note saying we want more information.  Then they pressured
7    me into going to talk to the mentors in the program.  And
8    several of the mentors in that program had helped me come
9    up with certain aspects that was doable for the program.
10   Q.   So you rewrote the -- when you say RPP, you mean
11   Relapse --
12   A.   Prevention Plan, yes.
13   Q.   And the document that has been referred to today
14   several times, is it fair to say you were strongly
15   encouraged to rewrite that because it wasn't acceptable?
16   A.   Yes.
17   Q.   And that was the fourth variation of that?
18   A.   Yes, sir.
19   Q.   And I believe you said you felt pressure --
20   A.   Very much.
21   Q.   -- to admit to things that you hadn't done?
22   A.   Yes.
23   Q.   Tell me how they pressured you.
24   A.   There were times when Dr. Hernandez and Mr. Herman
25   brought me into their office and stated that if I didn't

1  admit to these certain things that I can lose good time, I

2  would be thrown out of the program and that we would tell

3  whomever is going up to your area about your being a sex

4  offender.

5  Q.   What do you mean by that last part?  They would out

6  you to the general prison population that you were a sex

7  offender?

8  A.   Yes.

9  Q.   So at that time you weren't in a unit like the

10  Maryland Unit, you were in a general population type

11  quarters?

12  A.   Yes.  At that time between the years of 2001, 2003

13  when I was there, we were open with the general population

14  at that time.  They were told that if -- the general

15  population individuals were told that if they harassed us

16  in any way they would be automatically rejected

17  off to another institution, at that time.

18  Q.   Do you know if other inmates were given the same

19  pressure that you were?

20  A.   Yes, there are several up there in Maryland Unit right

21  now.

22  Q.   Now, there was some good parts in the Sex Offender

23  Treatment Program, wasn't there?

24  A.   Yes, there was.

25  Q.   Describe those for me.

1    A.    I learned a lot about myself as an individual.  I
2    learned about how to communicate better on what I wanted in
3    a relationship with somebody.  I learned that more or less
4    how to deal with my own situation in order to stay away
5    from any type of sex crimes and stuff like that.  I don't
6    know how to put all this in words, but it taught me a lot
7    how I harmed a lot of people, not just the children but the
8    people that loved and care about me.  And that a lot of --
9    what the RPP had stated about my precursors and I learned
10   how to put those -- enact them and stuff like that.
11   Q.    Did you -- I'm sorry, I don't mean to cut you off.
12   A.    Go ahead.
13   Q.    That program lasted 19 months, is that right?
14   A.    Yes.
15   Q.    Did you learn skills that you could use on the
16   outside?
17   A.    Absolutely.
18   Q.    Tell us about that.
19   A.    Coping skills, learning how to deal with high risk
20   situations, basically.  Like the one -- the major things
21   that I was more involved was when I was able to be in
22   certain areas if there was going to be children around, how
23   to handle that kind of situation.  Which means if I'm in a
24   store and there was several chidren that came in, either --
25   if it's a big store go on the other end of the store until

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 125 of 271

1    they came around the way.  Then if I had gotten where it
2    was a small store just leave my stuff and exit the store
3    and come back later.  I'll give another big thing that I
4    had to do was step off the bus.  During -- it was like 3:30
5    in the afternoon that I was just getting off work and I had
6    gotten on the bus.  The next stop several teenage girls got
7    on the bus.  I'm looking at them and I'm like, I've got to
8    get off.  The next stop I got off the bus, and I called --
9    I had a cell phone, and I called the halfway house, told
10   them I was going to be late.  The new person that was there
11   --

12        THE COURT:  Why did you have to get off the bus?  Did
13   you have such a compulsion that you couldn't be around.
14   A.   No, it's a coping skill.
15   THE COURT:  What?
16   A.   It's a coping skill, not to put myself into high risk
17   situations.
18   THE COURT:  Well, where is the risk involved?  You're out
19   in the middle of society.  Were you going to do something
20   to the girls?
21   A.   No.  No, sir.  It was one of these coping skills that
22   I was supposed to put into effect with my RPP.
23        THE COURT:  Did you feel you needed to do that?
24   A.   Yes and no.  Yes --
25        THE COURT:  What's the yes part?

1    A.    Yes, because I was scared that somebody might be

2    watching me, see if I do what I'm supposed to be doing.

3    And, no, I wasn't attracted -- I wasn't interested in the

4    girls.  It was just one of those coping skills I was

5    supposed to put into effect.

6        **THE COURT:**  Okay.

7    Q.    So you were essentially taught to remove yourself from

8    that situation?

9    A.    Yes.  If anybody has seen -- there's a movie out there

10   that it was based on the same thing with -- and I can't

11   remember I think it was called The Woodcutter or something

12   like that.  It was Kevin Bacon starred in it and it

13   happened almost the same way.  I had to step off that bus

14   because I didn't want to be presented as oh, he's scoping

15   out these girls and stuff like that.

16   Q.    And that was when you were -- one of your periods of

17   being on supervised release?

18   A.    Yes.

19   Q.    And where did that happen?

20   A.    It happened in Albany, New York on the way home from

21   work.

22   Q.    What were doing for work at that time?

23   A.    I was a welder, learning to weld.

24   Q.    So after you finished the sex offender treatment in

25   Butner, eventually you were released around what time?

1    A.    I was released April 12, 2004.

2    Q.    And what happened next?  Did you go to a halfway

3    house, or just straight release?

4    A.    I got released back up northern New York.

5    Q.    And did you go to a halfway house?

6    A.    Not until eleven months later.

7    Q.    So at first you just went -- and where did you live?

8    A.    I lived in a motel room.

9    Q.    And you checked in with a probation officer?

10   A.    Once a week, yes.

11   Q.    And you got a job?

12   A.    I -- the job market up there in northern New York is

13   nil, and it's right in the middle of the Adirondacks.  I

14   did work occasionally with a company, but he was not paying

15   his people, so I talked to my supervise release officer at

16   the time and said, look, I can't do this.  I've got rent to

17   pay.  And he goes, all right, we'll figure this out.  In

18   the meantime I was volunteer a lot of my work around the

19   motel.

20   Q.    And tell us what happened next.  How did the rest of

21   your supervised release go?

22   A.    Well, right up until that point I was doing fine until

23   they moved me to Albany, New York into the halfway house.

24   Q.    So you went from the hotel to -- they put you back

25   into a halfway house?

1    A.    Yes.

2    Q.    Did you volunteer for that, did they put you in there?

3    How did that happen?

4    A.    Due to not having a job, and the location of where I

5    was living, they decided to revamp my supervised release

6    and put me in the halfway house.

7        **THE COURT:**  Do you have any contact from your brothers

8    or your mother or other family members, uncles, aunts,

9    cousins?

10   A.    I had contact with my mom.

11       **THE COURT:**  Any support system at all?

12   A.    At that time my mom was coming up and visiting me from

13   Ohio.

14   Q.    So you're in a halfway house, and how did that go?

15   A.    It was really rough.  The director of the house right

16   off the bat didn't like me very much.  I clashed with him a

17   lot.  I clashed with the assistant director also and one

18   other --

19       **THE COURT:**  What do you mean clashed?

20   A.    We were butting heads on what I need to be doing in

21   the halfway house and not doing in the halfway house and

22   stuff like that.

23       **THE COURT:**  Why?

24   A.    I -- I felt that I was back in prison again.  And I

25   needed to be out there trying to find a job ASAP.  And

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 129 of 271

1  that's one of the reasons why they decided to move me down

2  to Albany.  I didn't have no idea where to go to look for a

3  job because I had never been there, and they weren't being

4  very supportive or very helpful at first.

5      **THE COURT:**  Did they need to be?

6  A.   I think they needed to be a little bit supportive.

7      **THE COURT:**  Why?

8  A.   In order to -- for somebody like me who had never been

9  there before needed to know where I can go, where I

10  couldn't go and job wise, where can I get a job and

11  everything else like that.  And they weren't being very

12  supportive at that point.

13      **THE COURT:**  You couldn't take care of yourself?

14  A.   I could, yes.  I did.

15  **BY MR. CRAVEN:**

16  Q.   Mr. Hall, is it hard for a sex offender to find a job?

17  A.   At the time for me, no.  Within 15 days of being

18  there, I did get a job working as a landscaper at a private

19  golf course.  Outside of the halfway house nobody had ever

20  bothered me.  They knew who I was, what I had been in

21  prison for, because that was the community contact, the way

22  the police had done it and everything.  And I was never

23  bothered.

24  Q.   Now, eventually your supervision was revoked; is that

25  right?

1    A.    Yes.

2    Q.    And that was while you were still at the halfway

3    house?

4    A.    Yes.

5    Q.    What happened?

6    A.    I had contact with a felon, and I had a cell phone

7    without the permission of a probation officer, and was

8    acting insolent towards the halfway house staff.

9    Q.    And so you went back into the BOP?

10   A.    No, I went in the county jail for four months.

11   Q.    Four months.  Just in the county?

12   A.    Yes.

13   Q.    And then what happened after that four months?

14   A.    They placed me right back in the halfway house.

15   Q.    The same halfway house?

16   A.    Yes.

17   Q.    Round two, huh?

18   A.    It was a little bit better the second time around.

19   Q.    Yeah, how did it go the second time?

20   A.    Even though I had minor conflict with staff about

21   cleaning abilities, I completed that time without getting

22   fired and stuff like that.

23   Q.    So how long were you in the halfway house?

24   A.    A total of 14 months.

25   Q.    The second time?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 131 of 271

1    A.   The second time, roughly about six months.

2    Q.   And after you left the halfway house, what happened

3    next?  Where did you go?

4    A.   I had gotten myself an apartment roughly about two

5    blocks from the state capital building.

6    Q.   In Albany?

7    A.   Yes.

8    Q.   What was going on at that time?  You had had

9    probation, registered as a sex offender?

10   A.   Yes.  I had to do all that and continue working my

11   job.

12   Q.   And what kind of job did you have?

13   A.   I was a welder.  I was learning to weld doors for

14   heating units, like for Lennox and Franklin units.

15   Q.   Are you licensed now as a welder?

16   A.   No.

17   Q.   How much money were you making at the time?

18   A.   I was making $8.00 an hour, 44 hours a week.

19   Q.   And in addition to working, were you participating in

20   any kind of sex offender treatment?

21   A.   Yes.  On Wednesday nights.

22   Q.   Just once a week?

23   A.   Yes.

24   Q.   And you're there in Albany, is that around the time

25   when the incident with stepping off the bus happened?

1    A.    Yes.

2    Q.    Now, how did that go and how were you managing your

3    behavior during this time?

4    A.    Every day I made sure that I wasn't into high risk

5    situations.  I always knew my surroundings.  Even though at

6    the time I was living in the halfway house, I was

7    surrounded by five schools and a daycare within 500 feet of

8    the building.  I managed to maneuver myself around before

9    school starts and after school ends so I can get back into

10   the halfway house without any incidences and stuff like

11   that.

12   Q.    Did you have any trouble refraining from reoffending

13   at that time?

14   A.    No, sir.

15   Q.    Now, something eventually happened and your supervised

16   release was revoked again, is that right?

17   A.    Yes.

18   Q.    Tell us what happened.

19   A.    On December 22, 2006, I had got my pink slip from the

20   company I was working for.  They were downsizing.

21   Q.    Was that the welding company?

22   A.    Yes.

23   Q.    Go ahead.

24   A.    And at that time being it was near Christmas time,

25   nobody was hiring.  I had gone immediately the day after to

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 133 of 271

1  the unemployment center, looked up on the computer and

2  paper what jobs were available that I could take.  Because

3  one of the stipulations I had to follow is making sure I

4  wasn't at a job site that was where children were around or

5  anything like that.  So I had to make it very careful on

6  where I was looking for work.

7  Q.   Go ahead.  What happens next?

8  A.   At the time I had signed up for unemployment and then

9  went to a couple of places, Department of Human Services

10  and Catholic Charities of Albany, New York to see if I

11  could get some help on paying for my rent until I was able

12  to maintain viable employment.

13       **THE COURT:**  How much was your rent?

14  A.   Three ninety-five (395) a month.

15       **THE COURT:**  You were only bringing home about a

16  thousand, right?

17  A.   Yeah.

18       **THE COURT:**  Net?

19  A.   Net.  Well, other than having child support taken out.

20       **THE COURT:**  Really?

21  A.   Yeah.

22  **BY MR. CRAVEN:**

23  Q.   Now that you mentioned it, how many children do you

24  have?

25  A.   I have two living and one that is deceased.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 134 of 271

1  Q.   The living child, how old is he or she?

2  A.   My oldest son has just turned 23 back at the same time

3  I had celebrated 23 years of sobriety, which is March 31st.

4  And my youngest son will be 23 June 9th -- not June 9th,

5  but October 9th.

6  Q.   Your youngest son didn't live long.  He died shortly

7  after birth, right?

8  A.   No, that was my daughter that was born April 12, 1987.

9  Q.   And tell us about the youngest son.

10 A.   The youngest son I don't know much about.  It was my

11 ex-wife's son.

12    **THE COURT:**  Your biological son or not?

13 A.   Yes.  Well, as far as I know, yes.  I never had the

14 test taken.

15 Q.   So that fit into Christmas 2006 and something goes bad

16 on supervised release.  What happens next?

17 A.   They started pressuring me about being out there eight

18 hours a day with no money walking.  And if you've ever been

19 to Albany, New York you'll know that most of the jobs are

20 outside the immediate city.  You have to take public

21 transportation to get to those locations.  Even though at

22 that time, Christmas time that year, we were 75 degrees and

23 no snow, I was able to deal with doing most of that.  But

24 it got quite monotomous a couple weeks into it when the

25 people kept saying we're not hiring until April --

1    March/April, March/April.  And then finally I was able to

2    contact somebody that said if I got down to New Orleans

3    before Mardi Gras then I would have a job sheetrocking for

4    $16 an hour.

5    Q.   So you were essentially pounding the pavement, if you

6    will --

7    A.   Yeah.

8    Q.   -- looking for a job and couldn't find anything?

9    A.   No.

10   Q.   In Albany?

11   A.   No.

12   Q.   So you and your friend or you came up with the idea to

13   head to New Orleans.  Tell me how that happened.

14   A.   Well, at first I wasn't so sure I was going to do

15   anything.  But feeling the pressure from probation and with

16   the knowledge that just in a few days I can end up losing

17   my apartment because I hadn't had the rent paid for that

18   month, they're going to violate me anyway.  And so I had

19   packed a bag, and I decided to leave, head to New Orleans.

20   Q.   You absconded?

21   A.   I absconded, yes.

22   Q.   Did you make it to New Orleans?

23   A.   No, sir.

24   Q.   What happened?

25   A.   The trucker I got a ride with, he went a roundabout

1    way from -- he went to Maine, Massachusetts, then New
2    Jersey where I ended up being in New Jersey for like a
3    couple days.
4    Q.   You hitchhiked?
5    A.   Yes.
6    Q.   Go ahead.
7    A.   I was at the truck stop.  It's called Pilot's and
8    apparently they didn't -- they don't allow hitchhikers to
9    stay in the restaurant part.  And I was there, and I fell
10   asleep.  I must have fell asleep.  I didn't hear nothing.
11   The next thing I know there was an officer tapping me on
12   the shoulder asking for my ID and then they said I had a
13   warrant out for my arrest for probation violation and so
14   they arrested me.
15   Q.   And so they arrested you, revoked your supervised
16   release, you got a little time on your revocation of
17   supervised release, and then they also charged you with
18   failing to register, is that right?
19   A.   Correct.
20   Q.   And you got a total for those two things how much more
21   time?
22   A.   Thirty-two months with 25 years of supervised release.
23   Q.   So you're back in the BOP?
24   A.   Yes.
25   Q.   And where did you go?

1   A.   I went to Petersburg, Virginia first and then three

2   months before I was supposed to be released went down to

3   Butner, North Carolina.

4   Q.   And do you know why you were transferred to Butner?

5   A.   Somebody indicated that I was looked at

6   precertification.

7   Q.   Did you know anything about 4248, the Adam Walsh Law

8   or anything?

9   A.   I had no knowledge whatsoever.

10  Q.   When did you find out about it?

11  A.   The night before I was supposed to be released from

12  prison.

13  Q.   After your release date passes and you were held, were

14  you moved to the Maryland Unit?

15  A.   Yes.

16  Q.   And have you been at the Maryland Unit ever since?

17  A.   Yes.

18  Q.   How long has that been?

19  A.   Just about two years now.  It will be two years the

20  24th of this month.

21  Q.   Not that we're counting right?

22       There have been a couple of incidences, and you've

23  heard it discussed already some today.

24  A.   Yes.

25  Q.   And of course you know about them -- at the Maryland

1  Unit.  Tell us the truth about that.  What happened?

2  A.   Well, two days before the shakedown happened, a

3  manilla folder had popped up in my cell.  I scanned through

4  the pictures.

5      THE COURT:  What do you mean, popped up?

6  A.   I don't know who placed them in my room.  They were

7  sitting on my desk in my cell.  It was a manilla envelope

8  with pictures in it.

9      THE COURT:  Pictures of what, the ones that are in the

10  case?

11  A.   Yes.

12      THE COURT:  The drawings?

13  A.   Yes.

14      THE COURT:  You didn't draw them?

15  A.   No, I did not.

16      THE COURT:  Who put them in there?

17  A.   I don't know.

18      THE COURT:  Had you ever seen the photographs before?

19  A.   Yes.

20      THE COURT:  Where?

21  A.   In several different magazines.

22      THE COURT:  No, no, no.  I mean in your cell?

23  A.   No, not until that day.

24      THE COURT:  When did you see them in the magazines?

25  A.   The magazines that are in the unit.

1      **THE COURT:**  Those magazines are in the unit?

2   A.   Yes, sir.

3      **THE COURT:**   In the unit officially or as contraband?

4   A.   In the unit officially at that time.

5      **THE COURT:**   That's ridiculous.

6   A.   It is, but it's what happened.  There was one

7   individual getting that Parenting magazine.

8      **THE COURT:**  Okay.

9   **BY MR. CRAVEN:**

10  Q.   The rule now, as far as you know, Mr. Hall, is that

11  you are not supposed to get certain magazines that are

12  considered contraband?

13  A.   Correct.  That was changed -- that rule went into

14  effect was like January or February of this year.

15  Q.   But there was a time, was there not, when if you

16  subscribed or someone else in the Maryland Unit subscribed

17  to a magazine even if it was contraband it may come

18  through?

19  A.   It come through all the time, even continues now.

20  Q.   And so is it -- help me understand what goes on in the

21  Maryland Unit.  Is it -- there is contraband floating

22  around.

23  A.   It comes from the lower compound, yes.

24  Q.   And so we go back to the manilla envelope and the

25  pictures, you don't know who put them in there?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 140 of 271

1    A.    No, I do not.

2    Q.    But you knew they were in your cell.

3    A.    Excuse me.

4    Q.    You knew they were in your cell.

5    A.    Not until I walked in my cell.

6    Q.    Not until you saw them, but once you saw them, and you

7    looked at them, didn't you?

8    A.    Yes, I did.

9    Q.    And you kept them for a couple days?

10   A.    Two days, yes.

11   Q.    Now the drawings that we saw here on the screen, did

12   you draw those?

13   A.    No, I did not.

14   Q.    Now, you are a drawer, are you not?

15   A.    Yes, I am.

16   Q.    And you have drawn other things while there in the

17   Maryland Unit?

18   A.    Yes.

19   Q.    And how do you -- describe some of the things that you

20   draw.

21   A.    I've drawn horses, cars, women.  I've drawn -- there's

22   three other pictures that wasn't shown, but I've drawn

23   those.

24        **THE COURT:**  What?  I didn't hear that.

25   A.    I've drawn three other pictures that weren't shown

1   that --

2        **THE COURT:**  Pictures of what?

3   A.   Adult women.  Nude.

4        **THE COURT:**  Naked?

5   A.   Yes.

6        **THE COURT:**  Why are you doing that?

7   A.   It came from a tattoo magazine that was in the unit.

8        **THE COURT:**  Are you not trying to get out?

9   A.   Yes, I am.

10        **THE COURT:**  Then why are you messing -- why didn't you

11   tear this stuff up?  You could have torn it up and put it

12   in the trash.

13   A.   Yes, I could have.

14        **THE COURT:**  Why didn't you?

15   A.   Lapse in ability to control that.

16        **THE COURT:**  Well, you went through all these other

17   steps of getting off a bus and going to work early and

18   getting out so you wouldn't be around kids, and now you're

19   in Maryland waiting to be in Federal Court some day, and

20   you've got pictures of naked little children and you left

21   them there.  Was it for your sexual gratification?

22   A.   No, not at that time, sir.

23        **THE COURT:**  Why didn't you just tear them up?

24   A.   I didn't think about that at the time.  It was -- I

25   looked at them because I was interested.

1    **THE COURT:**  Interested in what?

2    A.   Looking at the pictures.

3    **THE COURT:**  Why?

4    A.   I just -- was just interested.

5    **THE COURT:**  They're not interesting.

6    A.   No, not really.

7    **THE COURT:**  It's ridiculous.  I mean it suggests

8    you've got a problem with that.  What do you think?

9    A.   I still need to be worked on, yes.

10   **THE COURT:**  What?

11   A.   I still need to be worked on, yes.

12   **THE COURT:**  What needs to be worked on?

13   A.   Making the right decisions.

14   **THE COURT:**  Somebody set you up?  Is that what your

15   case is?

16   A.   I don't know.

17   **THE COURT:**  Who would do that, somebody else in there?

18   A.   I don't -- I know there are several artists in that

19   place, but I don't know who did it.

20   **BY MR. CRAVEN:**

21   Q.   Mr. Hall, was it a good idea for you to have that

22   stuff?

23   A.   No.

24   Q.   Why not?

25   A.   I made a mistake in having it.

1  Q.  And what have you learned from that?

2  A.  That no matter what that if stuff like that pops up

3  just rip it up and throw it away.

4  Q.  Now, when you were on release for 29 months that kind

5  of material was everywhere in the public, was it not?

6  A.  Yes.

7  Q.  And how did you deal with it then?

8  A.  I only made one lapse and that was when I was in a

9  book store looking for my car magazines I was trying to get

10  and right next to car magazines was the pornography, and I

11  happened to look at the -- a calendar of Playboy.

12  Q.  Adult pornography?

13  A.  Yes.

14  Q.  And did you report that?

15  A.  Yes, I did.

16  Q.  Did you buy the magazine?

17  A.  I bought my car magazines, but I didn't buy that.

18  Q.  You didn't buy the one you weren't supposed to have?

19  A.  No.

20  **THE COURT:**  All right.  Let's take a recess for 15

21  minutes.

22          (Court recess at 4:00 p.m.)

23  **THE COURT:**  Mr. Craven.

24  **MR. CRAVEN:**  Thank you, Your Honor.

25  Q.  Mr. Hall, if you are released, are you interested in

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 144 of 271

1   having a relationship with a significant other?

2   A.   Eventually, yes.  I need to get some things worked out

3   before I start doing that again.

4   Q.   And explain to me what kind of relationship you are

5   looking for.

6   A.   I'm looking for a relationship with an adult woman

7   that has no kids or doesn't plan to have any kids, that is

8   meaningful, loving, caring and that would help me out with

9   everything I need to be helped out with.  She would be my

10  right hand.

11  Q.   Are you going to have a relationship with any minors?

12  A.   No.

13  Q.   Why not?

14  A.   Because it's wrong.  I made a mistake back then.  I'm

15  not going to make any more mistakes now.

16  Q.   Why do you say that?

17  A.   Because what I've learned in the SOTP about how I

18  harmed people and looking back and I should have realized

19  that what happened to me I have also perpetrated on

20  somebody else, and I can't do that again.

21  Q.   Describe what you have learned from the past.

22  A.   I have learned that -- that no matter what I need to

23  be doing, in order to make sure that I do not harm anymore

24  children or adults I need to be mindful about what is real

25  and what is not.

1    Q.   What are your goals for the future?

2    A.   When I am released, I will probably be placed in

3    another halfway house.  And if that happens, I'll be more

4    open and honest with staff.  I won't be belligerent or --

5    make sure I get a job and continue my counseling in some

6    form or way that hopefully will continue to help me grow as

7    a person and make sure I won't harm anymore people.

8    Q.   Do you think you are going to harm more people?

9    A.   No, sir.

10    Q.   Where would you go?  Do you know where, if you were

11    released, where you're going to go?  Back to New York or

12    somewhere else?

13    A.   As I know right now, Albany, New York.

14    Q.   You've got a laundry list of pretty onerous or

15    stringent conditions for 25 years of supervised release.

16    Are you going to be able to make it?

17    A.   Yes.

18    Q.   Why?

19    A.   Looking back on what has happened in the past four

20    years alone, of my attitude and everything, I need to be

21    more vigilant on maintaining an open and -- a personality

22    that will be more open and listening to what probation or

23    other staff members has to say about what I need to be

24    doing.

25    Q.   Is it fair to say you will do everything you can to

1  stay out?

2  A.  Absolutely.

3  Q.  What do you think about the two witnesses who

4  testified this morning saying that they thought you would

5  reoffend, that you were a high risk to reoffend?

6  A.  I know that my past shows what it has, you know, that

7  I've reoffended twice.  It isn't going to happen again.

8  And they don't know me as a person.  They only know me

9  what's on paper.  And if they know who I am in person,

10  maybe they -- maybe they'll think otherwise, but I can't

11  change their mind.  I only can do what I'm supposed to be

12  doing for me, and that is to maintain a lifestyle that is

13  offense free and hopefully be in a relationship with

14  somebody.

15  Q.  Do you know what kind of work you want to do?

16  A.  Depending on if they put me back in Albany, it's going

17  to be very difficult to get a job that I want to be

18  involved in, which is back in landscaping.  If I can get

19  back into the golf course I'll hopefully be there for

20  numerous of years.  If not, maybe building houses or

21  painting houses again.  Because they don't have a very big

22  area that's in the city.  It's outside the city.  And I

23  don't have transportation, so --

24  Q.  You've got skills in the general construction

25  industry, Sheetrock, that type thing?

1    A.    Yes, I do.

2    Q.    Are you going to reoffend?

3    A.    No, I can't do that again.

4    Q.    I'm sorry?

5    A.    I can't do that again.  It's wrong.  It was wrong -- I

6    made a big mistake the first time, made a big mistake the

7    second time.  It isn't going to happen a third.  I can't do

8    that.  What I know now about how I have hurt somebody and

9    people that actually loved and cared for me once upon a

10   time, I've hurt them.  I can't do that again.

11        **THE COURT:**  What Federal district were you sentenced

12   in?

13   A.    The Eleventh District of New York.

14        **THE COURT:**  And that's where you got the 63 month

15   sentence?

16   A.    Yes, sir.

17        **THE COURT:**  What was the term of supervised release at

18   the time of your sentence?

19   A.    Three years.

20        **THE COURT:**  Three years.  And that was revoked?

21   A.    Yes.

22        **THE COURT:**  How did you get a 25 year term of

23   supervised release?

24   A.    Under the SORNA Act --

25        **THE COURT:**  Under the what?

1  A.   The SORNA Act, Sex Offender Registration, the Federal

2  sexual registry, I did not register as a sex offender when

3  I left the state of New York.

4     **THE COURT:**  Were you convicted of that?

5  A.   I was convicted of not registering as a sex offender.

6     **THE COURT:**  In Federal Court?

7  A.   Yes.

8     **THE COURT:**  And so the earlier conviction for which

9  you got a 63 month sentence and three years of supervised

10  release was later followed by the failure to register as a

11  sex offender conviction?

12  A.   Actually, no.  The first offense was the possession of

13  child pornography, which I got the 63 months, yes.  And

14  then the not register as a sex offender case --

15     **THE COURT:**  What was your sentence on that?

16  A.   That was 25 months unsupervised release and 25 years

17  of -- 25 months of --

18     **THE COURT:**  Prison.

19  A.   Prison and 25 years of supervised release.

20     **THE COURT:**  Okay.  So that's the supervised release

21  term that you are currently under?

22  A.   Yes.

23     **THE COURT:**  All right.  Go ahead.

24  **BY MR. CRAVEN:**

25  Q.   And, Mr. Hall, that all stemmed from when you decided

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 149 of 271

1   to take off to New Orleans?

2   A.   Yes.

3        **MR. CRAVEN:**  Nothing further.

4        **THE COURT:**  So when he was certified at the end of his

5   prison term, it was the term of 25 months that was being

6   served under the last sentence?

7        **MR. CRAVEN:**  Yes, Your Honor.

8        **THE COURT:**  Okay.  Does the Government have any cross?

9        **MR. JAMES:**  Yes, Your Honor.

10       **THE COURT:**  Go ahead.

11                        <u>CROSS-EXAMINATION</u>

12  **BY MR. JAMES:**

13  Q.   Mr. Hall, you stated that with regard to 25 years of

14  supervised release that you would follow the rules; is that

15  correct?

16  A.   Yes, sir.

17  Q.   And, in fact, I want you to turn to Exhibit Number

18  [28].  Exhibit Number [28], that is, in fact, the Judgment

19  in the matter in which you got 25 years supervised release,

20  is it not?

21  A.   Yes, sir.

22  Q.   I want you to look at -- on the bottom of the exhibit

23  are what we call Bates stamp numbers; do you see that?

24  A.   Yes.

25  Q.   Go to number 16, okay?  Under where it says,

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 150 of 271

1    "Additional Standard Conditions of Supervision."  I want

2    you to look at paragraph number 10.  All right?

3    A.    Yes.

4    Q.    Now, you were not supposed to view, own or possess any

5    obscene, pornographic, or sexually stimulating visual,

6    auditory, or written material.  And that includes any

7    telephone, electronic media, books, computer programs, or

8    computer services that have a reasonable relationship to

9    the offender's deviant behavior pattern.  And so you, in

10   fact, violated that while you were in the Maryland Unit

11   because you possessed those images of little girls that

12   were drawn over and were nude.  Is that correct?

13   A.    That's correct, sir.

14   Q.    So this talk about 25 years is going to make sure that

15   you don't reoffend, while you were in the Maryland Unit you

16   violated that already?

17   A.    Yes, sir.

18   Q.    All right.  Now, I want to talk about those

19   photographs again.  You stated on Direct Examination -- The

20   Court asked you -- why did you do these things, right?

21   A.    Yes, sir.

22   Q.    Do you remember those questions?

23   A.    Yes.

24   Q.    And do you remember telling The Court that you didn't

25   know why you did it?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 151 of 271

1   A.   I said I didn't know, but I was interested.

2   Q.   Well, you were more than interested, were you not?

3   A.   Yes, sir.

4   Q.   In fact, you were going to draw those pictures

5   yourself, redraw them nude?

6   A.   Yes, sir.

7   Q.   In fact, you had stated during the deposition that in

8   the past you had received those type of photographs and

9   drawings, and you claimed you had ripped them up.  You had

10  these for two days.  That's what you said before, right?

11  A.   On other photographs, yes.

12  Q.   Right.  But these particular photographs you held them

13  for two days, after viewing them?

14  A.   Right.

15  Q.   You put them on top of your locker?

16  A.   Yes.

17  Q.   You intended to keep it?

18  A.   Yes.

19  Q.   You intended to redraw it?

20  A.   Yes.

21  Q.   Were you going to masturbate to it?

22  A.   No, sir.

23  Q.   Why were you going to keep it then?

24  A.   I was going to attempt to draw it for somebody else.

25  Q.   So you could give it to somebody else?

1    A.    Yes.

2    Q.    And when you would do that would they, in exchange,

3    give you drawings of nude girls?

4    A.    Not that I know of.  I didn't know that -- when these

5    pictures showed up, I didn't know what the major intent was

6    at the time.

7    Q.    I'm asking you, had you in the past exchanged drawings

8    with other Maryland Unit detainees?

9    A.    No, sir.

10   Q.    You've given -- you've distributed nude drawings to

11   others; is that what you're saying?

12   A.    Excuse me?

13   Q.    Have you distributed nude drawings to others?

14   A.    No, no nude drawings to others, no.

15   Q.    Now you made reference on Direct Examination to a

16   number of other photographs that we did not see.

17   A.    That is correct.

18        **MR. JAMES:**  If I may have just one moment, Your Honor.

19        **THE COURT:**  Sure.

20        **MR. JAMES:**  May I approach the Clerk, Your Honor?

21        **THE COURT:**  Yes.

22            (Government's Exhibit Number [57] marked.)

23   Q.    I'll show you what has been marked as Government's

24   Exhibit Number [57].  Government's Exhibit Number [57],

25   that is a photograph that was seized during a shakedown, is

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 153 of 271

1  that correct?

2  A.   That is correct.  And it was also June 10th.

3  Q.   I'll show you what is marked as Government's Exhibit

4  Number [58] -- Your Honor, the witness has testified about

5  other photographs The Court did not see.  So the Government

6  now shows The Court additional photographs.  Exhibit Number

7  [58], do you recognize that?

8  A.   Yes, sir, I do.  That also was in the manilla

9  envelope.

10  Q.   I'm showing you Government's Exhibit Number [59].

11  That's another one of the photographs?

12  A.   Yes, sir.

13  Q.   And that is a photograph of a young girl with a

14  surfing board to her back?

15  A.   Yes, sir.

16  Q.   And, in fact, there were also additional nude drawings

17  that were found that were not shown to The Court here, is

18  that correct?

19  A.   That is also correct.  That was part of that package

20  that came in June 10th.

21  Q.   I'm showing you what is marked as Government's Exhibit

22  Number [60].  And Government's Exhibit Number [60], that is

23  a hand drawing of a young girl, is it not?

24  A.   It looks like it, yes, sir.

25  Q.   And she is not wearing any undergarments.  Is that

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 154 of 271

1  correct?

2  A.   Yes, sir.

3  Q.   And this is one of the photographs you had intended to

4  keep.  Is that correct?

5  A.   Yes, sir.

6      **MR. JAMES:**  Your Honor, at this time I offer into

7  evidence Government's Exhibits [57] through [60].

8      **THE COURT:**  Received.

9  Q.   Now, when you testified that -- let me show you what

10  is marked as -- what is in evidence as Government's Exhibit

11  Number [54].  And that is the most recent found -- if you

12  will just turn to Exhibit [54] in your book.  Government's

13  Exhibit Number [54], those are nude photographs of women,

14  is that correct?

15  A.   They're not nude.

16  Q.   Are they semi-nude?

17  A.   Yes, sir.

18  Q.   And go to the next page.  This was during the February

19  shakedown, is that correct?

20  A.   Yes, sir

21  Q.   Go to the next page, please.  And, in fact, there is a

22  drawing in there as well.  That's a drawing of what appears

23  to be a female on a -- it looks like a child's bike, is

24  that correct?

25  A.   No, sir.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 155 of 271

1    Q.   No?

2    A.   No.  It is a bicycle that was made for long distance -

3    - it was in the GQ magazine.

4    Q.   Okay.  Now, all those drawings that were found in

5    February, you were not to possess or view all of them:

6    obscene, pornographic, or sexually stimulating visual,

7    auditory or written materials.  Is that correct?

8    A.   Yes, sir.

9    Q.   Part of that 25 year term of supervision that you are

10   stating now that you can follow?

11   A.   Yes, sir.

12   Q.   Now, I want to go back to the first part of your

13   testimony for a moment.  You testified about the abuse at

14   the hands of your father.  Is that correct?

15   A.   Yes, sir.

16   Q.   But that's not what caused you to become a pedophile,

17   right?

18   A.   No.  It's not the catalyst, no.  I mean, it's not the

19   cause, it's the catalyst.

20   Q.   But is the catalyst what made you a pedophile?

21   A.   No.  What made me as an angry person.

22   Q.   And because you're an angry person is that what led

23   you to become a pedophile?

24   A.   No, sir.

25   Q.   So that's not related to why you are a pedophile?

1  A.   Under the program, yes, it did.  That is part of --

2  Q.   Under the program directive --

3  A.   The program directive states that my anger is part of

4  my pedophilia, yes.

5  Q.   I see.  And when we say, under the program, are we

6  talking about the SOTP program?

7  A.   Yes.

8  Q.   And that being the SOTP program that you were in back

9  in 2002?

10  A.   Yes.

11  Q.   The same program that once you got out you didn't

12  follow anything in that release plan, did you?

13  A.   I followed everything in that release plan.

14  Q.   Everything in the release plan?

15  A.   Not 100 percent, but I did follow it.

16  Q.   Oh, you did?

17  A.   Yes.

18  Q.   I see.  So was it consistent with that release plan

19  for you to possess things such as Heavy Metal magazine?

20  A.   That is an art fantasy book.  That has nothing to do

21  with a sexual thing.

22  Q.   In that magazine aren't there pictures of women in

23  bondage?

24  A.   Yes, there is.  Sometimes, yes.

25  Q.   Right.  And is that consistent with that release plan

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 157 of 271

1   that you are boasting about having completed?

2   A.   I'm not sure on the magazine itself.

3   Q.   What about Teen Vogue, is that consistent with this

4   release plan that you have been touting?

5   A.   Yes.

6   Q.   It is?

7   A.   Yes.

8   Q.   For pedophiles to possess Teen Vogue?

9   A.   Oh, no, it's not -- it's not -- it's not advisable.

10  Q.   What about High Caliber Latina?  Is that consistent

11  with this release plan that you have been telling everyone

12  about and how you are going to follow it?

13  A.   No.

14  Q.   What about the photographs of scantily clad women?  Is

15  that consistent with this release plan that you have been

16  boasting about?

17  A.   No, sir.

18  Q.   What about those photographs that we've all seen here

19  of those little girls with no clothes on?  Is that

20  consistent with this release plan you boast about

21  following?

22  A.   No, sir.

23  Q.   Now, with regard to your -- may I have one moment,

24  Your Honor?

25          **THE COURT:**  Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 158 of 271

1    Q.   All right.  Now, your first sexual offense conviction,

2    the one with the -- I believe it was a ten-year-old girl?

3    A.   Yes, sir.

4    Q.   And in that conviction you knowingly did that, right?

5    You knowingly had that little girl place her hand and her

6    mouth on your genitalia; is that correct?

7    A.   No, sir.  When?  I didn't quite catch the question.

8    When?  What year?

9    Q.   Did you knowingly throughout your first conviction

10   with the ten-year-old girl --

11   A.   1987, correct.

12   Q.   1987.  You knowingly had that little girl place her

13   hand on your genitalia and also had her place her mouth on

14   your penis?

15   A.   Not to my recollection, no.  I did not remember that.

16   Q.   Did you plead guilty to that?

17   A.   Yes, I did.

18   Q.   So you appeared before a judge.  Now, the judge is

19   sitting to your right, and that judge asked you -- the

20   judge read you the charges, right?

21   A.   Excuse me?

22   Q.   The judge read you the charges?

23   A.   Yes, sir.

24   Q.   He read you what the indictment stated?

25   A.   Yes.

1    Q.   And that judge asked you, did you, in fact, commit
2    that crime?
3    A.   Like I told him, yes, I did, because I at the time
4    believed that I did do it.  I was under the influence of
5    alcohol at the time of the incident.  I do not remember
6    what -- I had gone on what she stated.
7    Q.   Oh, so you told the judge that -- is that what you
8    told the judge, or is that what you are saying now?
9    A.   That's what I'm saying now.
10   Q.   Well, I'm asking you what you told the judge at the
11   time.
12   A.   I don't recall what I said to the judge back then.
13   Q.   Well, you didn't say not guilty, right?
14   A.   No, I know I pled guilty.
15   Q.   So you pled guilty?
16   A.   Yes.
17   Q.   All right.  Did you plead guilty because you were
18   guilty?
19   A.   Like I said, at the time I did not remember what
20   happened, but I have to believe I did do it.
21   Q.   With regard to your second offense -- your second
22   offense in which you pled guilty, injury to the welfare of
23   a minor.
24   A.   Uh-huh.
25   Q.   And that's where you had the little girl -- you were

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 160 of 271

1    trying to groom that little girl, were you not?

2    A.    Yes, I was trying to groom that little girl.

3    Q.    Tell the Judge, what is grooming?

4    A.    Grooming is either overt or covert trying to get her

5    to do whatever you want to do through knowledge of what --

6    that I knew of her.  Like they stated before, my knowledge

7    of her sexual abuse with the father and I tried to use that

8    for my grooming technique at the time.

9    Q.    And you were also grooming the mother, too, were you

10   not?

11   A.    I was intimately involved with the woman, yes.

12   Q.    Well, not just -- you weren't just involved with the

13   woman.  You were grooming the mother so that you could have

14   sex with her and then her daughter?

15   A.    No, sir.  That was the 1987 conviction.  That's not

16   the 1999 one.

17   Q.    Well, let me go back to the 1999 conviction.  That

18   same little girl, you had her view pornography; is that

19   correct?

20   A.    Yes, sir.

21   Q.    You had her sit in your lap?

22   A.    Yes, sir.

23   Q.    While you were watching pornography?

24   A.    Yes, sir.

25   Q.    And, in fact, when we talk about drawings, you drew

1    pictures of an unclothed girl, and you showed it to the
2    eight-year-old girl, isn't that correct?
3    A.   Yes, sir.
4    Q.   And you also showed it to that girl's eight-year-old
5    friend?
6    A.   Yes, sir.
7    Q.   You had that little girl wear lingerie for you?
8    A.   No, sir.
9    Q.   You didn't have her wear lingerie for you?
10   A.   No, sir.
11   Q.   What about did you have her dance for you?
12   A.   Yes, she danced all the time, sir.
13   Q.   And you inserted your finger into her vagina?
14   A.   No, sir.
15   Q.   And so you dispute what the little girl says?
16   A.   I dispute it because I know for a fact that even the
17   test results came back that didn't say I penetrated her.
18       **THE COURT:**  All right.  Let's continue this in the
19   morning.  You can be back on the stand.  And then you have
20   your expert after this witness?
21       **MS. LITTLE:**  Yes, sir.
22       **THE COURT:**  We will probably finish up by lunch break
23   tomorrow.  We will be in recess until 9:30 tomorrow
24   morning.
25              (Court recess at 5:05 p.m.)

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 162 of 271

1    **THE COURT:**  Good morning.  Let's see, you were cross-

2    examining last night.

3        **MR. JAMES:**  That's correct.  Thank you, Your Honor.

4    Q.  Mr. Hall, when we left last night you had corrected me

5    with regard to a 1987 conviction that involved a ten-year-

6    old girl, is that correct?

7    A.  Yes, sir.

8    Q.  And you were grooming that girl because you

9    specifically wanted to have sex with her, is that correct?

10   A.  Yes, sir.

11   Q.  Now, that's your testimony now.  Now, four days ago

12   you were under oath at a deposition, were you not?

13   A.  Yes, sir.

14   Q.  And you were asked with regards to that ten-year-old

15   girl, did you establish a relationship with the mother

16   specifically to groom her to have a relationship, sexual

17   relationship with the child?  Answer:  No.  That was your

18   answer, was it not?

19   A.  1987, that is correct?

20   Q.  Now, during that examination at one point you stated

21   that you had self-reported about an incident in 2006 when

22   you were out in the community?

23   A.  Yes, sir.

24   Q.  And you said you had viewed -- I believe you said you

25   viewed pornography?

1    A.    Yes.

2    Q.    And you said you reported that to your probation

3    officer, is that correct?

4    A.    Yes, sir.

5    Q.    And is it your testimony to this Judge that you did

6    this out of the fact that you felt sorry for what you did?

7    A.    I reported it because it was a necessary thing to --

8    when I make lapses I'm supposed to report it to my PO and

9    to the counselor who is counseling me.  And I did it

10   because I was -- I made a mistake; I lapsed.

11   Q.    Well, you reported it four days later when you called

12   into your probation officer, not immediately?

13   A.    I'm not certain if I did that or not, sir.

14   Q.    Now, this occurred on -- I believe it was September

15   20th -- that's the day you made your report --

16   but isn't it true that on September 16th you were seen at a

17   local shop looking at men's magazines, and there was a

18   report by a law enforcement officer to your probation

19   officer?

20   A.    That happened up in Westport, New York in 2004, sir.

21   Q.    So the incident in 2004 --

22   A.    It was a local general store in Westport, New York.

23   Q.    You didn't -- okay, I'm sorry.  Go ahead.

24   A.    That I had viewed Maxim magazine and FHM magazine in

25   that general store.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 164 of 271

1    Q.    All right.  And then you didn't report that to your

2    probation officer in 2004?

3    A.    No, I did not, because I didn't think that magazine

4    was pornographic.

5    Q.    Now, so are you saying in 2006 you reported that to

6    your probation officer?

7    A.    Yes.

8    Q.    Was that the only incident in 2006?

9    A.    Yes, sir.

10   Q.    Now, didn't there come a time -- I believe it was in

11   February of 2006 -- in which you were searched, and they

12   found pornography in your -- you know where I'm going with

13   this, right?

14   A.    Excuse me?

15   Q.    You know where I'm going with this?

16   A.    Yes, I do.

17   Q.    Right.

18   A.    And it was a certain movie in my possession that I

19   bought at Wal-Mart.  Wal-Mart don't sell pornography.  It

20   was a movie that was very -- I assumed that it was very

21   harmless, because I never got to watch it.  I had just

22   bought it.  I think the movie was called, The Hills Have

23   Eyes.  And it was a -- a unrated version.

24   Q.    So is it your testimony that that was not pornography?

25   A.    That was not pornography, no.

1   Q.   Despite what they reported?

2   A.   Despite what they reported.

3   Q.   So your probation officer couldn't tell what

4   pornography is?

5   A.   What the -- Dr. Hamill had stated to me and to the

6   probation officer when we had a meeting with them that the

7   movie itself -- I can't remember how he exactly worded it,

8   but it had a lot of violence.  It had a few graphic rape

9   scenes in it, and there was nothing else in that movie.

10  Q.   Would you turn to Exhibit Number [26] in the book?

11  Gus Ramirez was the Executive Director at Horizon Center,

12  is that correct?

13  A.   Yes, sir.

14  Q.   And in his memorandum, which is Exhibit Number 26, he

15  states, found in plain view numerous articles and pictures

16  of pornography, which is a violation of program rules.

17  A.   I can't answer this fully, but I know it wasn't my

18  material that he had checked because I didn't have

19  pornography.

20  Q.   And the movie you are referring to, that Hills Have

21  Eyes movie, that's a slasher type movie, is it not?

22  A.   Yes, it is.

23  Q.   It involved cannibalism and women being hacked apart?

24  A.   I think -- yes, sir.  If I remember correctly, yes.

25  When I seen the trailer on the television, yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 166 of 271

1    Q.   And, in fact, while you were -- back in 2006 while you

2    were on release, you were cited for, again, viewing

3    pornography and having casual sex with an AA participant.

4    In fact, you failed to report to probation, you failed to

5    report to the mental health agency.  This is all in

6    reference to the conviction that you had for child

7    pornography before Judge -- I think it was The Honorable

8    Judge McAvoy?  Is that right?

9    A.   Yes.

10    Q.   Now, when you were sentenced before Judge McAvoy, you

11    got a chance to speak at your sentencing, didn't you?

12    A.   I don't recall that, but I might have.

13    Q.   Do you remember ever saying to that judge whether or

14    not, you know, I'm sorry, Judge, for my offense?

15    A.   Yes, I do.  I vaguely remember it, yes.

16    Q.   You told the judge you were going to follow his rules?

17    A.   I'm not sure if I did or didn't.

18    Q.   Did you attempt to follow his rules?

19    A.   Excuse me?

20    Q.   Did you attempt to follow that judge's rules?

21    A.   On what incident are you talking about, the 2006 or

22    the 2000 -- 1999, after he sentenced me?

23    Q.   I'm talking about 1999, when you first got sentenced

24    for child pornography.

25    A.   Okay.

1   Q.   You spoke before that judge, right?

2   A.   Like I said, I don't remember fully.

3   Q.   Now, when you were testifying yesterday you stated

4   that you pled guilty to a 1987 offense involving a ten-

5   year-old girl but you didn't remember it.

6   A.   No, I don't remember it.

7        **MR. CRAVEN:**  Objection.  Asked and answered.

8        **THE COURT:**  Overruled.

9   A.   I don't remember ever doing what I was supposed to

10  have done.

11  Q.   Right.  But you had planned to do that, right?

12  A.   I was grooming the child.

13  Q.   Yes, but you had planned to use that child?

14  A.   I don't know.

15  Q.   You don't know?

16  A.   I don't remember if I planned or not.  I was grooming

17  that child at the time.

18  Q.   Did you tell Dr. Rosell -- he's sitting back here.  He

19  is your expert witness, is he not?

20  A.   Yes, sir.

21  Q.   And you interviewed with Dr. Rosell, did you not?

22  A.   Yes, sir.

23  Q.   And in fact, did you look at Dr. Rosell's report?

24  A.   Yes, I have.

25  Q.   I believe it's Exhibit Number [7], Your Honor.  With

1    regard to that you told -- well, I'll give you a chance to

2    turn to it.

3    A.   I don't have that here.  You said [70]?

4    Q.   It's Exhibit Number [70], page number 6.  I'm sorry,

5    Exhibit Number [7], excuse me, page number 6.

6    A.   Okay.  Page number 6?

7    Q.   Page number 6.

8    A.   Okay.

9    Q.   Now, you have seen this report before, have you not?

10   A.   Yes, I have.

11   Q.   And, in fact, in that report your expert witness says

12   -- he notes your version of offending.  And you stated to

13   him, "I groomed the mother to have sex with her and then

14   her daughter.  I told the daughter that I thought she was

15   pretty.  The abuse happened twice and I did plan it, but I

16   don't remember much the days it happened because I was

17   drunk."  So you told your expert witness you had planned to

18   abuse that girl?

19   A.   Yes, sir.  I now recall what I said.

20   Q.   Now, on Direct Examination you testified that with

21   regard to that ten-year-old girl, that you had her on your

22   lap viewing pornography.

23   A.   No, that's not -- which case are you talking about,

24   the 1999?

25   Q.   We're talking about the 1999 -- you're correct.  It's

1    the 1999 conviction, about the eight-year-old girl, I

2    believe.

3    A.   Yes.

4    Q.   You had that eight-year-old girl in your lap viewing

5    pornography, correct?

6    A.   Yes.

7    Q.   And you told Dr. Rosell that you never touched that

8    girl?

9    A.   Correct.

10   Q.   And obviously that's not true because you did touch

11   that girl.

12   A.   I had my hands on her, yes.

13   Q.   Now you testified with regard to the photographs that

14   we showed yesterday, on Direct Examination you testified

15   that you -- and you told the Judge.  You told the Judge to

16   your right that you didn't know who put those pictures in

17   your room.  Is that correct?

18   A.   I'm -- yes.

19   Q.   But that's not what you told Dr. Rosell, is that

20   correct, when he interviewed you?

21   A.   I'm not sure what I -- remember what I said to him.

22   Q.   Did you tell Dr. Rosell that you had received the

23   pictures to give to someone else?

24   A.   Uhm -- apparently I must have said it, because it's

25   written in here, yes.  I don't recall.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 170 of 271

1    Q.   And you told something different to Dr. Arnold.  You

2    told Dr. Arnold that you were -- that I believe -- well,

3    withdraw.

4        There are two other incidences in which there were

5    shakedowns and objectionable materials found in your

6    possession, right?

7    A.   There was just two incidences itself.

8    Q.   No, there was July 8, 2010.  There was a shakedown

9    then, right?

10   A.   Right.

11   Q.   There was July 15, 2010, there was another shakedown?

12   A.   I'm not -- I don't remember that one.

13   Q.   All right.  You don't recall the February 11

14   shakedown?

15   A.   Yes, sir, I do.

16   Q.   All right.  So are you saying you don't recall there

17   being three shakedowns?

18   A.   There have been numerous of shakedowns in that unit,

19   and I don't remember what was taken, because I never got

20   confiscation slips on most of them.

21   Q.   On the shakedowns that occurred in the unit, were

22   those materials your materials?

23   A.   I'm not sure what materials you are talking about.

24   Q.   The materials that were confiscated.

25   A.   I know the June 10th one, that earliest one, that

1    stuff was in my possession, yes.

2    Q.   The June 10th.  Are you talking July 15, 2010?

3    A.   No.  The earliest one.

4    Q.   July 8, 2010?

5    A.   Yes.

6    Q.   So that was your material, is that correct?

7    A.   Yes.  That was in my possession, yes.

8    Q.   Now, did you tell Dr. Arnold that that material you

9    were holding for someone else who gave you that material

10   because they were afraid they were about to be shaken down?

11   A.   I do recall saying something maybe of that sort, yes.

12   Q.   And with regard to the number of sexual partners that

13   you have stated, how many sexual partners have you had?

14   A.   I'd have to -- I rough estimate it about -- I don't

15   know --

16   Q.   How much?

17   A.   A hundred fifty to 500.

18   Q.   A hundred and fifty to 500.  You told Dr. Rosell you

19   had had a hundred sex partners, is that correct?

20   A.   Probably.  Like I say, I don't remember what I said to

21   him exactly, directly.

22   Q.   And you told Dr. Arnold you had about 500 sex

23   partners, didn't you?

24   A.   Again, like I said, I don't exactly remember what I

25   said.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 172 of 271

1  Q.   How many male sex partners have you had?

2       **MR. CRAVEN:**  Objection.  Relevance.

3       **THE COURT:**  Overruled.

4  A.   I don't think no more than fifty to a hundred.

5  Q.   Now, you told Dr. Rosell you had one male sex partner?

6  A.   Yes.

7  Q.   Were you saying these things to Dr. Rosell because you

8  wanted to be presented in a better light to him?

9  A.   No, sir.

10 Q.   Now, with regard to the shakedowns in which materials

11 were taken from your cell, you have said that on July 8

12 that was your material?

13 A.   That was in my possession, yes.

14 Q.   Was it your material as well?

15 A.   It was in my possession.  Not my material.  It was in

16 my possession.

17 Q.   Just like the other shakedowns that they were in your

18 possession?

19 A.   I'm not sure which shakedown you are speaking of?

20 Q.   All right.  The July 15th shakedown?

21 A.   Like I said, I don't remember that one.

22 Q.   The February 11 shakedown?

23 A.   That one I remember.  Those three pictures were mine,

24 yes.

25 Q.   Were there more than three pictures taken?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 173 of 271

1    A.    No, sir.  They came out of my spiral notebook.

2    Q.    Now, what are the conditions -- when you were out in

3    the community back in 2006 -- you were cited back on

4    February 3, 2006 with 20 different incidents for either

5    being unaccountable, inappropriate female contact, for

6    being defiant to staff, for not doing your chores and for

7    being in contact with a sex offender.  I believe his name

8    is Johnny.  Is that correct.

9    A.    That's correct, yes, sir.

10   Q.    Now, to this period of time as of, let's say March, I

11   believe, you were in contact with another sex offender,

12   your good friend, Mr. Barrett; is that correct?

13   A.    Yes, sir, I am.

14   Q.    In fact during the February shakedown I believe photos

15   were seized, and these were risque photographs that you had

16   taken from a magazine.  You enlarged them, you photocopied

17   them, and you drew them.  Is that correct?

18   A.    In what incident was this?

19   Q.    From February?

20   A.    No.

21   Q.    No?

22   A.    No.

23   Q.    But in fact you have done -- you have taken risque

24   photographs, you have enlarged them, drew them out,

25   photocopied them and then sent the originals to Mr.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 174 of 271

1    Barrett, isn't that correct?

2    A.   No, sir, that's not the way I stated it.

3    Q.   All right.  When you were deposed last week, did you

4    not state that you sent this risque material --

5    original material to Mr. Barrett?

6    A.   I stated that the material that was told I had to send

7    home, which was the risque three photos that you now have

8    there, to be sent home to whomever.  And I did send them to

9    Mr. Barrett, yes.

10   Q.   That's what I was asking.

11   A.   No, you were asking about other materials.  There has

12   been no other materials except for those three photos.

13   Q.   All right.  Now, there has been much testimony about

14   your 25 years of supervised release, and if this Court were

15   to release you, how that you would probably follow those.

16   Is that correct?

17   A.   Today, yes, I will.

18   Q.   Oh, today, as you are sitting before the Judge?

19   A.   Excuse me?

20   Q.   As you are sitting before the Judge today, now, you

21   would follow it?

22   A.   No.  As when I first lapsed and first made my

23   mistakes, I realized I shouldn't have made those mistakes,

24   and I will be following those rules accordingly.

25   Q.   Turn to Exhibit Number [28].  One of the conditions of

1   that 25-year-term of supervised release is condition number

2   9, is it not?

3   A.   Yes, sir.

4   Q.   And condition number 9: "You shall not associate with

5   any persons engaged in criminal activity and shall not

6   associate with any person convicted of a felony. . ."

7   A.   Yes, sir.

8   Q.   And Mr. Barrett is a felony sex offender, is he not?

9   A.   Yes, he is.

10  Q.   In fact, you have been in contact with him at least

11  once a month by telephone?

12  A.   Yes, I have.

13  Q.   While in the Maryland Unit?

14  A.   Yes, I have, while I have been incarcerated, yes.

15  Q.   And you were certified back on June 16, 2009?

16  A.   Yes, sir.

17  Q.   So throughout the entire pendency of these proceedings

18  you have been contacting that sex offender?

19  A.   Yes, I have.  And by the way, sir, I'm not on

20  supervised release right now.

21  Q.   Oh, I see.  So it doesn't matter if you're not on

22  supervised release?

23  A.   Don't put words in my mouth, sir.  It has nothing to

24  do with that.  Some of the things I've done is wrong.

25  Q.   Uh-huh.

1    A.    Okay.

2    Q.    Right.

3    A.    I admit to that.  But right now as according to Judge

4    McAvoy, I'm not on supervised release right yet.  I have

5    had that verified so I can go accordingly to whatever I had

6    to do.

7    Q.    I see.  So the fact that you are not on supervised

8    release right now, it's okay for you to stay in contact

9    with a sex offender?

10   A.    I was supposed to have indirect contact through my

11   mother at the time.  They did give me permission to do

12   that.

13   Q.    Who gave you permission to do that, to have indirect

14   contact with a sex offender?

15   A.    Indirectly it was through -- like through mail to my

16   mom for me to send to him.

17   Q.    Who?

18   A.    If I remember correctly, it was Jay Driscoll, my first

19   supervised release officer.

20   Q.    So your supervised release officer said it was okay

21   for you to have indirect contact with a sex offender?

22   A.    He said as long as it went through my mom.

23   Q.    And so you're saying that since you're not on

24   supervised release right now it's okay for you to have

25   things like Teen Vogue?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 177 of 271

1    A.    No.  That was a mistake also.

2    Q.    What about Maxim?

3    A.    Maxim is a regular gentleman's magazine.  I don't see

4    that as a problem for me, sir.

5    Q.    And Heavy Metal magazine with pictures of female

6    bondage and so forth, that's not a problem either?

7    A.    That's probably I shouldn't have either.

8    Q.    Now, possessing Teen Vogue, that means you've got a

9    path, does it not, to reoffending?

10   A.    It could lead me to a lapse, then to reoffend, yes.

11   But I've made sure it has not.

12   Q.    Well, you said you made sure you have not.  Did you

13   voluntarily -- are they all receiving Teen Vogue magazine.

14   A.    No, because I only received it once in the unit.

15   Q.    Well, you weren't going to -- if they kept sending it

16   to you, you were going to keep it, were you not?

17   A.    Yes, sir.

18   Q.    Now, while you have been in the unit, the Maryland

19   Unit, you have refused sex offender treatment?

20   A.    No, sir.

21   Q.    You refused the Sex Offender Treatment Program?

22   A.    Yes, sir.

23   Q.    And that's because you dislike Dr. Hernandez?

24   A.    It's more than that, sir.

25   Q.    Did you say that you blame Dr. Hernandez for why you -

1    - at least partially for why you were certified?

2    A.   I have a feeling that he's the one that helped put me

3    where I am at today, other than my own actions outside in

4    the community, yes.

5    Q.   Since you have been in the Maryland Unit, have you

6    learned from written materials that, in fact, there is a

7    board that certifies you in Washington, D.C.?

8    A.   I've learned that there are current individuals that

9    used to work with BOP that is currently certifying people,

10   yes.

11   Q.   And Dr. Hernandez is not on that board, is he?

12   A.   No, but his memorandum -- the Butner Study is all over

13   the place, yes.

14   Q.   And so you partially blame him for why you are

15   detained?

16   A.   In part, yes.

17   Q.   And you once had a relationship while you were out,

18   with a woman, and she broke it off with you.  And you, in

19   fact blamed -- with no proof -- the probation officer for

20   causing that to happen, is that correct?

21   A.   What had happened in that situation, I had -- she is

22   the one that approached me.  I didn't know she had feelings

23   for me.  When I first moved out of the halfway house, she

24   had approached me to say that she wanted to start a

25   relationship with me.  Two weeks after the relationship

1  started, she came to me and apologized to me straight up

2  stating that I am sorry I put you through this.  Now, the

3  only way I could have taken that -- because she knew that I

4  had to report my relationship to probation and to the

5  counseling service, somebody got to her and told her to

6  back off and go away.  And, yes, that's how I blamed him.

7  Q.  Now, when you were out in the community in 2005, you

8  were given a polygraph?

9  A.  Correct.

10 Q.  Now, you, sir, are a man of reasonable intelligence,

11 are you not?

12 A.  I'm quite intelligent, yes.  I don't use it all the

13 time, but, yes.

14 Q.  And you can understand my questions?

15 A.  For the most part, yes.

16 Q.  And, in fact, if I've misstated anything, you have

17 been quick to correct me, is that correct?

18 A.  Correct.

19 Q.  Because if you hear the question you understand what

20 the question means, is that correct?

21 A.  Correct.

22 Q.  Now, when you were polygraphed you were asked, have

23 you been on the internet since starting probation?  That

24 was one question.  And the second question during the

25 course of that polygraph, "Since starting probation have

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 180 of 271

1    you touched the sex organs of any minor?"

2          And this is Exhibit Number [66].

3          I believe the first question was since starting

4    probation have -- it's question number 4 on the first one

5    was, "Since starting probation have you been on the

6    internet?"  And you responded, "No."

7    A.    Correct.

8    Q.    And question number 3 was, "Since starting probation -

9    - withdraw.  Question number 2.  "Since starting probation

10   have you touched the sex organs of any minor?"  And you

11   responded, "No."

12   A.    Correct.

13   Q.    And the result of that polygraph with regard to those

14   questions, the polygrapher observed -- significant

15   psychophysiological responses were observed when specific

16   relevant questions regarding the incident were asked.

17   A.    Correct.

18   Q.    And then with regard to the first question I posed,

19   have you been on the internet since starting probation, the

20   polygrapher found you were practicing deceptive behavior.

21         With regard to the second question I asked, since

22   starting probation have you touched the sex organs of a

23   minor, the polygrapher noted, "Mr. Hall had the most

24   deceptive response to this relevant question."

25         And that was in 2005.

1   A.   Correct.  If you go on to the next test three months

2   later, that same question was asked, and I passed it.

3   Q.   Well, you had already heard the question.

4   A.   I'm just letting you know.  Three months later.

5   Q.   Well, that's not the same question, and it's later in

6   time.

7        Now, let's talk about your -- I want to go back for a

8   moment about your Relapse Prevention Plan that we have

9   talked about that you said you would follow.  There are a

10   number of things.

11        First, on Direct Examination you told this Judge that

12   you wouldn't make the same mistakes because of what you had

13   learned back in the SOTP in 2002?

14   A.   Correct.

15   Q.   Now, in your Relapse Prevention Plan, Exhibit Number

16   [13], Bates Number 776, you talk about Deviant Sexual

17   Thoughts, Fantasies and Urges.  And do you remember that

18   one of the ways you are going to deal with this is that if

19   you were to do anything again you could go back to jail for

20   life.

21   A.   Correct.

22   Q.   You said that back in 2002?

23   A.   Correct, yes.

24   Q.   Also on Direct Examination you said if you were

25   released to a halfway house you would be open and honest

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 182 of 271

1   with the staff.  And that, in fact, the probation officer
2   you work with will be someone to help you obey every rule
3   and law.  Right?
4   A.   Correct.
5   Q.   And that was back in 2002?
6   A.   Correct.
7   Q.   And you got out in 2004?
8   A.   Correct.
9   Q.   And then you violated the terms of supervised release?
10  A.   In 2006, correct.
11  Q.   You still violated.  Oh, is there a two year
12  limitation on it?
13  A.   No, sir, but you made it sound like it was
14  immediately.
15  Q.   All right.  So it took you some time before you would
16  violate the rules?
17  A.   That I lapsed, yes.
18  Q.   In fact, you absconded which led to the current
19  federal charge for failure to register as a sex offender?
20  A.   Correct.
21  Q.   And that's in Judge McAvoy's original -- he's the
22  judge that you pled guilty to with regard to child
23  pornography, is that correct?
24  A.   Correct.
25  Q.   And I believe he's the same judge with regard to

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 183 of 271

1    absconding which led to the failure to register; is that
2    correct?
3    A.    Correct.
4    Q.    So one of the conditions that he had imposed upon you
5    when you were released originally were that you would
6    register as a sex offender?
7    A.    Correct.
8    Q.    And you absconded from that court's jurisdiction,
9    violated that judge's order because you felt you wanted to
10   go to New Orleans to look for a job?
11   A.    On part that is correct, but there is more to it.  I
12   had already registered as a sex offender in Albany, New
13   York December 2006.
14   Q.    Did that make it okay for you to leave?
15   A.    Let me finish, please.  When I absconded I made the
16   assumption that I was going to be still under the old Megan
17   Law rule, ten days of getting from point A to point B in
18   order to register.  I didn't know nothing about the Adam
19   Walsh Act or the SORNA Act at that time.  Nobody had ever
20   told me.  The piece of paper I received from the Sex
21   Offender Registry said that I had ten days prior or after I
22   left the area.
23   Q.    So are you saying that you thought you had ten days
24   from the point when you would just, on your own, not tell
25   your probation officer, I intend to go to New Orleans and

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 184 of 271

1  look for a job.  And that they would give you a ten day

2  berth in which you could arrive in New Orleans and then

3  register as a sex offender?

4  A.   That's partly correct, yes.  It was a mistake that I

5  left without permission.

6  Q.   You said that someone told you that there were jobs in

7  New Orleans.  Who was that person who told you that?

8  A.   There was a contractor that I contacted through the

9  unemployment center.

10  Q.   Why didn't you report this to your probation officer

11  that, listen, I spoke with a contractor at the unemployment

12  center who said that there is work in New Orleans.  I can't

13  find work right around here.  Can you help me transfer my

14  probation to New Orleans?

15  A.   Yeah, I could have done that, and I didn't do that at

16  the time because at the time that I had tried back in 2005

17  to be transferred to Ohio.  And everything was going well

18  to get transferred to Ohio.  But all of a sudden nobody

19  heard anything from the Ohio branch of the probation

20  department.  When my mother finally got in contact with

21  them, they stated that the New York branch had dropped the

22  ball on Mr. Hall.  That was all that was stated.  I don't

23  know what else happened, but they said they refused me to

24  go there because of whatever was said in New York.

25  Q.   So because of that prior incident, you didn't tell

1    this probation officer this time about this job

2    opportunity?

3    A.   No, I did not.  That was a mistake I made.

4    Q.   Are you still sexually attracted to children?

5    A.   Not today, no.

6    Q.   Back in 2002 you took what we call a pbg, is that

7    correct?

8    A.   That is correct.

9    Q.   And just so -- because this is in the record, and I

10    want to be sure The Court knows this -- when you look at

11    images on pbg you don't see the genitalia of the child or

12    the woman?

13    A.   They are scantily clad.  They are in undershorts or

14    bras and panties and stuff like that, yes.

15    Q.   You don't look at their genitalia?

16    A.   No, I do not.

17    Q.   Not like -- you know, unlike the drawings that you had

18    in your possession that you were keeping for two days would

19    show the drawing of the naked girl -- little girl -- with

20    her exposed vulva?

21    A.   Yes.  True.

22    Q.   That's what you find sexually stimulating?

23    A.   At the moment I was not sexually attracted.  I was

24    going to draw pictures, yes.

25    Q.   Are you saying you were not sexually attracted to

1    them?

2    A.    I was not sexually attracted.  They were just

3    pictures.

4    Q.    They were just pictures.  You just wanted to draw

5    them?

6    A.    I was going to draw them, yes.

7    Q.    And keep them?

8    A.    Yes.

9    Q.    Just for no other reason that what?

10   A.    I don't know.  Maybe just to fantasize maybe.

11   Q.    And to fantasize and masturbate to it?

12   A.    It was possible.

13   Q.    Now yesterday you said you weren't going to masturbate

14   to those.

15   A.    I wasn't going to masturbate to them.  Like I said, I

16   didn't know at first.  That's why I kept them for two days

17   because I wasn't sure what I was going to do with them.

18   Q.    Oh, so you hadn't decided whether you were going to

19   draw them and masturbate to them or not; you had to take

20   some time to make that decision?

21   A.    I wanted to do -- I was trying to think what I was

22   going to do, whether I was going to the right thing, just

23   rip them up or whatever, at that moment.

24   Q.    Well, you stated in your deposition in the past when

25   you received that sort of stuff, you didn't keep it for two

1    minutes; you just tore it up?

2    A.   Correct.  That was after the incident.

3    Q.   I believe you said in the deposition that was before

4    the incident?

5    A.   I'm not sure if it was before or after it.  I know

6    there was a lot of times that I received after, and I

7    ripped them up.

8        **THE COURT:**  You've got about a hundred people in the

9    Maryland Unit?

10   A.   Correct.

11       **THE COURT:**  Do they just spend every waking moment day

12   and night trying to get pornography into that place?

13   Honestly?

14   A.   Pornography is already on the compound.

15       **THE COURT:**  Okay.  But it's not supposed to be in the

16   Maryland Unit?

17   A.   Correct.

18       **THE COURT:**  Because everybody who is in the Maryland

19   Unit is identified as a sex offender?

20   A.   Yes, sir.

21       **THE COURT:**  So is the whole goal of that unit's

22   existence internally, the inmates, is it to get to somehow

23   break the security and get pornography in there?

24   A.   I think on some level there is with certain people,

25   but not all of them.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 188 of 271

1    **THE COURT:** Really? That's not the obsession of that

2    unit?

3    A.   Like I said, again, some people, yes, but not all of

4    them. Some of them just want to be left alone and stuff

5    like that.

6    **BY MR. JAMES:**

7    Q.   Finally, sir, if you were to be released and you

8    reoffended, you would have someone kill you, is that

9    correct?

10   A.   Correct.

11       **MR. JAMES:** No further questions, Your Honor.

12       **THE COURT:** I didn't hear the last -- you would have

13   someone what?

14       **MR. JAMES:** He would have someone kill him, if he

15   reoffended, if you release him.

16       **THE COURT:** He would have someone kill him?

17       **MR. JAMES:** That is correct, Judge. That is what he

18   stated on the witness stand, and that's consistent with

19   what he stated in his deposition about four days ago?

20       **THE COURT:** What do you mean by that?

21   A.   I mean that if I ever touched another child again,

22   which I'm not going to, that that parent I would make sure

23   they would kill me.

24       **THE COURT:** You would ask them to kill you?

25   A.   Yes.

1      **THE COURT:** Well, that's not any form of deterrent.

2    A.  Well, you know, I've got to look at --

3      **THE COURT:** That's not the kind of society we have.

4  You're going to make somebody a murderer?

5    A.  I don't want to, but in order to ease their pain --

6      **THE COURT:** That's not an appropriate methodology.

7    A.  No, sir, it's not.

8      **THE COURT:** Okay. You understand that?

9    A.  Yes, sir, I do understand that. It's just that I

10  don't think I can ever face the music again like I have

11  now.

12      **THE COURT:** Okay. Any redirect?

13      **MR. CRAVEN:** Yes, Your Honor.

14                 REDIRECT EXAMINATION

15  **BY MR. CRAVEN:**

16    Q.  Mr. Hall, would it be fair to say that you made that

17  statement about you would have someone kill you because

18  that's how bad -- that's how much you don't want to do

19  that?

20      **THE COURT:** Well, aren't you asking him is it

21  hyperbole or is it a truthful statement?

22    Q.  Well, can you explain that a little further, Mr. Hall?

23      **THE COURT:** Do you know what hyperbole means?

24    A.  No, sir.

25      **THE COURT:** An exaggeration in order to emphasize a

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 190 of 271

1     point.  Something ridiculous like I could swim a million

2     miles to get an ice cream cone.  Well, I couldn't swim a

3     mile.

4     A.   Yeah, that's maybe how I stated it.  And like I say,

5     like yesterday when we left here on break, I had tears in

6     my eyes because my stomach was so knotted up and thinking

7     that everything that has been said here yesterday and today

8     is like I don't want to do this again.  I can't go through

9     this again.  I can't -- I can't seem to want to harm

10     anybody else again.  I look at my RPP and the conditions of

11     release.  I followed them the best I could at that moment.

12     I wasn't perfect.  That means I'm human.  And if I can get

13     it a hundred percent, which nothing is a hundred percent

14     today, then I will have accomplished a lot of things.  I've

15     accomplished a lot of things right up to this date.  You

16     know, I have been clean and sober for 23 years.  I have

17     managed for two years and some odd months outside of prison

18     not to reoffend.  Yes, I lapsed once.  Here in the prison

19     system, I didn't get in trouble until I got in the Maryland

20     Unit.  When I got in that Maryland Unit, it was a tough

21     situation.  People -- if you sat there for two days you

22     will find out how really tough it is in there.  People want

23     to be selfish, and I feed into it sometimes.  I get right

24     into that, and that's when the pictures popped up.  I want

25     to be a part of what everybody is all about.  I didn't want

1    to be somebody they said, oh, there's Mr. Goodie Two Shoes

2    and, you know, he's one of those individuals.  Yeah, I had

3    those pictures.  I was going to draw them.  I was looking

4    at them.  I don't know whether I was excited about them or

5    not because I still was trying to analyze that.  Did I want

6    to masturbate to it, maybe.  I don't know for sure.  But

7    overall I have focused a lot on staying away from trouble,

8    staying away from harming anybody and staying away from any

9    type of atmosphere that can get me back in those

10   situations.  It didn't work very well, but I managed a lot

11   of different things that I can be very proud of.

12       **THE COURT:**  Do you think it's a mistake to concentrate

13   all the sex offenders in one housing unit?  Do you think it

14   exacerbates the problem?

15   A.   Yes.

16       **THE COURT:**  Where could you put them?  You can't build

17   a little boat and put each person on a boat and send them

18   out in the ocean.

19   A.   I'm not sure what the answer is, sir.  It has

20   exaspirated --

21       **THE COURT:**  Exacerbated, aggravated.

22   A.   Yeah.

23       **THE COURT:**  Made it worse.

24   A.   It has made it worse being -- you know people up

25   there.  It's crazy up there sometimes.  It gets really

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 192 of 271

1    crazy up there.  People --

2         **THE COURT:**  Crazy, what does that word mean?

3    A.    People demanding their rights and stuff like that.  A

4    lot of the habeas corpus was part of the living conditions

5    but yet people didn't want to put down what they really

6    thought, what they really wanted and stuff like that.

7    Leave our mail alone, stuff like that, the magazines that

8    were coming in, which it's still coming in today, those

9    kind of things.  They didn't want to put those things down

10   because they know darn well they would probably get ripped

11   up and thrown away.

12   **BY MR. CRAVEN:**

13   Q.    Mr. Hall, you mentioned the magazines just now, and

14   obviously in the last day and a half there has been

15   discussion about that.  Maxim magazine, for example, you

16   subscribe to that?

17   A.    Yes, I have.

18   Q.    And you are getting that in the mail through the

19   Maryland Unit?

20   A.    Yes, I am.

21   Q.    And the people at Maryland Unit are giving it to you?

22   A.    Yes, they are.  The staff is giving it to me.  There

23   is three of us that receive that magazine.

24   Q.    And that's an ordinary men's magazine in some form.

25   It's not pornography.  It's GQ or maybe it's a little

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 193 of 271

1    younger, but is that fair?

2    A.    Yes.

3    Q.    Just to be clear, when Mr. James yesterday and today

4    asked you about violating supervised release, you are not

5    on supervised release?

6    A.    Not currently, no.

7    Q.    And you would like to be?

8    A.    Yes.

9    Q.    And Mr. James brought up a few minutes ago a

10   relationship, what seemed to be the start of a relationship

11   with a woman that perhaps was cut short by probation.  Did

12   that woman have children?

13   A.    No, she did not.  She didn't have any children, and

14   she wasn't going to have children.

15   Q.    You were at Butner twice.  You did the SOTP the first

16   time and then later you were at Butner.  Didn't you ask to

17   participate in the Sex Offender Treatment Program again?

18   A     Yes, but not at Butner, North Carolina.  It was back

19   in Petersburg.

20   Q.    Oh, that was in Petersburg.  I'm sorry.  And did you,

21   in fact, participate in it again?

22   A.    No, because they said I didn't have enough time left

23   on my sentence to participate.

24        **THE COURT:**  So are the pictures and magazines like

25   Maxim or whatever is equivalent -- are they like the

1    currency?  In jail you can't have money, you can't have

2    dope, you can't have alcohol.  So people figure out --

3    can't have cell phones.  People figure out a way to

4    substitute things that are inside for stores of value.

5    Money is a store of value.  You look at a $20 bill; you get

6    $20 worth of value from it.  You look at some pictures or a

7    magazine, is that what people trade or use as currency in

8    Maryland?

9    A.   Basically, it was mostly pictures from different types

10   of companies that you could get scantily clad women.

11       **THE COURT:**  Yeah, and you could use that -- you could

12   trade that as currency or for value if you needed something

13   from somebody?

14   A.   There was some people that did that, yes.

15       **THE COURT:**  Okay.  Because in the regular unit you're

16   trading dope, you're trading cigarettes, your trading

17   things that have external value because you can't get them,

18   right?

19   A.   Right.

20       **THE COURT:**  But in Maryland it's a different currency.

21   It's porn or simulated porn.

22   A.   Yeah.  You can get almost anything that's on the

23   regular compound.  There is a lot of people that --

24       **THE COURT:**  Yeah, but the intense valuing of -- people

25   in Maryland might put a higher value on some pictures than

1 they would on cigarettes?

2 A. Correct.

3 **THE COURT:** Isn't that true?

4 A. Yes.

5 **THE COURT:** They could do without the cigarettes, but

6 they can't do without the pictures.

7 A. Right.

8 **THE COURT:** Okay. I get it. Is that it?

9 **MR. CRAVEN:** Just a few more questions, Your Honor.

10 Q. Mr. Hall, the Government has focused on some of these

11 polygraphs, specifically the one in June of 2005. Now, you

12 took another polygraph in October of 2005 and then another

13 one in September of 2006. And on both of those, Mr. Hall,

14 didn't you pass the question about touching a minor?

15 A. Yes, I did. And in fact I passed the September '06

16 completely.

17 Q. I meant to say that one if I didn't. I'm sorry, you

18 passed the entire -- every question.

19 A. Every question in 2006, yes.

20 Q. Mr. Hall, why aren't you going to reoffend?

21 A. Because, one, I know that it would harm somebody that

22 should not be harmed. I know I did a lot of damage to the

23 two girls that I have harmed. I know I did damage to

24 people that surround them and surround me. I don't want

25 that to happen again, because it's just -- I can't put no

1    more pain that I felt onto somebody else like that.  And
2    that's basically I think the core issue for me is how to
3    express and deal with the pain that I have dealt with in my
4    life and not press it on somebody else.  And I have always
5    heard that anger was fear and pain come out sideways.  And
6    that's through the program and other places, also.  And
7    I've learned for the most part not to make that kind of --
8    I don't know what the right word to put it there -- but I
9    feel that I have learned enough that I'm not going to hurt
10   nobody else again.
11        **THE COURT:**  This anger thing with your father is a
12   radiating stimulus in your life, isn't it?
13   A.   Yes, sir.
14        **THE COURT:**  It's the root.  If you had to get to the
15   absolute nuclear center of you, that's what it would be,
16   right?
17   A.   Yes, sir.
18        **THE COURT:**  Isn't that your understanding of it?
19   A.   Yes.
20        **THE COURT:**  Everything else is a byproduct of that?
21   A.   Yes, sir.
22        **THE COURT:**  Yes or no.
23   A.   Partially.
24   **BY MR. CRAVEN:**
25   Q.   Are you prepared to deal with that anger?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 197 of 271

1  A.   Yes.  I want somebody to -- when I get out, hopefully

2  probation will have some kind of place where I can go to

3  deal with the anger management, anger management groups.

4       **THE COURT:**  Is that going to keep you away from

5  children?

6  A.   That would help, yes.  My other -- I don't intend to

7  get near children.  That's why I did a lot of my own

8  processing that I did in the RPP, stay away from children,

9  stay away from situations that --

10      **THE COURT:**  You've learned certain methodologies that

11  you're practicing here on the stand.  You have admitted to

12  Mr. James a lot of things that are incriminating, and

13  that's because you've learned that you are to be candid

14  about the answers, not defensive.  Is that right?

15  A.   There are times I want to be defensive, but, yes,

16  overall, yes.

17      **THE COURT:**  Because you have admitted a lot of things

18  that would keep you in jail; you understand that?

19  A.   Yes, sir.

20      **THE COURT:**  Okay.

21  **BY MR. CRAVEN:**

22  Q.   Are you going to make it, Mr. Hall?

23  A.   Absolutely, yes.

24      **MR. CRAVEN:**  No further question.

25      **THE COURT:**  All right.  We'll take a recess, because

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 198 of 271

1    your last witness is your expert?

2         **MS. LITTLE:**  That's correct, Your Honor.

3         **THE COURT:**  Okay.  We'll take a recess.

4              (Court recess at 10:31 - 10:50 a.m.)

5         **THE COURT:**  Call your next witness.

6         **MS. LITTLE:**  Thank you, Your Honor.  We would call Dr.

7    Luis Rosell.

8         **DR. LUIS ROSELL, RESPONDENT'S WITNESS, SWORN**

9                        DIRECT EXAMINATION

10   **BY MS. LITTLE:**

11   Q.   Dr. Rosell, could you please give your full name and

12   spell your last name, for the record.

13   A.   Luis Rosell, R-O-S-E-L-L.

14   Q.   Dr. Rosell, what is your occupation?

15   A.   I'm a clinical and forensic psychologist.

16   Q.   And would you briefly describe to the Judge your

17   education and training?

18   A.   I have a Bachelor's Degree in Psychology from the

19   Catholic University of America.  I have a Master's Degree

20   in Clinical Psychology from the University of Cincinnati

21   and a Doctorate in Psychology from the Miami Institute of

22   Psychology in Miami, Florida.

23   Q.   And when did you receive your doctorate degree?

24   A.   In 1998.

25   Q.   And have you had any additional training outside of

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 199 of 271

1    your educational background you just described?

2    A.    Well, in terms of training I attend conferences on a

3    regular basis and workshops.  For example, ATSA, which was

4    described yesterday, A-T-S-A, they have an annual

5    conference.  I've been going to those since 1995.  I've

6    only missed about two of those.  They deal specifically

7    with this area of sex offender evaluations and treatment

8    and many times specific to risk assessment and SVP

9    proceedings.  I have also attended other conferences that

10   are more specific to other areas in forensic psychology,

11   workshops offered by the American Board of Professional

12   Psychology, Forensic Division.  So that's how I mostly do

13   my training and upgrading because, as we've seen spoken

14   already, there is a lot of stuff to learn on a regular

15   basis and update every five to six months.

16   Q.    So it's fair to say you try to stay current on your

17   training and education in your sex offender evaluations?

18   A.    Yes.  Every day just through emails and list serves

19   and new articles that are constantly being published

20   regarding sex offender risk assessment.

21   Q.    And the curriculum vitae that you gave to us, does

22   that list all the trainings you have done recently?

23   A.    Yes.  All the trainings that I have attended and some

24   that I have given.  That's pretty much -- that's all there.

25   Q.    And, for the record, that is Exhibit Number [6].

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 200 of 271

1      Are you licensed in any particular jurisdictions?

2  A.    Yes.  I am licensed in the state of Iowa, Missouri,

3  Illinois and Washington state.  And I have a temporary

4  license in Alaska.

5  Q.    And you are licensed as a psychologist in all those

6  jurisdictions?

7  A.    Yes.  As a psychologist, yes, ma'am.

8  Q.    And could you briefly describe for The Court your

9  professional experience in the field of psychology?

10  A.    After I obtained my master's degree I moved back to

11  Maryland where I grew up and I started working for the

12  Maryland Division of Correction at a reception center there

13  that had a sex offender program, a 24 bed program within

14  the reception center.  And I was one of the psychology

15  associates that provided treatment, both individual and

16  group treatment for about three and a half years that I was

17  working there.  Then I got transferred over to another

18  state prison, Patuxent Institute.  It was more or less a

19  forensic psychiatric hospital.  Well, it was a prison, but

20  we had some severely mentally ill individuals there.

21      Then when I moved to Miami to get my doctorate, I --

22  well, I was in Baltimore and I also did sex offender

23  outpatient treatment with Johns Hopkins Sexual Disorders

24  Clinic run by Dr. Fred Berlin.  Then when I moved to

25  Florida I did outpatient sex offender treatment in Coral

1    Gables.  Because I speak both languages, I was able to do
2    sex offender treatment in both languages with many of the
3    Cuban immigrants there.  And so eventually I moved back to
4    Maryland to do my internship at a forensic psychiatric
5    hospital.  And then I moved to Iowa in 1998 to be the Sex
6    Offender Treatment Director for the Iowa Department of
7    Corrections in Mt. Pleasant, Iowa.  And then I held that
8    position for three and a half years until I resigned to go
9    into private practice and basically do mostly forensic
10   psychology work, which is what I do now in Iowa and in many
11   other states.
12   Q.   So professionally how many years have you been
13   involved in sex offender treatment?
14   A.   Since 1988 -- 1989 is when I started working in
15   Maryland, so it's been about 21, 22 years dealing with sex
16   offenders at one level or the other.  It was initially
17   mostly treatment and then it has slowly gotten to be more
18   evaluations.
19   Q.   Are you still involved in treating sex offenders
20   today?
21   A.   No, not currently because I live in a really small
22   town, and we don't have many individuals who get arrested
23   for sex offenses and if they do, they go to towns that are
24   about a half an hour away from me on each side.  They have
25   a community corrections program there, so if anybody would

1  go to treatment on an outpatient basis it would be with the
2  Iowa Department of Corrections, Community Corrections
3  Section.  So I really haven't done that much treatment.
4  I've done some juvenile sex offender individual work in the
5  past, but I just haven't had that many cases in the last
6  few years.
7  Q.  How long have you been involved in the evaluation of
8  sex offenders and their risk of recidivism?
9  A.  Well, as part of my job as the Treatment Director I
10  was on the board that reviewed all the sex offenders for
11  the state of Iowa to make a determination whether they
12  should be transferred or referred to the Attorney General's
13  office for civil commitment.  And I held that position for
14  the basically three and a half years I was there.  Because
15  I started working in Iowa the same month or basically two
16  months after the law passed for Iowa's civil commitment
17  statute.  So I was involved in -- it wasn't so much
18  evaluations but just we would go through the records and
19  refer -- we reviewed everybody who had ever committed a
20  sexual offense in the state of Iowa and then make a
21  determination who we were going to refer to the AG's office
22  and then the AG would decide, after they consulted with
23  their experts, who were they going to file on for civil
24  commitment.
25       But then since 2002 since I've been on my own, I've

1   been doing SVP evaluations in a variety of states.  I've
2   been doing most of my risk assessment work has been since
3   then, more specific on every individual, yes.
4   Q.   And when you say SVP, does that refer to sexually
5   violent predators?
6   A.   Yes.  It's either sexually violent predators or, for
7   example, like in Missouri, Iowa and Washington state it's
8   predator.  And in Wisconsin and Illinois, other states
9   where I work a lot in, it's person.  So I just say SVP as a
10  way of saying -- to me it means civil commitment.  It's
11  just a quicker way of speaking.
12  Q.   How many years have you been involved in evaluating
13  sex offenders?
14  A.   For these types of proceedings, it's been exactly nine
15  years.
16  Q.   Have you testified previously in court about the risk
17  of recidivism posed by sex offenders?
18  A.   Yes, I have.
19  Q.   And has your testimony included diagnosis of mental
20  illness or disorder?
21  A.   Correct.
22  Q.   Were you received as an expert in courts previously in
23  sex offender cases?
24  A.   Yes, I have.
25  Q.   And have you been qualified as an expert in Federal

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 204 of 271

1  Court on the issue of 4248 or sex offender cases?

2  A.   Yes.  I've done two cases previously in Federal Court

3  where I have testified.

4  Q.   And were those cases that arose under 18 U.S.C. 4248?

5  A.   Correct.

6     **MS. LITTLE:**  Your Honor, at this time I would offer

7  Exhibit Number [6] as well as tender Dr. Rosell as an

8  expert in the field of psychology and sex offender

9  assessment.

10    **THE COURT:**  I'll accept the witness as an expert and

11  allow him to express his opinions in the area of psychology

12  and forensic psychology and sex offender evaluation.

13    **MS. LITTLE:**  Thank you, Your Honor.

14  Q.   Dr. Rosell, since April of 2002 approximately how many

15  sex offenders have you evaluated to determine a risk of

16  recidivism?

17  A.   For these types of proceedings I've consulted and

18  evaluated probably between 280 and maybe 300.  I don't have

19  the exact number.

20  Q.   And of those 280 to 300 individuals, how many have you

21  found to be at risk of reoffending?

22  A.   If I incorporate both release cases that I often get

23  asked to do or precommitment cases, about 35 percent of the

24  time I find the individual does meet criteria and I find

25  that they are dangerous to be released in the community.

1    Q.   And could you explain to The Court what -- your

2    differentiation between release and commitment?

3    A.   It depends on the statute.  In many states to

4    determine if an individual is ready to be released it's not

5    so much about risk as it is substantial progress in

6    treatment.  Some of the statutes are written -- for

7    example, in the state of Washington there has to be a

8    determination that the individual has so changed, and

9    that's usually through treatment.  There's a lot of arguing

10   that goes on.  There's a recent ruling, actually, in

11   Washington where it doesn't have to be treatment, it can be

12   age.  But now they're going to appeal that, so.  It's

13   called the McQuesten Ruling.  And then in other states it's

14   also in Wisconsin and Iowa the individual has to have made

15   progress in treatment.  And the argument becomes what I

16   deem as being what I feel somebody has made progress might

17   not be the same as what another expert might say, or the

18   facility themselves might say, well, he's not ready to

19   leave yet.  And then we go to court and the trier of fact

20   will decide.

21        So the -- it's different in that sense.  So if a

22   person hasn't done any treatment, it's usually more

23   difficult to find that they no longer meet the statute

24   unless there is some other kind of explanation for it.

25   Q.   Okay.  How many times have you testified in civil

1  commitment proceedings with regard to sex offenders?

2  A.   Over a hundred times.

3  Q.   And over those hundred times, how many times have you

4  testified that the individual would be sexually dangerous

5  and should be committed.

6  A.   Well, given the fact that most of the time I'm hired

7  by the defense, and if I find the person is dangerous, they

8  will not ask me to write a report or come in and testify

9  against their client.  So no one ever knows about it except

10 for the attorney.  But other times when I have been ordered

11 by The Court, for example, in this Federal case in

12 Massachusetts I was ordered by The Court to give the

13 evaluation and whatever I decided I was going to testify

14 to.  So I found the individual did meet criteria under this

15 statute 4248.  And so I testified for the Government in

16 Massachusetts.  And then one other time I testified on a

17 release case in the state of Illinois where once again the

18 Judge called me and asked me to be the independent

19 examiner.  And I found that the individual was not ready to

20 be released because he hadn't spent a day in treatment.  So

21 I couldn't really say that he was ready to be released

22 since he had never been treated.  Based on their statute

23 there has to be some type of treatment, so I testified for

24 the Cook County attorney.  I testified on their behalf.

25 Q.   So there is a number of times you have evaluated

1    individuals and have not been asked to produce a report or
2    testify in court, isn't that correct?
3    A.    Correct.
4    Q.    Did you perform an evaluation of Mr. Hall?
5    A.    Yes.
6    Q.    And what was the purpose of your evaluation of Mr.
7    Hall?
8    A.    To determine if he is -- should be civilly committed
9    under this statute.
10   Q.    And that's civil commitment under 18 U.S.C. 4248?
11   A.    Correct.
12   Q.    And did you review the statute prior to your
13   evaluation of Mr. Hall?
14   A.    Yes.
15   Q.    Did you meet with Mr. Hall?
16   A.    Yes.
17   Q.    And how long did you meet with Mr. Hall?
18   A.    I think about three and a half hours.
19   Q.    Did you have only the one time interview with him?
20   A.    I called him back -- the first time on March 16th of
21   this year and then I called him back, I think, on April
22   4th.  We had a phone call, which was maybe 15 or 25
23   minutes.  I just had a couple follow-up questions to ask
24   him.
25   Q.    And this contact with Mr. Hall was before you wrote

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 208 of 271

1    the report?

2    A.    Correct.

3    Q.    Did you review documents to render your evaluation?

4    A.    Yes.

5    Q.    And briefly, what documents did you review?

6    A.    Well, I received basically all the documents that I --

7    I hope I received everything that I was supposed to.  It's

8    not always the case, but I received -- I was able to go

9    through his whole history from all the reports that had

10   been conducted beforehand: Dr. Demby's report, Dr. Arnold's

11   report, the PSI's from the past, records from while he was

12   at Butner for treatment, police records, pretty much what

13   everybody has seen already.  I'm sure a lot of it is in

14   here or in other areas.

15   Q.    And have you continued to receive documents from my

16   office from the time frame from when you issued your report

17   until today?

18   A.    Yes.  I have received several hundred pages since I

19   submitted my report.

20   Q.    And did you receive some as of Saturday of last week?

21   A.    Yes.  I received some last week, yes.

22   Q.    Did you review those?

23   A.    Yes.

24   Q.    Did you prepare a report in connection with your

25   evaluation?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 209 of 271

1    A.   Yes, I did.

2    Q.   And does the report set forth your findings and

3    conclusions in this case?

4    A.   They do.

5    Q.   And I would like for you to turn to Tab 7.  Is that

6    the report you prepared after you evaluated Mr. Hall?

7    A.   Yes.

8         **MS. LITTLE:**  Your Honor, I would ask that Exhibit [7]

9    be received into evidence.

10        **THE COURT:**  It's received.

11   Q.   And this report sets forth your findings and

12   conclusions in this case, correct?

13   A.   It does.

14   Q.   In your professional opinion does Mr. Hall meet the

15   criteria of a sexually dangerous under the Adam Walsh Act?

16   A.   No, he does not.

17   Q.   And did you reach this opinion to a reasonable degree

18   of professional certainty?

19   A.   I did.

20   Q.   In rendering your opinion did you review his criminal

21   history?

22   A.   Yes.  I'm aware of his criminal history.

23   Q.   And did you consider his sex offense convictions, his

24   prior sex offense convictions?

25   A.   Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 210 of 271

1    Q.    And you understand that we have stipulated that Mr.

2    Hall has previously engaged in child molestation?

3    A.    Correct.

4    Q.    In your professional opinion does Mr. Hall suffer from

5    a serious mental illness, abnormality or disorder?

6    A.    He's -- that terminology is more of a legal issue.  He

7    does have a diagnosis of pedophilia and antisocial

8    personality disorder.  Whether that is determined to be a

9    serious mental illness, I guess it could be called serious,

10   pedophilia, because it is a concerning behavior.  If the

11   individual acts out on it, it is concerning.  So from that

12   standpoint I would say that part of the statute I could say

13   that he does suffer from a mental illness or disorder.

14   Q.    And your diagnosis is consistent with the diagnosis

15   that was rendered by Dr. Arnold and Dr. Demby?

16   A.    Correct.  I don't have any argument with that.

17   Q.    In your professional opinion as a result of the mental

18   illness, abnormality or disorder, would Mr. Hall have

19   serious difficulty refraining from sexually violent conduct

20   or child molestation?

21   A.    That's where I part from that long sentence.  I

22   disagree.  I think he has demonstrated that he can refrain

23   from engaging in that type of sexual behavior.

24   Q.    So in your professional opinion, you do not believe he

25   meets the criteria for commitment under 18 U.S.C. 4248?

1    A.    Correct, I do not.

2    Q.    Could you explain to The Court how you reached that

3    conclusion?

4    A.    Well, I reached the conclusion based on the -- the

5    offending history is somewhat limited compared to others,

6    other cases that I have been involved in, hundreds of other

7    cases.

8    Q.    I'm going to stop you.  What do you mean by offending

9    history being limited?

10   A.    He has two victims.  So that's probably less than most

11   invididuals that I have evaluated.  And what really

12   separates him is the -- what makes him different than other

13   people is he also possessed child pornography, which is not

14   that common in other cases I've been involved in because

15   most of the cases I've done are state cases, and usually

16   there is not child pornography in the state cases, because

17   usually it's a federal crime.  So that's why we're seeing a

18   long more child porn in these Federal SVP cases.

19        But the issue of his time in the community I think is

20   very significant, because it basically was an experiment

21   where he was out in the community not once -- not twice,

22   but I think a third time with a total of 27 to 28 months

23   where he did not reoffend where he had ample opportunity to

24   reoffend.  And there's no evidence, there's no allegations,

25   there's no accusations of that.  So, for example, he would

1    have been -- when he got charged in the '99 case and never
2    released again, and now we were at these proceedings I
3    wouldn't be able to testify to that, I might not be here.
4    I would be concerned about a lot of things.  But that issue
5    is what separates him from basically 98 percent of the
6    other cases that I've been involved in.  In the several
7    hundred cases I've done, it is very rare that an individual
8    has time in the community since their last index -- since
9    their index offense or their last hands-on offense, for
10   example.

11        So that's what separates, then, those type of
12   offenders, and I think it's a significant aspect regardless
13   of he kept on getting in trouble for failing to register,
14   not following the rules, having sex with a woman that he
15   wasn't supposed to because he has to tell his PO, et
16   cetera.  I know all the reasons for the rules.  However,
17   that's -- it separates him from the other type of
18   individuals that we usually do in these types of cases.
19   And I think it's significant because it shows that although
20   he can't follow all the rules all the time and sometimes he
21   makes bad decisions, and he has admitted that today and
22   yesterday, the big picture, the bottom line is don't
23   reoffend.  And he hasn't.  And that's more important than
24   some guy who follows all the rules, does all the right
25   things and then reoffends, relapses in a huge way where he

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 213 of 271

1    commits a crime. So a hands-on offense. So that's why I
2    think it's what separates him from most cases.
3    Q.   Do you have any thoughts on why he did not sexually
4    reoffend during that 28 months of release in the community?
5    A.   Well, I think that in treatment you're taught -- the
6    bottom line is no more victims, okay. And now let's see
7    how can we get there? And that's where you get, you know,
8    as some of the issues we're going through with the RPP, you
9    know, the distant precursors, the more recent precursors,
10   what are the triggers, what should we stay away from. All
11   these things could lead, could lead. It doesn't mean it's
12   going to lead, but it could lead. And that's usually based
13   on the individual's own history and what they have done in
14   the past that led to that behavior. The fact that just
15   because the individual may engage in that behavior, may
16   still look at a picture, may still draw, may still have
17   thoughts about children, doesn't mean that the individual
18   is going to reoffend. Just look at -- if you look at all
19   the data on pedophiles, child molesters, sex offenders, the
20   majority do not reoffend. So there are a lot of people out
21   there who probably meet the diagnosis of pedophilia who do
22   not reoffend. The reoffense rate is not a hundred percent,
23   so what are those individuals doing? They're finding out,
24   hey, I'm getting older, I don't want to hurt anybody, I'm
25   not going to do any more time. This isn't for me anymore.

1     As people get older, some people say, hey, they finally get
2     it.  The other aspects of not following the rules,
3     absconding, that's part of -- not the pedophilia.  That's
4     more part of the antisocial personality disorder where he
5     is the first one to admit that he can get angry, he can get
6     cantankerous, he can get where I don't want to be told what
7     to do.  I can't follow all the rules.  So that's why he
8     keeps getting in that kind of trouble.  But this statute is
9     not about that kind of trouble.  This statute is about
10    sexually offending hands-on on a victim.  And that's why I
11    think -- like I said before, that's what separates him; and
12    I forgot what the initial question was.  I apologize.
13    Q.    That's fine.
14          **THE COURT:**  You answered it.
15    A.    Okay.
16    Q.    You reviewed his Release Prevention Plan, correct?
17    A.    The Relapse Prevention Plan?
18    Q.    Yes.
19    A.    Yes, ma'am.
20    Q.    And the statements he made in that Release Prevention
21    Plan, did that impact your opinion?
22    A.    Well, I think, as Dr. Demby indicated, it looked
23    really good on paper.  It does.  It looks really good on
24    paper, and he would be the first to admit that he hasn't
25    followed them all.  He didn't follow them all when he was

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 215 of 271

1   out on the street and he didn't follow them all when he has
2   been at his current facility.  So it's like he knows what
3   he needs to do, but sometimes he doesn't implement it.  The
4   main thing, as I have said, is that just because you don't
5   follow all those rules, it doesn't mean you are going to
6   reoffend.  The fact that, okay, it's probably not the best
7   thing for him to have pictures of adult -- well, adult
8   pornography, if that's the only thing he ever has, and if
9   the only thing he ever does the rest of his life is have
10  sex with adult women, then God bless him; he won't have any
11  other problems.  But just because you have pornography,
12  even if it's child pornography, does not mean that you are
13  going to reoffend.  The research just came out in the last
14  year where they looked at child pornography possessors who
15  also had hands-on victims, and the recidivism rate was
16  very, very low.  So it does not mean that you are destined
17  to reoffend.  In some cases there is the belief the same
18  way as we have with the proliferation of adult pornography
19  has actually there has been a decrease in, for example,
20  rape behavior.  There is an article called Porn Up, Rape
21  Down, where they are saying now that people have more
22  access to pornography for some reason the rape rate has
23  gone down.  Who knows if there is a connection.  The
24  analogy that I like to make is, just because an individual
25  is looking at child pornography doesn't mean they are going

1    to go engage in hands-on offending.  The same way if

2    someone gets married -- let's use a male for example --

3    makes a vow to his spouse that he is not going to cheat on

4    her, he looks at adult pornography maybe all the time,

5    maybe once a day, whatever, but it doesn't mean he is going

6    to commit adultery.  For whatever reason, well, it's better

7    that he looks at her in a magazine or on the internet than

8    going out and trying to find someone to have an affair

9    with.  In some ways it can be analagous.  Because it's

10   clear that not everybody who possesses child pornography

11   engages in hands-on offending.  And even the ones who have

12   engaged in hands-on offending who have also looked at child

13   pornography, it's not that they are destined to recidivate.

14   Because that's not what the research has shown.

15   Q.   And this is current research about the child

16   pornography and recidivism?

17   A.   Yes.  It was published in March.  The ATSA Journal,

18   it's called Sexual Abuse, a journal of research and

19   treatment.

20   Q.   And their conclusions were --

21   A.   Well, it was Dr. Seto's study that showed that -- when

22   they followed up at a one and half to six year follow-up

23   individuals who possessed child pornography who also had a

24   hands-on victim, the recidivism rate was less than four

25   percent.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 217 of 271

1   Q.   And in that study did they specifically target

2   pedophiles?

3   A.   Well, most people who have child pornography are, if

4   not pedophiles, they are considered to have some pedophilic

5   interest most likely.  They did not look at the issue of

6   adult pornography, because adult pornography is legal.

7   Q.   Is pedophilia a chronic disorder or disease?

8   A.   Well, according to the course and DSM-IV, it says

9   usually chronic.  So I guess that means there might be some

10  exceptions, but it's usually considered chronic.

11  Q.   So research basically suggests that because

12  pedophilia is chronic that it wouldn't be impossible that

13  they would use kiddie porn without recidivating?

14  A.   Yes.  The interest, the attraction is not likely to go

15  away.  So the main thing is how can it be managed so that

16  the individual does not engage in the behavior.  So to say

17  that we want to cure them so that they never think about

18  it, that's not going to happen.  So that's not the goal is

19  to cure.  The goal is to manage, manage, supervise, treat,

20  so that the individual does not engage in the behavior.

21  That's the goal.  And so to think that, well, it will just

22  go away, it's not.  People, if you like something you're

23  usually going to be interested in that unless -- there's

24  always to be exceptions but on average you're always going

25  to like what you see before.

1  Q.   Now, in reaching your opinion that he doesn't meet the
2  criteria for commitment under 4248, did you use any
3  actuarial tests?
4  A.   I used two of the -- well, I actually used three
5  actuarial tests, two of those have been spoken to already,
6  the Static-99R, which I had the same score at five, and the
7  Static 2002R, which I had the same score of seven.  And
8  then I used another instrument called the MATS, M-A-T-S,
9  which is the Multisample Age Stratified Table of Sexual
10 Recidivism Rate.  It's a mouthful.  And what that is, it's
11 a very recent actuarial which is basically -- they took the
12 Static-99.  They only used six items from the Static-99 and
13 looked at 9,000 subjects.  And then they divided it -- they
14 age stratified it, so they looked at -- they took out the
15 whole age factor that was included in the 99-R and so they
16 looked at it where you score the person on the other six
17 items and then the table has scores based on age.  So
18 whatever you score then you look at the recidivism rate if
19 they are 18 to 39, then 40 to 49, then 50 to 59, then 60
20 plus.  And then that's how you determine the individual's
21 risk percentage.  So you look at basically their score,
22 then you look at the age grouping as opposed to the way the
23 Static-99R does it where basically you take away a point
24 once they get over 40 and you take away two more points
25 once they get over 60.  And then you just use the same

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 219 of 271

1  table as you would with anybody else.

2  Q.  And the MATS-1 test that you referred to, is that a

3  new test?

4  A.  Correct.  It was just published within the last six

5  months, also in the same journal, the ATSA Journal of

6  Sexual Abuse.

7  Q.  Is it an actuarial instrument like the Static-99R?

8  A.  Yes.  It's basically -- what they did was they used

9  the same items from the Static-99 and then just used a

10  different group of individuals -- well, part of it is using

11  the same sample that Dr. Hanson used in 2006 when he looked

12  at age with over 3,000 subjects.  Then they got another

13  5,500 subjects, so they had a total of 9,000 subjects.

14  Q.  And when you talk about Dr. Hanson, you're referring

15  to Dr. Hanson's development of the of the Static-99R?

16  A.  Correct.  Yes.

17  Q.  Has the MATS-1 been subject to peer review?

18  A.  Not so far.  It's just the first study that they have

19  just done.

20  Q.  And what was your scoring on the MATS-1?

21  A.  He scored a four, which puts him at basically 25

22  percent over an eight year period.

23  Q.  Explain that 25 percent over an eight year period.

24  A.  Well, like was mentioned yesterday a risk percentage

25  over years means that if you compare that individual to

1  other groups, individuals who score a four in that age

2  group, 40 to 49, had a recidivism rate of 25 percent.

3  Q.  And does the MATS-1 subdivide the sample groups like

4  the Static-99R?

5  A.  No, it does not.

6  Q.  So it would be when you were comparing Mr. Hall you

7  would be comparing him to a group of 9,000 individuals that

8  made up that sample group?

9  A.  Correct.  And then there was a smaller subsample that

10  were in that age range, because you're just comparing him

11  to that age range.  You're not comparing him to the whole

12  group.

13  Q.  And he was considered under the MATS-1 to be at

14  moderate risk of reoffending?

15  A.  I think a score of four is moderate high.  It's either

16  moderate or moderate high.  I'm not sure.

17  Q.  You're report reflects moderate.

18  A.  Moderate, okay, then moderate.

19  Q.  Let me turn back to the Static -- you said you also

20  used the Static-99R and the 2002R.  Could you explain to

21  the Judge in your report -- and I'm going to refer to pages

22  20 and 21 -- you break out recidivism rates.  And I would

23  like you to explain to the Judge why you break them out and

24  how you break them out.  And, Your Honor, that is on page

25  20 of the report.  If you would look at the very last

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO  Document 74  Filed 06/30/11  Page 221 of 271

1  paragraph on page 20 and on page 21, at the top of the

2  page.

3  A.   As I looked at what was written in there, I took from

4  the developers of the Static-99R on their website they

5  indicated on how to present these for these types of cases.

6  It's really not clear how they broke down these different

7  groups.

8  Q.   When you are referring to groups, please explain what

9  groups.

10  A.   The routine and non-routine, preselected for treatment

11  and then preselected high risk/high needs.  For example --

12  Q.   I'm going to stop you just to make sure that this is

13  clear.  Those groups, those are individuals that were

14  subject to the study; is that how you are defining them?

15  A.   These were basically I think twenty-some studies that

16  were conducted and then they were broken -- they had the

17  whole aggregate.  The total sample was about 8,000

18  subjects.  And then they had that total recidivism rate and

19  then they broke it down into different subsamples.  And

20  it's not clear how they determined that.  Because, for

21  example, when you hear the term preselected for high risk,

22  then right away you think, well, that's the high risk

23  group.  Well, there are many people in that high risk group

24  that did not score high risk on the actuarials.  They

25  scored a zero, one, or two or three.  It's just not clear.

1    It was all done post hoc, afterwards, and it's not -- it's

2    never been clearly determined on how -- they basically said

3    that when you use this instrument for these sort of

4    proceedings you need to look at that one.  So I have

5    concerns about just automatically using that one.  So

6    that's why I present the total sample where his risk

7    percentage would be comparable to other individuals who

8    scored what he scored, the five.  That's 18 percent at five

9    years.

10   Q.   I'm going to stop you and back up for a minute just to

11   make sure the record is clear on this.  When you are

12   talking about samples, you just talked about the

13   preselected for treatment -- high risk preselected for

14   treatment sample.  What does that mean?

15   A.   The pre -- well, there's a preselected for treatment.

16   Then there's the preselected high risk/high needs group.

17   So the preselected for treatment were the ones who had been

18   referred to treatment.

19   Q.   In other words, of the sample group of individuals

20   that were studied to make this test up,

21   there were a group of them that had been in a treatment

22   program?

23   A.   Yes, but it wasn't what -- to make this test up.  The

24   test had already been made up many, many years ago.  It's

25   only been revised in that one item where -- which is the

1    age.  It was basically a way of not just cross validating
2    the test, but just getting more information, more -- to see
3    if the probability estimates, which is the corresponding
4    cut score, the risk percentages are -- to see if they were
5    comparable to the original instrument and just to provide
6    evaluators a way of presenting the data to compare
7    individuals to.
8    Q.  So you're comparing individuals to people that are
9    high risk or low risk amd I'm just using those terms.  Is
10   that what you were trying to say?
11   A.   Yes.  Well, that's what happens as within these
12   subsamples there are individuals who scored high, medium
13   and low on the instrument.  So that's why I explained
14   before that just because you compare -- that high risk/high
15   needs group were not all scored high risk on the Static-99.
16   They were put in that group for some other reason that has
17   not been made clear, as far as I know.
18   Q.  So when you calculated these percentages, could you
19   explain to the Judge which groups you compared Mr. Hall to
20   and what percentage you reached?
21   A.   Well, I believe the best way to do is present a
22   variety of scores and then maybe make some type of a --
23   create a range.  Because if you compared him to the whole
24   sample like we used to do just a couple years ago with the
25   Static-99, it was just one sample.  And that's all he would

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 224 of 271

1      have been compared to. But now there's these other

2      subsamples to compare him to, so that's why you have the

3      total group or the numbers -- the risk percentages lower

4      estimate and then you have the preselected for treatment,

5      which is a little big higher than that number. And then

6      you have the high risk/high needs group where that's the

7      highest. I think it's 35 percent at ten years. So he is

8      compared to that. Individuals who score a five on that

9      instrument will be comparable to 35 percent at ten years.

10     So that's the range that I am looking at. And then

11     basically if you look at the -- going back to the MATS,

12     it's right in between the two. So basically 18, 25, and 35

13     is the risk range. The only thing is that the --

14     Q.   I'm going to stop you there for a minute. When you

15     said 18 percent, is that compared to -- you would compare

16     his score to the entire sample group, the entire six to

17     nine thousand individuals?

18     A.   The only caveat is that it was a five year follow-up.

19     The total sample is only a five year follow-up, so then I

20     can say 18 percent at five years to 35 percent at ten

21     years, just to be clear.

22     Q.   What were your percentages on the 99R if you looked at

23     the aggregate, the whole group, what were your percentages?

24     A.   Five years, 18 percent.

25     Q.   Eighteen percent rate of recidivism?

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 225 of 271

1    A.   Rate of recidivism.  So 82 percent of those

2    individuals did not recidivate as far as we know.

3    **THE COURT:**  What percent do you have an opinion would

4    be necessary in order for there to be a serious difficulty

5    of recidivism?

6    A.   Well, that's a good question.  When you look at it --

7    first of all, the issue of serious difficulty controlling

8    their behavior or volitional impairment, that is totally --

9    it's not even addressed in these actuarials.

10    The actuarials are looking at risk assessment.  The other

11    issue is more of a -- it could be -- a person might have a

12    low score, but what's going on with them right now.  For

13    example, I've seen individuals who scored an eight or a

14    nine where I found that they were not.  And then I've had

15    individuals who scored a two or a three where I felt that

16    they were.  So it's only a guideline and I do not say, oh,

17    he's a six, boom, he's SVP.  He's a four, boom, he's not.

18    Because there is other factors that I feel could and have

19    influenced my behavior -- my opinion on them.  So I don't

20    use it -- as you said yesterday, this is not a -- I forget

21    what word you used, a bright line or something.  Yeah.

22    That's one way to put it.  As I said, there has been

23    individuals who can score really high, but what if they're

24    a lot older now, they've done a lot of treatment.  There's

25    a lot of factors, you know.  So there's a lot of ways to

1    score.  You can get a score of a five that could be much

2    more aggravating than a person who scores a seven whose

3    crimes were not nearly as bad, relatively.  So that's why I

4    -- it's really hard to make a decision about one number

5    means one thing.  That's not how I would do things.  Other

6    people may disagree with me, because they often do.

7    Q.   So on the Static-99R you have 18 percent for the

8    entire group, rate of recidivism, correct?

9    A.   Correct.

10   Q.   And for the high risk sample?

11   A.   The high risk sample would be -- the number is the

12   highest.  It's 35 percent over a ten year period if you

13   compare him to that group, but I've got concerns about just

14   comparing him to that group.

15   Q.   And what about the preselected for treatment sample?

16   A.   That number I think was 22 percent over a ten year

17   period.

18   Q.   And do you feel that Mr. Hall fits into any one of

19   those particular categories or should be compared to one

20   more than the other?

21   A.   Well, I think comparing him to that high risk/high

22   needs group is concerning in that there is a lot of factors

23   that make him individually different than many of the

24   individuals in those samples in terms of his -- the time in

25   the community that I have mentioned, time in treatment.  He

1    is a different individual than those -- than that whole

2    sample, as far as I know.  Like I said, it's very uncommon

3    for individuals to have a lot of time in the community

4    between offenses that's not related to a sex offense.  So I

5    think in my opinion that 35 percent would be on the higher

6    end, and I feel it would be closer to the other risk

7    percentages that I have also mentioned.

8    Q.    And the Static-99R does not take into account time in

9    the community?

10   A.    No, it does not, except in the original study.  The

11   original coding rules for the Static-99 there was Appendix

12   1 on page 75 has a table on time in the community that the

13   longer you are in the community the lower your risk.  So,

14   for example, if you are out there for five years, your risk

15   gets cut in half, whatever it may be.  For two years it

16   gets cut down a little bit also.  In his case it's been in

17   and out, in and out, so it's hard to determine how much

18   risk, but they are -- the fact that they put a table in

19   there demonstrates that they did consider that, not for the

20   instrument itself but just as a way of addressing that

21   issue.  So it's not like I'm just saying, oh, it's a really

22   good idea.  There is research that backs that if you're in

23   the community -- especially when you're trying to make a

24   determination about, oh, he has serious difficulty

25   controlling his behavior or he's going to engage in this

1  behavior, and you give him an opportunity and he doesn't,

2  well, that's very telling.  Because there is something

3  about talking the talk and walking the walk.  He has walked

4  the walk.  Okay, he hasn't done perfect, but the main thing

5  was, don't offend.  And he hasn't done that.  And that's

6  the bottom line.

7  Q.  Again, if you would turn to page 21 of your report,

8  I'm just going to briefly have you go over the rates of

9  recidivism you listed under the Static-2002R.

10  A.  Okay.  For that one the aggregate group at five years

11  was 23 percent.  And then if you looked at the range

12  between the two other samples, it's 32 to 36 percent.  So

13  they are comparable to -- and that's at ten years.  They're

14  comparable to the Static-99R.  They're maybe a little bit

15  higher on that one part, but the bottom line it's in that

16  20 to 35 percent range, and -- where basically you're

17  saying the majority of those do not.  So 65 percent, which

18  is like almost two-thirds, do not reoffend.  Or did not, as

19  far as we know, over that ten year period.  So that's just

20  something to keep in mind.

21  Q.  And when you were talking about those percentages, the

22  32 percent and 36 percent, 32 percent pertains to the non-

23  routine sample; is that correct?

24  A.  Correct.

25  Q.  And the 36 percent pertains to the high risk sample?

1    A.    Correct.

2    Q.    I would like to direct your attention to page 22 of

3    your report.  In the middle of the page you list Positive

4    Predictive Values and Negative Predictive Values.  Could

5    you explain to the Judge what you mean by that?

6    A.    Well, this is basically a mathematical formula to make

7    a determination of how -- the probability of something is

8    going to happen once you predict it.  So it's positive

9    predicted power is the probability that the person will

10    recidivate based on a positive score.  For example, a

11    positive score would be any score on the Static five or

12    above.  And then a negative score would be the probability

13    that you would say someone is not going to reoffend and

14    they don't.  And that would be the scores five and below.

15    And so when you do this analysis with the raw numbers that

16    are provided from the Static-99R, you find that the

17    majority of the time you are going to be wrong.  If you're

18    going to rule in recidivism, for example.  And so I looked

19    at all three of the samples.  Even if you go -- let's say

20    you looked on the high risk/high needs.  If you go with the

21    highest risk, you are going to be wrong like over 60

22    percent of the time if you say someone is going to

23    recidivate.  If you go with the total sample, you're going

24    to be wrong about 80 some percent of the time, because

25    you're going to say, yes, they're going to recidivate, but

1    80 percent of the time they did not.  So it's just a

2    mathematical formula that quantifies the likelihood that

3    you are going to be correct in making your decision based

4    on the individual score and then the base rate of the

5    overall sample.

6    Q.   Explain what you mean when it states on your report on

7    page 23, when you rule in recidivism risks will be correct

8    16 percent of the time and 37 percent of the time on the

9    Static-99R.  Explain that statement, would you, please.

10   A.   Well, if on the -- if I looked at the total sample and

11   I said, yes, he is going to reoffend, and I took a hundred

12   guys -- a hundred guys who scored a five and I said, all of

13   them are going to reoffend, I would be right 16 percent of

14   the time, and I would be wrong 84 percent of the time.

15   Q.   And what does this mean to Mr. Hall, in your opinion?

16   A.   Well, it all comes down to -- what it means to Mr.

17   Hall is that if we say he is going to reoffend we're

18   probably -- statistically we're going to be wrong more

19   often than we're going to be right.

20   Q.   Would Mr. Hall's scores on the Static-99R and 2002R

21   have been basically the same in 2004 when he was in the

22   community on supervised release?

23   A.   Well, neither of those instruments existed at the

24   time, but let's assume that they did exist.  His score

25   would be one point higher on the 99R because he wasn't 40

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 231 of 271

1   yet.  He would be a six.

2   Q.   And that would mean that compared to other groups he

3   would have a higher risk of reoffending?

4   A.   Correct.  He would have a slightly higher risk.  I

5   don't know exactly how much more, but, yes, he would be one

6   at the next score, risk percentage would be higher,

7   correct.  And on the 2002R I'm not sure if he would have

8   gotten a point or not.  I haven't -- I guess I could look

9   it up, but I don't have those memorized as much as I do the

10  other one.  But I think I have it right here, so let me

11  just look at the chart real quick.  Yes, he would have --

12  he was in his late 30's.  He would have one extra point, so

13  his score would be an eight.  So that would probably put

14  him at a little bit higher risk.  So he would have had

15  higher risk percentages in 2004 if both of these

16  instruments were developed -- as they're developed now were

17  created -- were available back then for someone to score

18  him.

19  Q.   So when he was out in the community his rate of

20  recidivism would have been higher, under these actuarial

21  instruments?

22  A.   Correct.  If we would have tried to, let's say,

23  civilly commit him in 2004 before he was released, his

24  scores would have been higher, he wouldn't have had time in

25  the community.  We would have said, yeah, let's release --

1    let's commit him and then we may have been wrong -- well,

2    we would have been wrong because once released he didn't

3    reoffend.  So this is kind of a way of looking at -- a good

4    example of a false positive.  We would have said yeah, he's

5    going to reoffend but he didn't in that 29 month time

6    period.  And so -- that's it.

7    Q.   So essentially he beat the statistics during his

8    release?

9    A.   Correct.  He did.  In a good way.

10   Q.   Did you use the MnSOST-R?

11   A.   No, I did not use the MnSOST-R.

12   Q.   And why did you not use that test?

13   A.   I don't use the MnSOST-R.

14   Q.   And why not?

15   A.   Well, I've never used it and I just don't feel that it

16   is a good instrument to use, for a variety of reasons.

17   Q.   Well, explain why you don't use it.

18        **THE COURT:**  Well, isn't that enough?  I mean, he

19   didn't use it.  That was his point.

20   Q.   Did you use any other instruments or tests in

21   formulating your opinion?

22   A.   Just the SVR-20.

23   Q.   Does the SVR-20 predict an individual's probability of

24   reoffending?

25   A.   No.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 233 of 271

1    Q.    Could you explain just briefly what the SVR-20 is?

2    A.    Well, it's more of a structured research guided

3    instrument that has about 20 factors that have been found

4    to be related to recidivism in the majority of studies.

5    Unfortunately there are some exceptions to -- some of the

6    factors are not always related to recidivism because there

7    are just so many studies out there, and there are a lot of

8    inconsistencies at times.  But what you do is you look

9    through the factors and try to determine if they are

10   present with this individual, whether it be in the past or

11   currently and then how much they can influence your overall

12   -- and then you can use it to influence your overall

13   decision if you are not really sure one way or the other.

14   But there aren't any estimates that go along with the

15   score.  There's not really a score.  There's just -- you

16   can add up a bunch of items, but it doesn't mean if you

17   have 15 that means that, oh, he's high risk.  It could be

18   concerning if an individual has many, many more than they

19   don't have.  But as Dr. Demby said yesterday, two or three

20   real bad ones could be a lot worse than six or seven

21   moderate ones.  So that's why you have to look at it as a

22   total package and not just say, oh, he got a 12 on it.

23   Wow, he's bad, or a 14 as opposed -- he could only have a

24   six, and it could be really bad.  So it's going to depend

25   on every individual.

1  Q.  When you are referring to bad ones, are you referring
2  to factors that are scored in the test?
3  A.  Yes, that's what I mean, correct.
4        **THE COURT:**  You know, I asked about 15 or 20 minutes
5  ago whether he had an opinion as to what score would make
6  you commitable and what score wouldn't.  And he said none
7  of the scores do, that the tests are not personal or
8  subjective enough to give you a basis to form an opinion.
9  They are just corroborative general predictions that apply
10  to the universe of subjects but not this person in the
11  case, right?
12  A.  Well, that's mostly correct, that the score itself --
13  well, that's just my opinion.  Other people disagree.  But
14  in my opinion there could always be exceptions based on
15  individual difference of --
16        **THE COURT:**  Right.  That was your answer.  And now
17  you're going through the whole guts of these tests to try
18  to establish that the tests are either reliable or
19  unreliable when he's not using the tests as the basis of
20  his opinion.
21  **BY MS. LITTLE:**
22  Q.  Let me ask you, Dr. Rosell, did you use these tests to
23  formulate your opinion?
24  A.  I do because it presents risk percentages that the way
25  I look at in terms of serious difficulty, so I do look at

1   the risk percentages to assist in my opinion.  But I am

2   also well aware of the limitations of these instruments

3   over the years and even now because there is some problems

4   with the overall test and how an individual could be

5   different, but he's being compared to a group.  So that can

6   make it a problematic situation.

7       **THE COURT:**  Well, the question is whether the tests

8   are material at all.  And the answer seems to be that the

9   tests can't tell you the important data about a person.

10  They can only tell you about trends.

11  A.   You've hit the nail on the head.  These tests have

12  nothing to do with a person's diagnosis or very little to

13  do with a person's diagnosis or with their ability to

14  control their behavior.

15      **THE COURT:**  So why are we spending a couple of days

16  talking about the tests then?

17      **MS. LITTLE:**  I'll move on, Judge.

18      **THE COURT:**  No, I'm not trying to preempt you.  I'm

19  just -- it seems like the lawyers are consumed and immersed

20  in the tests.  And the tests aren't what are on trial.

21  That's the way I look at it, but, you know.

22      **MS. LITTLE:**  My concern, Your Honor, why I was

23  bringing this up and belaboring the point obviously is that

24  it was one of the basis for his opinion and I believe it

25  was one of the basis of the opinions for the other doctors.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 236 of 271

1    They did do these tests, and I would assume they wouldn't
2    have done the tests if they didn't think they were relevant
3    in terms of formunlating their opinion.

4        **THE COURT:**  Well, the fact of the matter is, nobody
5    can tell what is going to happen in the future.  And they
6    are asked in this law to tell what is going to happen in
7    the future.  And so people hobble around looking for
8    crutches to try to estimate or to do in a whatever way they
9    can to predict the futute.  And, you know, that's one of
10   the problems with the law.  We are very much like a parole
11   commission where -- except they are not in prison anymore.
12   They have finished their prison.  And in a parole
13   commission you have to say, well, he's got five more years
14   to serve.  Is he going to be an axe murderer if I let him
15   out next week because if he is I don't want to let him out.

16       **MS. LITTLE:**  I'll move on, Your Honor.

17   Q.   Dr. Rosell, were there any other facts you took into
18   consideration in forming your opinion that Mr. Hall was not
19   a risk for recidivism?

20   A.   Well, the fact that he has 25 years really is not so
21   relevant in terms of his present condition, but the fact
22   that he does have 25 years from a risk assessment
23   standpoint is a positive thing in that he is not going to
24   be released without any conditions that he doesn't have to
25   follow.  Because when an individual does have conditions

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 237 of 271

1    they have to follow, they are more on guard, although I
2    know in the past he has failed. I think -- in my opinion
3    his failure to respond well on supervision is probably the
4    reality is that the worst thing that could happen would be
5    he would go back to jail for a little while. Now, he's
6    looking at a violation of any kind, it could be many, many
7    more years. He could have to go through this proceeding
8    again. For example, if he is found with a picture or
9    something, he could get another street charge, even if it's
10   a hands-off offense, and he could be looking at -- if he
11   gets another felony -- of lifetime. Or if he gets a ten or
12   15 year state charge, and then you throw in 25 years on top
13   of that, he's looking at the rest of his life, possibly.
14   So I think he is going to take that into account a lot more
15   seriously than he did in the past when the Adam Walsh Act
16   was not hanging over his head like it is currently.

17        **THE COURT:** If he gets released from the 4248
18   detention, he will be on criminal supervised release for 25
19   years. And if he gets violated and revoked on that, he
20   won't come back into Adam Walsh, he'll go back into prison
21   as a supervised releasee who has been violated and
22   resentenced. And the Adam Walsh would come later if he
23   ever got out of prison again.

24   A.    Correct.

25        **BY MS. LITTLE:**

1   Q.   Did you consider Mr. Hall's infractions at the Bureau
2   of Prisons in formulating your opinion?
3   A.   Yes.  I'm well aware of his infractions.  And I think
4   I kind of explained it earlier that although it is probably
5   not the ideal situation but the fact that an individual has
6   images, pictures, drawings, does not mean that they are
7   going to automatically go reoffend.  For example, on the
8   streets he had access to offending and he did not.  And
9   there was a lot more opportunity than he had -- he has
10  currently to offend as well as more opportunity to obtain
11  all types of pornography, more so than at Butner although
12  it doesn't seem like it's really that hard to get things at
13  Butner either, unfortunately.
14  Q.   Now, in reaching your opinion, did you review
15  documents of his prior sex offender treatment program?
16  A.   Yes, I did.
17  Q.   And after a review of those documents, did that impact
18  your opinion?
19  A.   Well, I think it's important whether -- I mean it
20  wasn't like he was exemplary.  He got through the program.
21  Not everything was totally positive.  But the fact is --
22  and as I mentioned previously, he does know what he needs
23  to do.  He learned the most important thing, is to not
24  reoffend.  I mean there is a lot of people who have gone
25  through these programs who have done really well and have

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 239 of 271

1   gone on to reoffend.  So the fact that he went through it,

2   maybe he didn't do the best, but he was able to not

3   reoffend, which was the most important thing.

4   Q.   Does an individual with a dual diagnosis like Mr. Hall

5   has, pedophilia and antisocial personality disorder, that

6   does not mean they are going to offend, does it?

7   A.   No.

8   Q.   Have you ever evaluated an individual under any kind

9   of sex offender commitment statute that has the period of

10  supervised release hanging over their head that Mr. Hall

11  does?

12  A.   Just one individual in Wisconsin had 29 years that he

13  was going to have parole, but in Wisconsin you can't

14  mention that in Court, so I wasn't able to testify about

15  that, because they don't believe that makes a difference.

16  But that's Wisconsin.  So 29 years is the most.  This is

17  25.  This is about the most I have ever seen of anybody --

18  of all the people I have evaluated.

19  Q.   Did that affect your opinion?

20  A.   Yes.  As I mentioned I think it is an important thing,

21  especially I think he is more aware of the consequences now

22  than he was in the past.

23       **THE COURT:**  As we go into the future Congress has

24  escalated the supervised release punishment on sex related

25  crimes and second offender sex related crimes and everybody

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 240 of 271

1   is going to have a life term of supervised release.  Have
2   you not had contact with that yet?
3   A.   Is that state or federal?
4        **THE COURT:**  Federal.  Persons who are convicted of sex
5   related -- child sex related crimes, passive or active, are
6   going to end up with a mandatory life term of supervised
7   release.  That's the new punishment for multiple offenses.
8   If it's your second offense or if it's an aggravated
9   offense, it's going to be life on supervised release.
10  A.   I wasn't aware of that.
11       **THE COURT:**  The Judge won't have any choice.  You
12  couldn't give five years.  You couldn't give 25 years.  You
13  have to give life.
14       **MS. LITTLE:**  I have no further questions, Your Honor.
15       **THE COURT:**  Do you have any questions.
16       **MR. ROYSTER:**  I do.  Thank you, Judge.
17                    <u>CROSS-EXAMINATION</u>
18  **BY MR. ROYSTER:**
19  Q.   Dr. Rosell, you keep saying that he hasn't reoffended.
20  But he has, in fact, reoffended sexually, has he not?
21  A.   How do you define sexual reoffense?
22  Q.   Well, when he was convicted in 1998 -- excuse me in
23  1989 -- that was a sexual conviction, right?
24  A.   Oh, yeah, I'm talking about --
25  Q.   In 1999 that was also a sexual conviction, right?

1    A.   I was referring to since his index offense.

2    Q.   So he has, in fact, reoffended?

3    A.   Oh, yeah.  I never said he -- I never meant it in that

4    say, sir.  I'm sorry if I was misunderstood.

5    Q.   And there was approximately a seven year gap that he

6    was in the community, and he still reoffended, right?

7    A.   That's true.

8    Q.   Now, you believe that sexual arousal with children is

9    akin to sexual orientation, don't you?

10   A.   It can be, yes.

11   Q.   But you believe that it is, don't you?

12   A.   Yes.

13   Q.   And you believe that it is not subject to change as

14   well, don't you?

15   A.   For most people it probably isn't.  There's always

16   exceptions, but for most people I think it probably isn't.

17   Q.   But you believe it is not subject to change, right?

18   A.   I said -- if I need to repeat myself I will.  For most

19   people it probably isn't going to change.

20   Q.   Now, you don't believe he will have serious difficulty

21   refraining from committing another offense.  Is that your

22   opinion?

23   A.   Yes, sir.

24   Q.   And by that you mean control his behavior, right?

25   A.   By that I mean I don't think he will commit another

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 242 of 271

1    sex -- he is not at high risk to commit a sexual offense.

2    Q.   And at your deposition several weeks ago you actually

3    testified, didn't you, that by that you mean controlling

4    his behavior.  That's what you said, isn't it?

5    A.   Okay.  Yes.

6    Q.   Is that right?

7    A.   Yes, sir.

8    Q.   Now you agree though that he has trouble controlling

9    some of his behavior?

10   A.   Yes, I agree with that.

11   Q.   And you agree, don't you, that he has difficulty

12   controlling some of his behavior that may lead him to

13   reoffend, right?

14   A.   Whether it's going to lead him to reoffend, I'm not

15   sure.  It has led him to get in other types of trouble that

16   has gotten him violated and got him to where he is

17   currently.  Whether it is going to directly lead him to

18   commit a hands-on sexual offense, I can't be that

19   definitive.

20   Q.   Well, for example, possession of pictures of little

21   girls with their genitalia showing, that's an example,

22   isn't it, of behavior he has difficulty controlling that

23   could potentially lead him to reoffend, right?

24   A.   If he chooses that he wants to engage in that behavior

25   of offending, which is something when he had the

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 243 of 271

1    opportunity when he was younger, when he had less to lose,

2    he did not.  Now that he has a lot more to lose, I can't

3    see that being as problematic as it was in the past.

4    Q.   So it's not problematic that he's looking at child

5    pornography?

6    A.   Not in the way it would appear.  It's problematic in

7    some ways but not in that it would automatically guarantee

8    that he is going to engage in another sexual offense.

9    Q.   But that's not the burden, is it, the guarantee that

10   he is going to offend?  It's serious difficulty refraining,

11   right?

12   A.   Okay.  I don't think he will have serious difficulty

13   refraining from engaging in the sexual violent act.

14   Q.   Now, he is not an Oman offender, is he?  He's not an

15   Oman only offender.

16   A.   No, he is not.

17   Q.   And there is recent research, isn't there that shows

18   that only one in eight Oman offenders also have a hands-on

19   sexual offense, isn't that what the research shows?

20   A.   Correct.

21   Q.   And so I take it it would be less than one in eight to

22   have an Oman ofense and multiple hands-on offenses, is that

23   true?

24   A.   Possibly.

25   Q.   Now, isn't it true that research shows that if someone

1  previously convicted of a hands-on sex offense is more

2  likely to commit a sex offense than someone with a criminal

3  history but with no sex offense?

4  A.    That's true.  Somebody who has committed a sex offense

5  in the past is probably more likely than someone who hasn't

6  committed a sex offense in the past.  But there's always a

7  first time for people -- there are people out there who

8  haven't committed any offenses yet, but they might.

9  Q.    Sure.  And isn't there research that shows that

10  someone with a hands-on sex offense is more likely to

11  reoffend than someone with an Oman only offense?  Isn't

12  there research that shows that?

13  A.    Could you repeat that again.  I'm just trying to --

14  Q.    If the research shows that someone with a hands-on sex

15  offense is more likely to reoffend than someone with an

16  Oman only sex offense?

17  A.    Yes.  But as I mentioned the recidivism rate was under

18  five percent, so it might be more so, but it's still very

19  low.

20  Q.    Now, you sat through his testimony yesterday, correct?

21  A.    Yes, sir, and this morning.

22  Q.    And this morning, is that what you said?

23  A.    Yes, sir.

24  Q.    And you heard him testify about what he was going to

25  do with those pictures, didn't you?

1   A.   Yes.

2   Q.   And you heard him testify that he was going to keep

3   those pictures.

4   A.   That's true.

5   Q.   And you heard him testify that he was maybe going to

6   fantasize and masturbate by those pictures?

7   A.   He said maybe, yes.

8   Q.   And I just want to make sure that that doesn't change

9   your opinion as to whether he is going to have serious

10  difficulty refraining, is that right?

11  A.   Correct.  I'm not here -- we're not here to civilly

12  commit people for their thoughts.  We are here to civilly

13  commit people for what they might do.

14  Q.   Based on their thoughts, right; that's part of it?

15  A.   What?

16  Q.   If they do something in response to their thoughts, if

17  they victimize a child that certainly is covered by the

18  Adam Walsh Act, wouldn't you agree with that?

19  A.   Yes, thank you.  If they engage in the behavior.

20  Q.   Now, you will agree though that at the very least it

21  is suggested that he has difficulty controlling his

22  sexually deviant thoughts, is that right?  You don't agree

23  with that?

24  A.   There have been times where he seems to have

25  difficulty controlling those thoughts, the fact that -- the

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 246 of 271

1    possession of the child pornography, yes.

2    Q.   His sexual deviant thoughts, correct?

3    A.   Correct.

4    Q.   Now, Mr. Hall told you that his risk -- you asked him,

5    on a zero to ten tell me your risk, and he told you he was

6    a one, right?

7    A.   Correct.

8    Q.   That is ten percent, right?

9    A.   Yes, sir.

10   Q.   And you actually agree with that.  That's where -- in

11   your report you wrote -- excuse me, in your deposition you

12   testified that's where I rate his risk, to be about ten

13   percent.

14   A.   Okay.  If that's what I -- I can't remember what I

15   said.  But if that's what I said.

16   Q.   Is that accurate as you sit there right now?

17   A.   Probably.

18   Q.   Okay.  And that's despite all the things you've heard

19   in the last two days from Mr. Hall, still ten percent?

20   A.   Yes.

21   Q.   Now, when he testifies he has to say whether or not he

22   is going to offend, doesn't he?  He has to say I'm not

23   going to reoffend?

24   A.   Yes, he said that.  I think that's a good thing.  I

25   think if he would have said, I'm going to reoffend we

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 247 of 271

1  probably would be having lunch by now.

2  Q.   Well, you actually said that you didn't take that away

3  from your interview.  In fact you said in your deposition,

4  he's not saying I don't have anything to worry about; I'm

5  safe.  That's what you took away from his interview though,

6  is that he actually recognized he had some risks, right?

7  A.   I think that it is usually a good idea when

8  individuals are aware that they always have a risk and that

9  way they will be vigilent.  When an individual says I'm a

10 zero, but I have no risk and I'm good to go, that's more

11 concerning.  I've had individuals say, I'm a zero because

12 I'm going to be so focused and concentrated.  Others say

13 I'm a one because I know what I've done in the past, and I

14 need to always be on what I need to think about.  So him

15 saying one is saying that there is always a chance, but I'm

16 going to do everything I can, as he said, to never ever

17 harm anybody and never have to go through any of this

18 again, because I think he is just tired of it.

19 Q.   He didn't testify to that yesterday or today, did he?

20 He said he was not going to commit an offense, which gives

21 you more concern, isn't that right?

22 A.   No, he wasn't asked to rate himself yesterday or

23 today.  He was asked, are you going to commit an offense.

24 He said, no.  My question was --

25 Q.   Well, that's less than ten percent, isn't it?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO  Document 74  Filed 06/30/11  Page 248 of 271

1   A.   It's two different questions and two different issues

2   and we're mixing them up.  I asked a question on a

3   continuum of rate on a scale of zero to ten, zero meaning

4   never, ten meaning very likely, and he gave me a score and

5   his explanation.  Here he wasn't asked what was his

6   likelihood.  He said, are you going to reoffend, and he

7   said no.  He didn't say, well, there's always a chance.

8   Q.   He said no, didn't he?

9   A.   Yes, he did say no.  Correct.

10   Q.   Now you said in your report that there is no evidence

11   of sexual offending while he has been out in the community,

12   is that right?

13   A.   Correct.

14   Q.   Well, that't not entirely true, though, is it?

15   A.   I don't know.  Give me an example where there is

16   evidence.

17   Q.   Well, you did read the reports regarding his

18   polygraph, didn't you?

19   A.   Yes, I did.

20   Q.   And you read the report that said, since starting

21   probation have you touched the sexual organs of a minor,

22   and he flunked on that question, right?

23   A.   Yes.  And then he passed it a couple months later.

24   Q.   It wasn't the same question though, was it?

25   A.   I can't recall what the questions were.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 249 of 271

1  Q.   Well, the question -- you read the three polygraph

2  charts, right?

3  A.   Yes.

4  Q.   The first question was, he was asked in July of 2005,

5  since starting probation -- which would have been sometime

6  in April of '04, right?

7  A.   Yes, sir.

8  Q.   So since starting probation have you touched the sex

9  organs of a minor, and he said no.  So he flunked that

10 question while he was in the community from '04 -- April

11 '04 until about July '05 he flunked that question.

12 A.   Okay.

13 Q.   So the second time he was polygraphed it says, since

14 January of 2005 have you touched the sexual organs of a

15 minor?  So there's a gap in time, wouldn't you agree?

16 A.   Okay.

17 Q.   April '04 to January '05.

18 A.   Okay.

19 Q.   And he passed that question.

20 A.   Okay.

21 Q.   But he flunked the one that asked about the time from

22 April '04 to January '05, right?

23 A.   Was he ever convicted, arrested, charged?

24 Q.   No.  Nobody has ever said he was convicted.  I'm just

25 asking you -- it's not accurate to say there is no evidence

1  at all, is it?

2  A.  It all depends on how reliable the polygraphs are.

3  That's a whole other issue.

4  Q.  Do you use polygraphs in your practice?

5  A.  I don't have a practice where I use polygraph, no.

6  Q.  Have you ever been involved in a practice that used

7  polygraphs?

8      A.  At the prison while I was the Director we had a

9  polygrapher, yes.

10 Q.  And you found it helpful, didn't you, in assessing the

11 truthfulness of the sex offenders?

12 A.  Sometimes it did work, yes.

13 Q.  Now, you will agree, won't you, that during this time

14 in the community there was certainly evidence of sexual

15 preoccupation, right?

16 A.  Yes.

17 Q.  In fact, during that post test that we just talked

18 about on his polygraph he admitted that he thinks about his

19 victims 45 percent of the time when he masturbates, right?

20 A.  Yes.

21 Q.  And he actually says he thinks about the things that

22 he did with them, didn't he?  That's what he said in that

23 polygraph.

24 A.  Correct.

25 Q.  But he testified on the stand yesterday and in his

1  deposition that he didn't remember what happened to those

2  victims, did he?  At least with respect to the first

3  victim.

4  A.  With the first victim my understanding is he was

5  inebriated, but he did admit that he had been grooming and

6  that he probably would have done something eventually.

7  Q.  So he admitted after his polygraph that he thinks

8  about his victims -- because there are only two victims as

9  you pointed out, right -- that we know of?

10  A.  That's true.

11  Q.  Now on February 14, 2006 you read the report, didn't

12  you, about his property was gone though and numerous

13  articles and pictures of pornography were found?

14  A.  Correct.

15  Q.  And that would be an example of sexual preoccupation,

16  right?

17  A.  Yes, which did not lead to any offending behavior as

18  far as we know.

19  Q.  But it would certainly indicate that he has difficulty

20  controlling his -- that he is sexually preoccupied?

21  A.  Right.  But it does not lead to any hands-on offenses.

22  Q.  That we know of?

23  A.  That we know of.

24  Q.  Right.  Now, also on January 4, 2006, probation was

25  notified by the treatment agency that he viewed pornography

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 252 of 271

1  again and had casual sex with an AA participant.  That

2  would be another example of sexual preoccupation, right?

3  A.  Having sex with an adult woman, you know.

4  Q.  I just asked you if there was an example of continuing

5  to be sexually preoccupied while he was in the community.

6  A.  Having a consensual sexual relationship with an adult

7  woman, yeah, I guess then a lot of us are sexually

8  preoccupied.

9  Q.  Well, was it a violation of his relapse program?

10  A.  I think it was because he didn't notify anybody about

11  it.

12  Q.  Now, in your -- as part of your evaluation you

13  consider understanding his offense behavior.  That's a

14  protective factor for you, right?

15  A.  Yes, sir.

16  Q.  Meaning that it decreases his risk that he understands

17  his offense behavior?

18  A.  Correct.

19  Q.  But you don't actually mean his convictions, do you?

20  A.  I'm not sure what you mean by --

21  Q.  Well, when you're talking about offense behavior, are

22  you talking about his prior convictions?

23  A.  I'm talking about his -- one of his main offense

24  behaviors would be interacting with women who have children

25  and then grooming the children.  That would be a high risk

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO  Document 74  Filed 06/30/11  Page 253 of 271

1    offense behavior for him.

2    Q.   Well, do you think that he completely understands his

3    offense behavior relative to the prior convictions?

4    A.   I think so, yes.

5    Q.   But with the second victim he told you he didn't touch

6    her, didn't he?

7    A.   I thought he said that about the first victim.

8    Q.   Well, let's take a look at your report.  That's

9    Exhibit [7], page 7, the paragraph where it starts Age 33,

10   dead center of the paragraph.  I did not touch her but I

11   did find it arousing.  That's what he told you, isn't it?

12   A.   Okay.

13   Q.   Because that's in your report under Mr. Hall's version

14   of offending, right?

15   A.   Correct.

16   Q.   So this is during your interview and you are asking

17   him about his sex offense, and he tells you he hasn't

18   touched that second girl, didn't he?

19   A.   Correct.

20   Q.   But he did touch her, didn't he?

21   A.   I believe he did.

22   Q.   He fondled her under her clothing and -- over and

23   under her clothing, didn't he?

24   A.   Correct.

25   Q.   And now he has testified he doesn't even remember

1    touching his first victim.  He has testified about that?

2    A.   Correct.

3    Q.   But yet you think he has an understanding of his

4    offense behavior with respect to these convictions, is that

5    right?  Is that your testimony?

6    A.   Yes, because, as I said, the way he set up the

7    opportunity he is not the type of offender who walks up to

8    a stranger and just snatches her or just starts touching

9    her.  He is an individual who creates an opportunity to

10    engage in offending behavior after building rapport.  And

11    so that's where he distinguishes himself.  And so from

12    other types of offenders.  Not that anyone is better than

13    the other.

14    Q.   He takes time to groom his victims, doesn't he?

15    A.   Right.

16    Q.   And sometimes it takes months, doesn't it?

17    A.   It could.

18    Q.   And in some situations it takes several months to

19    groom his victims, right?  That's how he did it in the

20    past, right?

21    A.   Correct.

22    Q.   Now you base your opinion that he does not meet the

23    criteria for commitment following the fact that he has

24    spent a significant time in the community since his last

25    hands-on offense.  Right?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 255 of 271

1    A.   Yes, sir.

2    Q.   And you think that that speaks volumes, don't you?

3    A.   I do.

4    Q.   Now, this significant amount of time is less than

5    three years, right?

6    A.   It's more than a day than most people have.

7    Q.   It's less than three years, right?

8    A.   It's less than three years, but it's more than a day

9    than most individuals that I have evaluated for these

10   similar types of cases.

11   Q.   So you are comparing -- in your evaluation you are

12   comparing Mr. Hall to other people?  Is that right?

13   A.   Sure.  It's done all the time.  What do you think we

14   do with the actuarials, compare them to other people or --

15   Q.   Well, I don't know.  I don't know --

16   A.   Well, I'm telling you --

17       **THE COURT:**  Stop arguing.  If you have nothing else to

18   ask then just rest.

19       **MR. ROYSTER:**  I've got some more questions.

20       **THE COURT:**  Well, make some of them relevant, because

21   they're not doing me any good.

22       **MR. ROYSTER:**  Okay.

23   Q.   Now, you consider his sex offender treatment

24   to have been a protective factor as well, right.

25   A.   Yes.

1  Q.   But he actually molested a child after he had had sex

2  offender treatment, correct?

3  A.   The first time.

4  Q.   And he has actually continued to possess these

5  pictures of little children since his sex offender

6  treatment, is that right?

7  A.   Correct.  I didn't say he did wonderfully.  I just

8  said he did it.

9  Q.   Now, in conducting your evaluation you considered the

10  information he told you during the interview as part of

11  your evaluation, right?

12  A.   Yes, sir.

13  Q.   And the information you asked about was important,

14  wasn't it?

15  A.   Yes.

16  Q.   And it was important that he be truthful with you?

17  A.   Yes.

18  Q.   And you actually find his honesty regarding his sexual

19  history is a protective factor, right.

20  A.   Yes.

21  Q.   And he told you he had about a hundred sexual

22  partners, is that true?

23  A.   Correct.

24  Q.   And certainly as you have sat through his testimony

25  and the testimony of others, you know there are several

1   versions of that, right?

2   A.   Yes, sir.

3   Q.   He also told you that he had one male sexual partner,

4   is that right?

5   A.   Correct.

6   Q.   And you know there are several different versions of

7   that as well, right?

8   A.   That's true.

9   Q.   And Dr. Rosell, in your deposition you were asked

10  questions about whether or not you believed him.  Do you

11  recall that?

12  A.   Correct.

13  Q.   And you testified in the deposition that in the areas

14  that matter most he is being truthful?

15  A.   Yes.  And in my opinion for me to make my decision,

16  yes.

17  Q.   And you still believe that as you sit there today,

18  correct?

19  A.   Yes, I do.

20  Q.   Right now?

21  A.   If I didn't believe it, then I wouldn't be here.

22       **MR. ROYSTER:**  May I just have one moment, Your Honor?

23       **THE COURT:**  Sure.

24  Q.   And at the time you did your report, you did not

25  believe that he touched the second girl; is that right?

1  A.   I can't recall.

2  Q.   Does it matter whether he did or did not, in your

3  mind?

4  A.   Whether he did or not?  I just assumed that he did.

5  But the fact that he was there.  There was pictures

6  involved, you know.  It doesn't change the diagnosis.  I'm

7  not going to argue one or the other.  It doesn't change my

8  opinion.  If it happened, it's unfortunate.  But if it

9  didn't, it's not going to sway me one way or the other.

10  But I'm assuming since there was a conviction that it

11  probably happened.

12  Q.   And you didn't know about the shakedown where the

13  photos and drawings of the scantily clad women in February

14  of 2011, you didn't know about that at the time, correct?

15  A.   I can't recall when I found out.  No, I think I knew

16  about the folder with the --

17  Q.   No, I'm talking about the recent shakedown, February

18  11, 2011.  You didn't know about that?

19  A.   Well, I saw him a month later, so I probably did.

20  Q.   You think he told you about it during your interview

21  with him?

22  A.   I can't recall if he told me or if I already knew.

23  Q.   You didn't include that information in your report,

24  did you?

25  A.   I can't recall if it's in the report or not.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 259 of 271

1    Q.   You didn't rate him using the psychopathy checklist,

2    did you?

3    A.   No, I didn't.

4    Q.   But there is research that that checklist is related

5    to the risk of sexual recidivism, isn't it?

6    A.   No.

7    Q.   There's no research that says it's related to sexual

8    recidivism?

9    A.   It's very questionable.  It's more related to

10   institutional maladjustment, general recidivism, violent

11   recidivism, and failure in the community.  With sexual

12   recidivism the correlation is not as strong.

13   Q.   But it measures the levels of psychopathy, right?

14   A.   Yes, that's what it does.

15   Q.   And psychopathy is an element that's on the SVR-20,

16   right?

17   A.   Correct.

18   Q.   And you used that test in your evaluation?

19   A.   Yes.

20   Q.   You found in your report that an appropriate release

21   plan is a protective factor.  Is that correct?

22   A.   Correct.

23   Q.   And presumably you mean that he actually followed it;

24   is that right?

25   A.   Correct.

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 260 of 271

1 Q. And you'll agree that that release plan is now
2 approximately ten years old, right?
3 A. You're talking about the Relapse Prevention Plan?
4 Q. That's right.
5 A. Yes.
6 Q. And clearly there's more information that should be
7 included for that to be an appropriate release plan; is
8 that right?
9 A. I think you're confusing release plan with Relapse
10 Prevention Plan. Which one are you talking about?
11 Q. Are they different?
12 A. The relapse prevention plan is what he did in
13 treatment. It doesn't really speak totally about the
14 release. It's more about behaviors while on release.
15 Q. You'll agree, won't you Dr. Rosell, that looking at
16 pornography is risky behavior for Mr. Hall; is that right?
17 A. It can be for most. The fact that he's looked at it
18 while in the community and there's no evidence -- well,
19 there's never been an arrest or a conviction or a charge of
20 him engaging in hands-on offenses. Maybe he's one of the
21 individuals who can look at it and not reoffend, as there
22 are many. He has shown in the community that he could look
23 at pornography and not reoffend.
24 Q. But you'll agree that it's risky behavior for him,
25 won't you?

1    A.   It may be.  To say that we know for a fact, because he

2    was looking at it on the street and he did not.  So to say

3    it's definitive for everybody is making a blanket statement

4    and saying everybody is the same, and we're not.

5    Q.   I didn't ask you if he was everybody.  I just asked

6    you if it was risky behavior for Mr. Hall.  Is that

7    accurate?

8    A.   It may be, but it might not be.  I can't answer any

9    clearer than that.  There's evidence that it wasn't.

10        **MR. ROYSTER:**  Thank you.  I don't have any other

11   questions, Judge.

12        **THE COURT:**  Any redirect?

13        **MS. LITTLE:**  Just two questions.

14                   <u>REDIRECT EXAMINATION</u>

15   **BY MS. LITTLE:**

16   Q.   You testified just recently that you may not be able –

17   that Mr. Hall may not be able to control his sexual

18   thoughts of children.  Does that change your opinion about

19   his risk of recidivism?

20   A.   No.

21   Q.   And do you recall that -- do you recall receiving some

22   information from my office this weekend?

23   A.   Correct.

24   Q.   And in that information was there information about a

25   February 11 shakedown?

1    A.    Yes.

2    Q.    Was that the first time you saw that information?

3    A.    That was the first time I saw the pictures, but for

4    some reason I thought I remembered hearing about it

5    previously.

6           **MS. LITTLE:**  I have no further questions, Your Honor.

7           **THE COURT:**  All right, thank you.

8           **MS. LITTLE:**  We rest at this point.

9           **THE COURT:**  All right.  Thank you.  You can step down.

10   Is there going to be rebuttal evidence?

11          **MR. ROYSTER:**  No, Your Honor, there is not.

12          **THE COURT:**  We have a jury coming in at 2:00.  If you

13   want to -- do you want to summarize your case now, or

14   what's your pleasure?  You want to come back after I pick

15   the jury?

16          **MR. ROYSTER:**  Your Honor, I'm fine with going ahead.

17          **MS. LITTLE:**  I'm fine too.  I'm very brief.

18          **THE COURT:**  All right.  Okay, fine.

19                     CLOSING BY MR. ROYSTER

20          Thank you, Judge.  You've heard testimony from

21   the psychologists, you've also actually heard from Mr.

22   Hall.  With respect to the psychologists, for the most part

23   they agree on several items.  They certainly agree with

24   respect to the first two elements.  Really the sticking

25   point appears to be the third factor with respect to having

1　serious difficulty refraining.  Throughout the Respondent's

2　case the theme, the underlying current has been this time

3　in the community with respect to reoffending.  And also

4　that he's going to be on supervised release for 25 years

5　and for that reason we shouldn't have as much concern.  To

6　some degree they are related.  Because we have some idea of

7　how he has conducted himself while on supervised release

8　and while he has already been out in the community, albeit

9　in a halfway house.  It's a little different setting than

10　just out on his own.

11　　　　Judge, his time in the community, for which there is

12　no reoffense was approximately 22 months until when he was

13　revoked.  And he's got six months.  This is after multiple

14　hands-on sex offenses, possession of child pornography, for

15　which he's not charged.  There was discussion about there

16　not being any evidence of another sex offense, but from the

17　record there appears to be.  We don't want to make more of

18　an issue than it is, but certainly the fact that he failed

19　the polygraph and was dishonest with his probation officer

20　would be indicative that something is awry.

21　　　　Even so the information that he provides in response

22　to that when he's confronted with it is that he's

23　masturbated to the victims 45 percent of the time, 35

24　percent he's thinking of -- and he's thinking about what he

25　did with his victims.  There's certainly evidence of sexual

1    preoccupation.  You heard evidence from the doctors.  And I
2    believe that it follows from that that his sexual
3    preoccupation is risky behavior for Mr. Hall.  And it's
4    something that could lead him to reoffend.

5         Judge, you also heard testimony about what he has done
6    while he has been at the Maryland Unit.  And since he's
7    been certified.  When he has the most on the line what his
8    behavior has been like.  And he has consistently attempted
9    to obtain and in many instances has obtained inappropriate
10   materials.  You heard him testify that after the shakedown,
11   or with respect to the pictures that were found during the
12   shakedown, that he was going to keep them for himself.  You
13   heard him testify that he was possibly going to fantazise
14   and masturbate about them.  Judge, those are -- those
15   should be very concerning -- that should be very concerning
16   to The Court.

17        There's certainly no evidence, there's no indication
18   that he is going to snatch a kid off the street, and that
19   is why the time in the community is significant.  It takes
20   him time to groom his victims.  He was in the community for
21   approximately seven years before he committed his sex
22   offense.  So to take that snapshot of 22 months and the six
23   months doesn't seem like an accurate reflection of what
24   he's going to be like when he is in the community.  And,
25   Judge, all these things are after multiple occurrences of

1   sex offender treatment.

2        Judge, with respect to the issue of supervised

3   release, there have been reports that said it's running

4   while they're locked up.  So potentially if that's the case

5   it would only be 23 years.  And I don't think that's

6   significant, but it may be that he could actually request

7   that his supervised release be modified.  So I don't think

8   that we can argue to you that there's a guarantee that he's

9   going to be on 25 years supervised relase.  But even so his

10  self-report to probation is important.  And his self-report

11  to probation, the information that he's provided in sworn

12  testimony, is completely inconsistent and completely

13  unreliable.  You got a taste of that today and yesterday.

14       Judge, additionally with respect to the last time he

15  was on supervised release, he just left.  He just

16  absconded.  And he was headed to New Orleans.  Judge,

17  yesterday when Mr. Hall testified you asked him a couple of

18  questions and there were a couple of things that he said

19  that really stood out to me.  One was with respect to

20  having the pictures of the little girls that we've all

21  seen.  There's no reason to show them again.  He said I had

22  a lapse in ability to control that and it's something that

23  still needs to be worked on.  Judge, it's our position that

24  the Adam Walsh Act is designed to protect the public from

25  sexually dangerous persons, from people that have a lapse

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 266 of 271

1   in their ability to control certain urges and certain

2   behaviors.  And these urges and these things that he's

3   doing while he's committed or while he's certified are

4   certainly indicative of what we can expect from him when he

5   gets out and increases the likelihood that he's going to

6   reoffend.  So we ask, Judge, that you do commit under Title

7   18 U.S.C. 4248.  Thank you.

8        **THE COURT:**  All right.  Thank you.  Ms. Little.

9                   CLOSING BY MS. LITTLE

10       Your Honor, I think I would agree with the Government

11  that the only real issue before you is whether Mr. Hall is

12  a serious risk of committing a new sex offense.  You've

13  heard Dr. Rosell.  Pedophilia is a chronic condition.  But

14  the question is, can he control hands-on offenses.

15  Possession of pornography, even if it's children, kiddie

16  porn is obviously illegal, but it is not a hands-on

17  offense.  And there's some studies to indicate that Dr.

18  Rosell talked about this morning that possession of

19  pornography, even children's pornography, does not mean

20  that a person will commit a new hands-on offense.

21       You have had the opportunity to listen to and observe

22  Mr. Hall.  He is committed to not reoffending.  More so

23  than ever he's had this desire not to reoffend.  He has

24  been through multiple sex offender treatment programs.  He

25  now understands the harm that he has done to those

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646

Case 5:09-hc-02083-BO   Document 74   Filed 06/30/11   Page 267 of 271

1   children.  He does not want to harm any children again.  He
2   testified about the fact that he would want somebody to
3   kill him if he harmed kids.  That was just an illustration
4   of how he has accepted this is a really bad behavior and
5   that he cannot reoffend.  This is a man that has 25 years
6   of supervised release, which is huge.  It's a hundred pound
7   hammer.  But more importantly he's got a thousand pound
8   hammer hanging over his head.  Because if he does another
9   sex offense he will be in custody for the rest of his life.

10          Even if he violates supervised release, the Judge when
11  he was under his SORNA conviction was adamant, 25 years,
12  and these are the conditions of your release.  And they're
13  very onerous.  And he knows that they're very onerous.  And
14  he understands what he has to do.  And I do not for a
15  minute think that that Judge would not impose the whole 25
16  years if he violates.

17          You heard the testimony of all of the doctors.  And I
18  think again the key point for Dr. Rosell is the fact that
19  this is an individual that has 28 months in the community
20  without reoffending.  Yes, he has had problems listening
21  and paying attention to rules, rules of the halfway house,
22  rules of the probation officer, but there has been no
23  sexual reoffenses.  He had time to groom another victim but
24  he chose not to groom another victim.  He put in coping
25  skills.  He testified about the fact that he did not --

1    except for the one instance he did not view pornography and

2    he reported that when he viewed that pornography to the

3    probation officer because he knew he had a lapse.  He

4    testified about how he does not get involved -- he did not

5    get involved with women.  He did not get involved with

6    women with children.  He had one relationship with a woman

7    who did not have kids and he selected her specifically

8    after she approached him.

9        He knows and he did not seek employment where he would

10   be exposed to children.  In stores he would leave stores to

11   make sure that he was not around children.  When he was on

12   the bus around children he got off the bus.  So he

13   understands the things that could put him back into a

14   position of potentially reoffending.  Again, pedophilia is

15   a chronic disease.  It's not going to go away.  The

16   question is whether he can control it.  And finally I would

17   like to suggest that he has shown his ability to control

18   his behavior in the way that he was able to control his

19   substance abuse for 23 years.  He decided to control that

20   and to stop using drugs and alcohol.  And he did it for 23

21   years.

22       So he had time in the community without a new sex

23   offense, 28 months.  And he had time in the community

24   without a reoccurence of substance abuse.  He has the

25   ability to do it, and he has the desire to do it, and he

1  has what's hanging over his head to ensure that he does not

2  sexually reoffend.  So we would ask that you would release

3  him.

4      **THE COURT:**  All right.  Thank you.

5      I'll reach a decision in the case and write an

6  opinion.  Thank you for presenting it in an efficient way.

7  I have nothing but praise for the way the lawyers handled

8  the case, and the witnesses.  All right, thank you.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
STATE OF NORTH CAROLINA          )
                                 ) C-E-R-T-I-F-I-C-A-T-I-O-N
COUNTY OF PERQUIMANS             )
```

        I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/S. Sandra A. Graham, CVR*            *6/24/2011*
Sandra A. Graham, CVR          June 24, 2011
Court Reporter & Notary Public
Notary Public Number: 19940140086

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646