UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-HC-2083-BO

| | |
|---|---|
| UNITED STATES OF AMERICA | RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| CLYDE HALL | |

Comes now the respondent, Clyde Hall, by and through undersigned counsel, and respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.     INTRODUCTION

Petitioner, the United States of America ("the Government") instituted this civil action on June 19, 2009, seeking to commit Clyde Hall ("Mr. Hall" or "Respondent") as a sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006 ("the Act"). 18 U.S.C. § 4248. Docket Entry ("DE") 1. The Government filed a certificate stating that mental health personnel for the Federal Bureau of Prisons ("BOP") examined Respondent and issued a preliminary determination that he is sexually dangerous within the meaning of the Act. A certificate filed under the Act stays Respondent's release from federal custody pending a hearing to determine whether Respondent qualifies for commitment as a sexually dangerous person.

1

The Court held a two-day evidentiary hearing in this matter on June 6 and 7, 2011. On July 11, 2011, the Court directed the parties to submit, within thirty (30) days from the entry of this Order, Proposed Findings of Fact and Conclusions of Law. After considering the testimony at the evidentiary hearing, the evidentiary record, and the parties' submissions, this Court concludes that the Government has failed to establish by clear and convincing evidence that Respondent is sexually dangerous to others as required by the Act and the Constitution.

## II.     FACTS

1. Clyde Hall was born in 1965 and was 45 years of age at the time of his evidentiary hearing.

2. At the time of his hearing, Mr. Hall had been incarcerated for more than two years after his release date.

3. Mr. Hall's release date from the BOP was June 24, 2009. DE 1.

### A.     Personal History

4. Mr. Hall was born into an intact family and has three brothers. Ex. 5, at 2179. [1]   He was subjected to physical and emotional abuse by his parents which resulted in the family being investigated by local child protective services. *Id.,* Tr. 113-115. At the age of sixteen, Mr. Hall was thrown out of his house by his father. *Id.*, Tr. 116. He briefly lived with an uncle and friends and then lived on the streets supporting himself by working as a prostitute. *Id.* Despite living on the streets, Mr. Hall graduated from high school in 1983 at the age of seventeen. *Id.*

---

[1]  The parties prepared a notebook of exhibits which was offered and accepted into evidence by this Court. The exhibits are referred to by exhibit tab number. Reference to a specific page(s) within an exhibit is referred to by the bates number indicated on the page.

5. Mr. Hall was sexually abused at the age of nine by a 16-year-old female acquaintance. *Id.* The abuse occurred approximately four times a week for a six-month period and consisted of oral sex and intercourse. *Id.*

6. From 1983 until 1985, Mr. Hall lived periodically with a girlfriend. *Id.* He learned that he had fathered a child with this girlfriend when the child was five years old. *Id.*

7. In January 1988, Mr. Hall married a woman. Ex. 5, at 2180. The marriage ended nine months later. *Id.* He fathered one child with this woman during their marriage and a second child after they had separated. *Id.* Mr. Hall admits being physically and emotionally abusive to this woman and being involved in extramarital affairs during their marriage. *Id.*

8. Mr. Hall has a sporadic work history in which he was often fired from jobs due to conflicts with supervisors. *Id.* He has held positions as a supervisor in a fish processing plant, plant cleaner, dishwasher, construction labor, and painter. *Id.*

9. Mr. Hall consumed alcohol on a daily basis from the ages of nine to 23. *Id.* He began using cannabis and cocaine at the age of 13, smoking between two and fourteen joints every day and using cocaine approximately four times a week until the age of twenty-three. Ex. 5 at 2180-2181. Mr. Hall voluntarily stopped all alcohol and drug use at the age of twenty-three. Ex. 5 at 2181, Tr. 135.

10. Mr. Hall's first contact with a mental health professional occurred in approximately 1976, when he was referred for behavioral problems at school at the age of eleven. Ex. 5 at 2181. He met with counselors several times between the ages of eleven and fifteen. *Id.* He participated in sex offender treatment for the first time while he was in custody in the state of Maine between

3

the years of 1987 and 1988. *Id.* After his release from prison in Maine he continued treatment in the community with the same therapist he had in prison. *Id.*

### B.     Criminal and Sexual Offense History

11. In 1985, at the age of 20, Mr. Hall was convicted of Obstructing Government Administration by the District Court of Maine. Ex. 51 at 108. He was fined $250.00, with all but $50.00 suspended on the condition that he have no other violations for six months. *Id.*

12. In 1988, Mr. Hall was convicted of theft by deception after he falsified a time card at work in 1986. *Id.* He was ordered to pay $240.00 in restitution. *Id.*

13. Mr. Hall was convicted of his first sex offense in 1989. He pleaded guilty to one count of Unlawful Sexual Contact and one count of Gross Sexual Misconduct. *Id.* The Presentence Report prepared for the United States District Court for the Northern District of New York, Docket No. 107-CR-157-001, reports that Mr. Hall exposed himself to a ten-year-old girl on March 1, 1987, and that he touched her and had her "help" him while he masturbated. *Id.* On April 1, 1987, Mr. Hall got into bed with the same ten-year-old, touched her vagina with his hands and mouth, and had her touch his penis with her hands and mouth. *Id.* He was sentenced to four years in prison on count one and eight years in prison on count two, to run concurrently, with all but four years suspended and six years of probation. Ex. 9 at 1192-1193. Mr. Hall was incarcerated at the Maine Correction Center from June 14, 1989 until his release on November 12, 1991. Ex. 51 at 108. He completed a term of probation following his release from prison. *Id.*

14. On February 28, 1999, Mr. Hall pleaded guilty to the charge of Act in Manner Injurious to a Child, a class A misdemeanor, in Essex County, New York. *Id.* He was sentenced to one year of incarceration and released on September 16, 1999. *Id.* Mr. Hall admitted showing

his girlfriend's ten-year-old daughter and her friend drawings of unclothed females, intended to be pictures of ten-year-old girls. *Id.* The victim's mother reported that Mr. Hall sexually abused her daughter by having her wear lingerie for him, dancing with him, sitting naked on his naked lap, having oral sex performed on her and performing oral sex on Mr. Hall, and being shown sexual pictures of young girls by Mr. Hall. Ex. 51 at 109.

15. In 2000, Mr. Hall was convicted in the United States District Court for the Northern District of New York of Possession of Child Pornography Transported in Interstate Commerce, in violation of 18 U.S.C. § 2252A(a)(5)(B). Ex. 51 at 110. He was sentenced to sixty-three months in prison and three years of supervised release. Ex. 10 at 25-31. The presentence report prepared in this case reports that Mr. Hall was living with his girlfriend and her eight-year-old daughter. Ex. 50 at 123. His girlfriend found drawings of young naked females, labeled with the names of her daughter and her friend, inside her daughter's diary. *Id.* Her daughter reported that Mr. Hall had shown the drawings to both her and her friend. *Id.* The information was reported to the Federal Bureau of Investigation who conducted a search of the residence and the home computer. *Id.* Pictures depicting children engaging in sexual acts were located among Mr. Hall's belongings and on the computer. Ex. 50 at 123-124. Mr. Hall admitted accessing child pornography sites, downloading and printing child pornography and showing the drawings to his girlfriend's daughter. Ex. 50 at 124.

16. Mr. Hall was released on supervision on April 12, 2004. Ex. 22 at 2640. His supervision was revoked on February 23, 2006 for violations of the program rules, inappropriate behavior with female clients, being defiant with staff, and failure to complete chores at the community correction's placement. Ex. 23-27. He was sentenced to four months confinement,

six months of community confinement and thirty months of supervision. Ex. 27. On June 8, 2006, Mr. Hall was released to the community corrections center to begin his new term of supervised release. *Id.* He was released from the community corrections center on December 7, 2006. *Id.* On January 4, 2007, the United States Probation Office was notified that Mr. Hall had reported viewing pornography and engaging in sex with another AA participant.[2] *Id.* Shortly thereafter, Mr. Hall lost his job and failed to report to the Probation Office and to his mental health treatment agency. *Id.* On April 19, 2008, Mr. Hall's supervision was revoked for failure to participate in a mental health program. Ex. 29. He was sentenced to seven months incarceration for the violation of supervised release, to be served consecutive to the sentence imposed in 107-CR-157. *Id.*

17. In 2008, Mr. Hall was convicted of Failure to Register as a Sex Offender in the United States District Court for the Northern District of New York, criminal case number 107-CR-157. in violation of 18 U.S.C. § 2250(a)(1). Ex. 28 at 11-21, Ex. 51. He was sentenced to twenty-five months in prison and twenty-five years of supervised release. *Id.*

C.     **Bureau of Prisons Disciplinary History**

18. On or about September 11, 2009, sixty-nine pages of material depicting women in sexually suggestive or explicit poses were seized from Mr. Hall's cell in the Maryland Unit of the Federal Correctional Center in Butner, North Carolina (hereinafter "Maryland Unit"). Ex. 42.

---

[2] There is some confusion as to the date of the reported violation. In a letter dated January 23, 2007, the United States Probation Officer reported to the Honorable Thomas J. McAvoy that he was notified of the violation by Mr. Hall's treatment agency on January 4, 2006. It appears that the correct date of the notification should be January 4, 2007.

19. On September 16, 2009 and November 5, 2009, Mr. Hall was observed making photo copies of sexually inappropriate material while confined at the Maryland Unit. Ex. 30-32.

20. On eight occasions in 2010, Mr. Hall was disciplined for receiving inappropriate mail. Ex. 33, 34, 38-41, 43, 56, 72. He ordered publications from Jam Marketing, Glamour Girl Photos, High Caliber, Heavy Metal Magazine, Teen Vogue, and Maxim Magazine. *Id.*

21. During a July 15, 2010-shakedown of the Maryland Unit pictures, photocopies, and drawings of prepubescent girls in swimsuits, ballet leotards, and shirtless were found in Mr. Hall's cell. Ex. 35-37, 44-49, 57-60. Some of the pencil drawings found during the shakedown were traced from the pictures located in his cell, but drawn without clothes and the genital regions drawn in. *Id.*

22. On February 11, 2011, drawing books with illustrations and photos of scantily clad adult women were found in Mr. Hall's cell. Ex. 54, 55.

23. Mr. Hall was also sanctioned for: refusing to obey an order on August 29, 2010; refusing to obey an order, being in an unauthorized area, and interfering with taking count on December 12, 2009; refusing to obey an order and being insolent to a staff member on October 13, 2009. Ex. 52.

### D. Sex Offender Treatment

24. While under state supervision, Mr. Hall participated in approximately forty-five sessions with Dr. Gaille Brennan from November 1994 to August 1995. Ex. 7 at 11. Dr. Brennan noted that Mr. Hall made little progress in therapy, was an irresponsible and dangerous individual, with a severe temper, who repeatedly put himself in situations with women who had children. Ex. 7 at 12.

25. On March 26, 2001, Mr. Hall was admitted to the Sex Offender Treatment Program ("SOTP") at FCI, Butner. Ex. 18. He spent nineteen months in the SOTP program and was discharged on October 24, 2002. *Id.* During his course of treatment he participated in a penile plethysmograph test, psychosexual assessment, individual therapy, and several group treatment activities including psychotherapy process group, discussion group, community meetings, and psycho-education classes. *Id. at 860.* He was reported to be an active and often insightful participant in psychotherapy process group but his performance in individual therapy indicated that he "took little responsibility for addressing issues central to his sexually deviant behavior." *Id.* at 861-862. It was noted in his discharge report that he "made only minimal progress in treatment while in the SOTP due to avoidance of accountability and responsibility for his sexually deviant behavior, and a lack of effort to address and change behaviors directly associated with his sexual victimization of children." *Id.* at 863. He was diagnosed at discharge with: pedophilia, sexually attracted to females, non-exclusive type; cannabis dependence, in a controlled environment; alcohol dependence, in a controlled environment; cocaine abuse; and antisocial personality disorder. *Id.* at 864. He was assessed upon discharge from the SOTP to be at high risk of reoffending. *Id.*

26. As part of the SOTP, Mr. Hall wrote a Relapse Prevention Plan ("RPP"). Ex. 13. The RPP addressed his sexual offense history, the precursors to his offending behavior, his offense patterns, the process of relapse, coping skills, necessary lifestyle changes, and the support network needed to prevent a new sexual offense. *Id.* In his RPP, Mr. Hall stated that he "must not lose sight that I will never be cured or safe from my sexual deviant behaviors and having an

excuse to relax." *Id.* He further made a commitment to "never re-offend to a child or adult woman or any other individual again." *Id.* at 780.

27. In March 2005, Mr. Hall was evaluated by Dr. Richard Hamill at the request of the United States Probation Office. Ex. 25. During the interview Mr. Hall admitted to engaging in prostitution, adultery, homosexual activities, voyeuristic acts, frotteristic acts, use of child pornography, bondage, and a failed attempt to meet another couple for sex. *Id.* at 176. Dr. Hamill opined that Mr. Hall "appears to be at high risk of reoffending." *Id.* at 181. He further opined that Mr. Hall "requires a high degree of supervision as well as mandated participation in a sex offender treatment program." *Id.* at 182. Dr. Hamill noted in his assessment of risk that Mr. Hall reported engaging in two forcible rapes, that he finds both boys and girls sexually attractive, and that he finds African-American children as attractive as Caucasian children. *Id.*

28. Mr. Hall was involved in outpatient group therapy with Dr. Hamill on a weekly basis for approximately one year. Ex. 7 at 12, Ex. 25. As part of the therapy, Mr. Hall was administered three polygraph tests to determine if he was abiding by his treatment and supervision requirements. Ex. 21, 66, 67. The first polygraph was administered on July 29, 2005 and it was determined that he provided a deceptive answer to the question of his internet use since starting probation. Ex. 66. Mr. Hall explained that he had provided some instructions to his roommate, who was on the internet on how to get to programs. *Id.* It was also determined that Mr. Hall was deceptive in his answer to the question of whether he had touched the sex organs of a minor. *Id.* Mr. Hall explained when questioned about his answer to this question that he thought about his victims when masturbating. *Id.* On October 14, 2005, a polygraph test was administered and it was determined that he was deceptive in his answer to the question of whether he had sexual or

physical contact with an adult since he left the halfway house. Ex. 21. The final polygraph was administered on Mr. Hall on September 16, 2006. Ex. 67. It was determined that he provided no deceptive answers to the questions designed to ensure that he was abiding by the conditions of his release and not reoffending. *Id.*

**E. Current Status**

29. On June 19, 2009, the United States filed the instant action seeking to commit Mr. Hall as a sexually dangerous person under the Adam Walsh Act, 18 U.S.C. § 4248. DE 1. Pursuant to the statute, the filing of this action stayed his release pending the outcome of the proceedings. Mr. Hall completed his criminal sentence on June 24, 2009 and was scheduled to be released that day if the government had not filed the certification pursuant to § 4248. Respondent's § 4248 proceeding was stayed *ab initio* for almost two years while the appellate courts analyzed § 4248 constitutionality. Respondent's case was assigned to this Court on August 6, 2010. DE 7.

30. If released, Mr. Hall will be on supervised release for a term of twenty-five years. Ex. 28. The conditions of his supervised release include, among others, no contact with anyone under the age of eighteen, boundary restrictions in places where persons under the age of eighteen are likely to congregate, registering as a sex offender, participation in sex offender treatment, mental health treatment and substance abuse treatment, no access to computers or other devices with online capabilities except at a place of employment, and reporting to a probation officer as required. *Id.*

**III. EXPERT'S QUALIFICATIONS**

31. The government retained Dr. Dale R. Arnold as an expert in the case. Dr. Arnold reviewed Mr. Hall's records and interviewed Mr. Hall.

32. The government also called Dr. M. Lela Demby as an expert in the case. Dr. Demby reviewed Mr. Hall's records but did not conduct a current interview of Mr. Hall.

33. Respondent retained Dr. Luis Rosell. Dr. Rosell reviewed Mr. Hall's records and interviewed Mr. Hall.

34. The parties did not challenge the qualifications of any of the above experts. The Court having reviewed the curriculum vitae of the experts, and having heard their testimony, finds that each individual is qualified by education and experience to offer expert testimony in this matter.

## IV. LEGAL PRINCIPLES

### A. <u>Section 4248 Violates Equal Protection</u>

35. As a preliminary matter, this Court finds that § 4248 deprives Respondent of equal protection of the law under the Fourteenth and Fifth Amendments because there is no rational basis for § 4248's differentiation between individuals in BOP custody and individuals in the general public. *Incorporated by reference, United States v. Timms,* 5:08-HC-01256-BO (Eastern District of North Carolina, filed July 1, 2011).

### B. <u>Delay in the Proceeding Violated Respondent's Due Process Rights</u>

36. This Court also finds that Respondent was deprived of his due process rights under the Fifth Amendment of the United States Constitution because the government failed to bring Respondent before the court for a civil commitment hearing within a reasonable time after they filed the petition seeking commitment pursuant to § 4248. *Id.*

## C.  Standard of Proof and Elements Required to be Established

37.  The government has the burden of proving each element by clear and convincing evidence.  18 U.S.C. § 4248(d).  "[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity" that this standard is required not only by the Act, but by the Due Process clause of the Constitution."  *Addington v. Texas*, 441 U.S. 418, 427 (1979).  The clear and convincing evidence standard is an "intermediate standard," lying somewhere "between preponderance of the evidence and proof beyond a reasonable doubt."  *Id.* at 425.  "'Clear and convincing' has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established."  *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001)(internal quotations and citations omitted).  It has alternatively been described "as meaning 'highly probable.'"  *Direx Israel Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 810 n.7 (4th Cir. 1992) (quoting 9 J. Wigmore, Evidence § 2498 (3d ed. 1940)).

38.  To commit Respondent, the government must prove by clear and convincing evidence that Respondent is a "sexually dangerous person," which the Act defines as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others."  18 U.S.C. § 4247(a)(5).  An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(6).

39.  This phrase has not been defined by the statute.  The legislative history indicates that it is a direct legislative enactment of the principle of volitional impairment enunciated in *Kansas v.*

12

*Hendricks*, 521 U.S. 346 (1997) and *Kansas v. Crane*, 534 U.S. 407 (2002). *See,* H.R. Rep. No. 109-218(I) Section-by-Section Analysis and Discussion § 511. In *Crane*, the Supreme Court stated that the "serious difficulty" requirement is intended to distinguish the "dangerous sexual offender whose mental illness, mental abnormality or mental disorder subjects him to civil commitment, from the dangerous, but typical, recidivist convicted in an ordinary criminal case who, having been convicted and punished for one crime, proceeds through his own free choice to commit another." *Crane*, 413.

40. A finding of dangerousness is also constitutionally required. *Kansas v. Crane*, 534 U.S. 407-409, 410 (stating "we have consistently upheld involuntary commitment statutes . . . [when] (1) the confinement takes place pursuant to proper procedures and evidentiary standards; (2) there is a finding of 'dangerousness either to one's self or others,' and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality'" (*citing Kansas v. Hendricks*, 521 U.S. 346, 357-358; quotations omitted)). *See also Foucha v. Louisiana*, 504 U.S. 71, 82-83 (1992).

41. The Court finds that in this regard, the statute and due process considerations require that, in addition to a volitional impairment, the government must prove by clear and convincing evidence that Respondent poses a risk of reoffense that is significant enough to justify a finding that Respondent is sexually dangerous and therefore can be preventively detained.

42. In this case the government has proven neither. The evidence in this case does not demonstrate that Respondent currently suffers from a volitional impairment. The evidence also demonstrates that the recidivism rates proposed by the government's experts are likely overestimates. Further, even if this Court were to credit the government's experts regarding

13

Respondent's likelihood of recidivism, the statistical evidence presented does not rise to the level of clear and convincing evidence of dangerousness sufficient to justify commitment.

## V.     FINDINGS

### A.     Prior Bad Acts

43.  Mr. Hall does not contest that he has engaged in child molestation in the past. This Court finds that the government has established this element by clear and convincing evidence.

### B.     Suffers from a Serious Mental Illness, Abnormality or Disorder

44.  All of the experts who have evaluated Mr. Hall are in agreement and have diagnosed: pedophilia, sexually attracted to females, non exclusive type; alcohol, cannabis, and cocaine abuse in remission, and antisocial personality disorder.  The Court finds that the government has established this element by clear and convincing evidence.

### C.     Serious Difficulty Refraining from Child Molestation

45.  In order to commit Mr. Hall, the government must prove that the disorder results in "serious difficulty refraining from sexually violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(6).  As discussed previously, this term implies a volitional impairment.

46.  The DSM-IV-TR is clear that the fact that someone has been diagnosed with a mental illness or disorder does not answer the question of whether that person's volition is impaired.  The manual states:

> It is precisely because impairments, abilities and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.  The fact that an individual's presentation meets the criteria for DSM diagnoses does not carry any necessary implications regarding the individual's degree of control over the behaviors that may be

14

associated with the disorder. Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is or was unable to control his or her behavior at a particular time.

DSM-IV-TR at page xxxiii.

47. This Court finds that the government has not shown by clear and convincing evidence that Respondent currently presents a serious mental illness, abnormality or disorder that impairs his volitional control such that he would have serious difficulty refraining from sexually violent conduct or child molestation if released.

## VI.    DANGEROUSNESS/RISK ASSESSMENT

### A.    Introduction

48. All of the experts in this case conducted a risk analysis based on empirical tools and actuarial instruments to evaluate, quantify, and support their dangerousness determination.

49. All experts agree that no psychological tests or actuarial instruments have been developed that predict with certainty an individual's risk of future sexual offending behavior. Tr. 40, Ex. 2 at 2207, Ex. 7 at 17. The actuarial instruments provide only group prediction rates on risk of reoffending. These instruments do not provide individual rates of reoffending. *Id.*[3]

50. In evaluating Mr. Hall all of the experts utilized a clinical analysis combined with actuarial instruments to determine if Mr. Hall presents a serious risk of reoffending.

---

[3] The risk instruments are based on group data and provide risk estimates of defined sample groups to which an individual is compared. "The recidivism rates contained in the actuarial tables are the product of the amalgamated risk characteristics of the group and, therefore cannot be ascribed to a particular individual since the risk factors for the individual may vary substantially from that of the group." Theodore Donaldson and Brian Abbott, *Prediction in the Individual Case: An Explanation and Application of its Use with the Static-99R in Sexually Violent Predator Risk Assessments,* American Journal of Forensic Psychology, Volume 29, Issue 1, at 7 (2011).

51. Three expert opinions were offered by the parties on the issue of whether Mr. Hall meets the criteria for commitment pursuant to 18 U.S.C. § 4248. Dr. Arnold and Dr. Demby testified for the government and both opined that Mr. Hall is a sexually dangerous person as defined by the Act. Dr. Rosell testified for the Respondent and opined that Mr. Hall is not a sexually dangerous person and is not at risk of reoffending if released.

52. For the reasons set forth below, the Court finds that the government has not established by clear and convincing evidence that Respondent suffers from a serious mental illness, abnormality or disorder that impairs his volitional control and would result in him having serious difficulty refraining from sexually violent conduct or child molestation.

### B. Expert Opinions

#### 1. Dr. Dale Arnold

53. Dr. Arnold testified for the government and authored two evaluation reports dated March 14, 2011 and April 28, 2011. Ex. 2, 3. He opined based on his examination of Mr. Hall and review of his records that Mr. Hall meets the criteria as a sexually dangerous person as described in 18 U.S.C. § 4248. Ex. 3 at 2589. At trial, Dr. Arnold testified that his opinion was based on both a clinical analysis of Mr. Hall and an assessment of actuarial instruments. Tr. 37.

54. Dr. Arnold opined that Mr. Hall suffers from both pedophilia and antisocial personality disorder, and that the combination of these two conditions gives him serious difficulty in refraining from sexually violent conduct in the future. Ex.2, 3, Tr. 21-22. He based his diagnosis of pedophilia on Mr. Hall's self reported sexual interest in children, his prior convictions of child molestation, and his ongoing possession of pictures of minors. Tr. 22-26. Dr. Arnold diagnosed antisocial personality disorder based on Mr. Hall's history of conduct disorder in childhood, his

noncompliance with rules and laws, and his callous or indifference to needs or emotional responses of others. Tr. 30. It was his opinion that the combination of Mr. Hall's deviant sexual interest in children (pedophilia) plus his antisocial personality disorder interferes with his ability to comply with supervision, benefit from treatment, and to control his urges and to control his pedophilia. Tr. 30-31, 34. Dr. Arnold did concede that an individual with the dual diagnoses of pedophilia and antisocial personality disorder can control his pedophilic urges and that Mr. Hall did control those urges by not engaging in sexual acts with children during the 29 months he was living in the halfway house and in the community. Tr. 52-53.

55. In assessing Mr. Hall's risk of recidivism he opined that Mr. Hall is in the high range of recidivism. Tr. 35. He based his conclusion on the fact that Mr. Hall has had a large number of sexual partners, both female and male, the fact that he self-reported spending 45 percent of his time masturbating to two prepubescent girls, his sexual history, his ongoing interest in materials such as Teen Vogue, and possession of pictures of children after he has been certified pursuant to § 4248 and in the custody of BOP. Tr. 35-36.

56. In reaching his conclusion, Dr. Arnold utilized several actuarial instruments and psychological tests. He used the Static-99 Revised, the Static-2002 Revised,[4] and the Minnesota

---

[4] In 1999, Dr. Karl Hanson, a statistical researcher with the Canadian Office of Public Safety, developed the Static-99, an actuarial instrument consisting of ten factors. The ten factors are: whether the offender is younger than 25 years old, whether the offender ever lived with a lover for at least two years, index non-sexual violence, prior non-sexual violence, number of prior sentencing dates, any unrelated victims, any stranger victims, and any male victims. The Static-99 scores the offender on a scale from 0 to 12. Each score is associated with a risk level (i.e. high, medium, low). Each score was also associated with a percentage of recidivism over 5 years, 10 years, and 15 years. Dr. Hanson derived the original recidivism percentages associated with each score on the Static-99 by retrospectively scoring the instrument on a group of 1,086 offenders released from incarceration in Canada and the United Kingdom between 1958 and 1993 with known 5, 10, and 15 year recidivism rates after release. The average age of these

Sex Offender Screening Tool-Revised (MnSOST-R) [5] actuarial instruments. Dr. Arnold noted that these actuarial instruments have moderate predictive accuracy. Ex. 2 at 2208. He also utilized the Psychopathy Checklist (PCL-R),[6] the Structured Risk Assessment-Forensic Version (SRA-FV),[7]

---

1,086 individuals was 33.5 years old. The Static-99 has been revised and replaced by the 99-R and revised again in 2002. Ex. 7 at 18.

In the fall of 2008, the developers of the Static-99 issued new recidivism percentages associated with the different scores on the instrument. The prior recidivism percentages associated with the original Static-99 were derived from sex offenders released from 1958 to 1993, these newer recidivism percentages are based on contemporary samples of sex offenders who were released from incarceration in the 90s and after. The new recidivism percentages associate with the different scores on the Static-99 are substantially lower than the old recidivism percentages. (Harris, A., Helms, L., Hanson, R.K. & Thornton, D.(2008) *"Are New Norms Needed for the Static-99,"* Presented at the 27th Annual Research and Treatment Conference of the Association for the Treatment of Sexual Abusers, Atlanta, Georgia, October 23, 2008. Ex. 7 at 18.

[5] The MnSOST-R was developed by Epperson, Kaul and Huot in association with the Minnesota Department of Corrects in 1995 and subsequently revised. The development sample for the MnSOST-R was comprised of 256 sex offenders incarcerated in the state of Minnesota for felony sex offenses. The MnSOST-R is a sixteen question instrument comprised of twelve static factors and four dynamic factors. The score ranges from 16 to 31. Each score is associate with likelihood of re-arrest over a period of six years. Epperson, Douglas, Kaul, James, Huot, Stephen, Goldman,Robin, Alexander, Will, *Minnesota Sex Offender Screening Tool–Revised (MnSOST-R): Development, Validation, and Recommended Risk Level Cut Scores*, December 2003.

[6] The PCL-R or Hare Psychopathy Checklist-Revised is a diagnostic tool used to rate a person's psychopathic or antisocial tendencies and does not specifically address sexual recidivism. "Originally designed to assess people accused or convicted of crimes, the PCL-R consists of a 20-item symptom rating scale that allows qualified examiners to compare a subject's degree of psychopathy with that of a prototypical psychopath." *Encyclopedia of Mental Dosorders.* In 1994, Harpur and Hare found that advancing age diminishes the effects of high PCL-R scores, showing a dramatic drop in criminal activity after the age of 40. Terrence W. Campbell, ASSESSING SEX OFFENDERS, Second Edition, 189 (Thomas Publisher, LTD, 2007)

[7] The Structured Risk Assessment-Forensic Version "SRA-FV "is a conceptually based instrument for assessment of potential long-term vulnerabilities or propensities that predispose an offender toward future sexual offending." Ex. 2 at 2210. Thorton,D. *Structured Risk*

and the Sexual Violence Risk-20[8] psychological tests in formulating an opinion on Mr. Hall's risk of recidivism.

57. Dr. Arnold scored Mr. Hall at a five on the Static-99R which he opined would be considered a moderate high rate of recidivism even though he classified a score of four or five as borderline "in terms of whether or not I'm going to see them as having serious difficulty." Tr. 32, Ex. 2 at 2209. Dr. Arnold associated the group recidivism rate associated with Mr. Hall as 35 percent of reoffending within ten years of release. Tr. 39. Dr. Arnold noted that the Static-99R does not provide a risk percentage rate for Mr. Hall but for groups of individuals who scored in the same range. Ex. 2 at 2207, Tr. 39-40. He scored Mr. Hall as a seven on the Static-2002R which he opined would be a moderate risk of reoffending for groups of individuals who scored in the same range. Ex. 2 at 2209, Tr. 41. When scoring Mr. Hall on the Static-99R and 2002-R, Dr. Arnold chose to compare him to the group of offenders in the studies with the highest recidivism rates, the "high-risk/high needs" group of individuals. Tr. 55. As noted in Dr. Arnold's report, the Static-99R and Static-2002-R have multiple reference groups for comparison (routine correctional, non-routine correctional, pre-selected for treatment, preselected for risk/need) and evaluators are instructed to select and use the reference group(s) that best fit selection criteria of the individual being evaluated. Ex. 2 at 2208. Dr. Arnold conceded that the high-risk/high needs sample group probably did not have the time in community that Mr. Hall had following his post index sexual

*Assessment: Using the Forensic Version of the SRA in Sex Offender Risk Assessment,* Presentation, Atascadero, California, 12-02-10. A limitation of the Forensic Version is that is has only one validation study. Ex. 2 at 2210.

[8] The SVR-20, developed by Boer, Hart, Kropp and Webster in 1997, assesses sex offender recidivism risk by addressing twenty risk factors. Terrence W. Campbell, ASSESSING SEX OFFENDERS, at 200. The test aids in rendering a clinical judgment.

19

offense. Tr. 55-56, 57. Dr. Arnold did not compare Mr. Hall to any other sample groups identified in the Static-99R actuarial instrument when rendering an opinion on his assessment of risk. He scored Mr. Hall on the MnSOST-R as a five that "associated him with a group of individuals twenty percent of whom had been arrested for reoffense after six years." Tr. 41, Ex. 2 at 2209.

58. On the PCL-R, Dr. Arnold rated Mr. Hall at a score of 31 and noted that individuals scored in excess of 30 would be considered in the severe range of psychopathy. Tr. 36-37, Ex. 2 at 2209. Dr. Arnold used the SRA-FV in his first report, a new test first available for use in December 2010, to assist him in structuring his clinical judgment and to assess the appropriate sample group to place Mr. Hall in scoring the Static-99R and 2002-R instruments. Tr. 42-44, Ex. 2 at 2210. Dr. Arnold agreed that the SRA-FV has only one validation study, and was developed from a study of sex offenders incarcerated from 1959 to 1984 in Bridgewater, Massachusetts. Tr. 62-63. He conceded that the SRA-FV did not include in the sample group of men studied, individuals who have time in the community without a sexual reoffense. *Id.* The Dr. Arnold reported in his initial evaluation of Mr. Hall that the SRA-FV suggests that Mr. Hall's risk of reoffending is higher than the Static-99R. In his subsequent evaluation, Dr. Arnold also utilized the SVR-20 in opining that Mr. Hall's risk of sexual reoffense remains in the high range. Ex. 3 at 2589. He conceded that the SVR-20 does not take into account individuals who have time in the community with no hands-on sex offense nor individuals who are subject to twenty-five years of supervision if released. Tr. 68.

59. Dr. Arnold conceded that neither the actuarial instruments nor the SRA-FV and the SVR-20 tests he relied on in formulating his assessment as to Mr. Hall's risk of reoffending do not

take into account supervision upon release, and except for the Static-2002-R, which factors in time in the community without a new offense. Tr. 60, 62-63, 68.

60. Lastly, Dr. Arnold considered Mr. Hall's 2002 relapse prevention plan which he thought was a good plan but Mr. Hall's attempt to follow the plan had been poor, the fact that he had twenty-five years of supervised release but had previously violated the terms of his supervision, the fact that he continues to engage in high-risk behavior at the BOP by possession of pornography and inappropriate magazines, and Mr. Hall's inability to understand the seriousness of his behavior. Tr. 45-47. Based on all of this information, and the fact that Mr. Hall suffers from a serious mental disorder of pedophilia combined with antisocial personality disorder which diminishes his ability to make choices about his conduct, Dr. Arnold concluded that "Mr. Hall risk for sexual reoffense is in the high range" and that he "does meet the criteria as a sexually dangerous person as described in 18 U.S.C. § 4248. Ex. 3 at 2589.

**2. Dr. M. Lela Demby**

61. Dr. Demby, a psychologist employed by the BOP, testified for the government and opined based on her earlier examination of Mr. Hall and review of the records that he suffers from a serious mental illness, abnormality, or disorder, and as a result would have serious difficulty in refraining from sexually violent conduct or child molestation. Ex. 5 at 2199. At trial, Dr. Demby testified that she diagnosed Mr. Hall with pedophilia, sexually attracted to females, nonexclusive type and antisocial personality disorder. Tr. 85. She noted that she based her diagnosis on the fact that "Mr. Hall has a decades-long pattern of violating the rights of others and violating social norms" and "multiple convictions for hands-on offenses of young children." Tr. 86. She noted that he has continued to collect child erotica and was found in possession of drawings of nude

children which is an "indicator that he continues to have deviant arousal to children." Tr. 86.

62. In assessing Mr. Hall's risk of recidivism Dr. Demby testified that she used the Static-99R which she scored as a five, moderate/high risk. Tr. 87-88. Dr. Demby conceded that the Static-99R does not take into account the 25-year period of supervision that Mr. Hall faces if released, nor does it take into consideration the fact that he was in the community for 28 months without a new sex offense. Tr. 107. When scoring Mr. Hall on the Static-99R, Dr. Demby compared him to the group of offenders in the studies with the highest recidivism rates, the "high-risk/high needs" group of individuals and the "preselected for treatment" sample. Ex. 5 at 2194. Offenders with the same score as Mr. Hall from the "high-risk/high needs" sample have been found to sexually reoffend at a rate of 25% in five years and 36% in ten years. *Id.* Offenders in the "preselected for treatment" sample have been found to sexually reoffend at a rate of 16% in five years and 23% in ten years. *Id.* In her report, Dr. Demby also relied on the Static-99 actuarial instrument that she opined placed him in the High risk category. Ex. 5 at 2193. Dr. Demby admitted that the developers of the Static-99 have replaced it with the Static-99R in all contexts where it is used. Tr. 106, Ex. 5 at 2193.[9] She also utilized the SVR-20 in assessing his risk of reoffending and concluded that based on the "number and nature of the exacerbating factors, Mr. Hall's risk of future sexual violence is High on the SVR-20." Ex. 5 at 2198.

63. Dr. Demby concluded in her report that the actuarial "scores indicate a high risk of future sexual reoffense" and that Mr. Hall "has several exacerbating factors and no mitigating

---

[9] The original Static-99 reoffense rates released in 2000 are now obsolete. The new instrument, the Static-99R was developed to account for the effects of age on reoffense rates. Hanson RK, Phenis A, Helmus L: *Static-99 and Static-2002:how to interpret and report scores in light of recent research.* Workshop presented at the ATSA 28th Annual Research and Treatment Conference on September 30, 2009, Dallas: TX.

factors to be taken into consideration with his actuarial scores." Ex. 5 at 2198. She notes that "his intimacy deficits, lifestyle instability, sexual preoccupation, attitudes tolerant of sexual reoffending, poor coping skills, personality disorder, psychopathy, substance abuse, and paraphilic disorder contribute to his risk of reoffense." *Id.* In her opinion, Mr. Hall's risk of sexual reoffense is High and his prognosis is considered poor. Ex. 5 at 2198.

      **3.**     **Dr. Luis Rosell**

64. Dr. Rosell testified for the Respondent and opined based on his examination of Mr. Hall and review of his records that it was his opinion that "Mr. Hall currently does not pose a serious risk for engaging in sexually dangerous behavior toward others and does not suffer from a serious mental illness, abnormality or disorder that would result in him having a serious difficulty refraining from sexually violent conduct or child molestation, and therefore he does not meet the criteria for commitment under 18 U.S.C. §§ 4247 and 4248." Ex. 7 at 26, Tr. 208-212. Dr. Rosell testified that Mr. Hall does suffer from a mental illness or disorder and he diagnosed him with pedophilia, females, non exclusive type, cannabis and cocaine abuse, alcohol dependence and antisocial personality disorder. Tr. 211, Ex. 7 at 17. Dr. Rosell testified that pedophilia is a chronic disease which requires management to control the behavior. Tr. 218. It was his opinion that Mr. Hall has demonstrated that he can refrain from engaging in sexually violent conduct or child molestation despite his mental illness, abnormality or disorder. Tr. 211.

65. Dr. Rosell testified that he reached his opinion based on Mr. Hall's somewhat limited offending history of only two hands on victims, his two periods of release into the community where he had ample opportunity to sexually reoffend but did not, the fact that he has difficulty following rules and makes bad decisions but has not reoffended, his twenty-five years of

supervision if released, and several actuarial instruments and psychological tests.  Tr. 212-214,

219.

66.   In assessing Mr. Hall's risk of recidivism, Dr. Rosell used several actuarial

instruments, namely the Static-99R, Static-2002R, and the Multisample Age Stratified Table of

Sexual Recidivism Rate ("MATS").[10]  Tr.219-220.  Dr. Rosell testified that the actuarial

instrument scores do not address the issue of serious difficulty controlling behavior or volitional

impairment, the actuarial instruments provide group risk assessments.  Tr. 226.  Dr. Rosell scored

Mr. Hall at a five on the Static-99R and a score of seven on the Static 2002R.  Tr. 219.  When

scoring Mr. Hall on the Static-99R,  Dr. Rosell compared him to the group of offenders in the

studies with the highest recidivism rates, the "high-risk/high needs" group of individuals as well as

comparing him to the total sample of 6,000 subjects.  Ex. 7 at 20.  He testified that he had some

concerns about comparing Mr. Hall with the "high-risk/high needs" sample group because of his

time in the community without a new offense and his sex offender treatment.  Tr. 227-228.

Offenders with the same score as Mr. Hall on the Static-99R from the "high-risk/high needs"

sample have been found to sexually reoffend at a rate of 25% in five years and 36% in ten years.

Tr. 229, Ex. 7 at 20.   If compared to the total sample of 6,000 individuals studied, his score would

---

[10]  The MATS is a recently developed actuarial instrument for estimating sexual
recidivism risk that was derived from data for 9,305 sex offenders.  The MATS-1 was complied
from an age-stratified table for Static-99 and an age-stratified table from the Automated Sexual
Recidivism Scale.  The MATS-1 validates the "age invariance effect" that the risk of sexual
recidivism declines with advancing age and shows that age-restricted tables understimate risk for
younger offenders and overestimate risk for older offenders.  Wollert, Richard, Cramer, Elliot,
Waggoner, Jacqueline, Skelton, Alex, & Vess, James (2010) *Recent Research (N=9,305)
Underscores the Importance of Using Age-Stratified Actuarial Tables in Sex Offender Risk,
Assessments*, Sexual Abuse: A Journal of Research and Treatment, 22, 472-490.

be comparable at a five-year rate of 18%. *Id.* Offenders with the same score as Mr. Hall on the Static-2002R from the "high-risk/high needs" sample have been found to sexually reoffend at a rate of 36% in ten years and those in the non-routine sample the recidivism rate in ten years is 32%. When compared to the aggregate group, the rate of recidivism is 23.6% in five years. *Id.* at 21. Dr. Rosell commented that if these actuarial instruments existed when Mr. Hall was released previously, his rate of recidivism would have been higher, which illustrates the false positive aspects of these instruments in accurately predicting recidivism rates. Tr. 323-233. On the MATS-1, Dr. Rosell scored Mr. Hall a four, which is considered in the moderate range for recidivism and equates to a 25 percent of reoffending over an eight-year period. Tr. 220-221.

67. Dr. Rosell also utilized the SVR-20 test in rendering his opinion on Mr. Hall's likelihood of recidivism and determined that "Mr. Hall appears to be characterized by a low to moderate likelihood of sexual recidivism. Ex. 7 at 25.

68. In formulating his opinion regarding Mr. Hall's risk of recidivism, Dr. Rosell took into account the fact that he has 25 years of supervision if released from custody. Tr. 237. He also considered Mr. Hall's infractions at the BOP. Tr. 239. In addressing the concern about Mr. Hall's recent possession of inappropriate pictures and drawings at the BOP, Dr. Rosell testified that "the fact that just because the individual may engage in that behavior, may still look at a picture, may still draw, may still have thoughts about children, doesn't mean that the individual is going to reoffend." Tr. 214, 216. He noted that recent research has shown that for "individuals who possessed child pornography who also had a hands-on victim, the recidivism rate was less than four percent." Tr. 217. Dr. Rosell commented on the fact that Mr. Hall had access to pornography when he was previously released but did not reoffend. Tr. 239. Lastly, he took into account Mr.

Hall's prior sex offender treatment and the fact that "he learned the most important thing, not to reoffend." Tr. 239-240.

### C. Clyde Hall

69. The Court has also considered the testimony of Mr. Hall. Mr. Hall testified that he is forty-five years of age with a high school education. Tr. 112-113. He was raised in a dysfunctional and physically abusive home environment. Tr. 113-115. At the age of sixteen, his father kicked him out of the family home and he lived basically on the streets supporting himself by prostitution. Tr. 116, Ex. 2 at 2203. It was during this time that he was sexually assaulted by a man. Tr. 116.

70. While in custody at the BOP, Mr. Hall voluntarily enrolled in the SOTP in 2001. Tr. 119-128. As a condition of the SOTP, Mr. Hall had to admit and take full responsibility for all of his sex crimes and felt pressure to report crimes that did not occur. Tr. 122-124. Specifically, Mr. Hall testified that he was "pressured to admit even crimes that we did not commit by the [SOTP] director and a couple of his staff members." Tr. 122. He recounted that "there were times when Dr. Hernandez and Mr. Herman brought me into their office and stated that if I didn't admit to these certain things that I can lose good time, I would be thrown out of the program and that they would tell whomever is going up to your area about your being a sex offender," informing the general prison population that he was a sex offender. Tr. 123-124.

71. Mr. Hall testified that his participation in the BOP/SOTP was good in that it made him learn about himself, how to communicate better in relationships, and coping skills to be used to avoid reoffending by sexually abusing children. Tr. 125-126. The SOTP also made him recognize how he harmed his victims. (Tr. 125).

72. Mr. Hall was released from federal custody after attending the SOTP on April 12, 2004. Tr. 128. For the next eleven months he lived in a motel room and checked in with a U.S. probation officer weekly. Tr. 128. Because he could not locate employment and was living in a hotel, the probation officer placed him in a halfway house in Albany, New York. Tr. 128-129, Ex. 22. His supervision was subsequently revoked on February 23, 2006, after he violated several rules at the halfway house, had contact with a convicted sex offender, and possessed an unauthorized cell phone. Tr. 131, Ex.23, 24, 27. He served four months in the county jail for the violation. *Id.* On June 8, 2006, Mr. Hall was released and commenced his new thirty-month term of supervised release. Ex. 27. He remained in the halfway house for six months and then moved to an apartment. Tr. 132. During that time, he was employed as a welder and was attending sex offender treatment on a weekly basis. Tr. 132.

73. On December 22, 2006, Mr. Hall's employment was terminated after the company downsized. Tr. 133. He attempted to find a job but was unsuccessful. Tr. 136. He heard that jobs were available in New Orleans so he absconded from supervision and attempted to hitch hike to New Orleans but was arrested at a truck stop in New Jersey. Tr. 135-137. After his arrest, his supervision was revoked and he was charged with failure to register as a sex offender. Tr. 137. He pleaded guilty to the offense of failure to register as a sex offender and was sentenced to a term of twenty-five months in prison to be followed by a term of twenty-five years of supervised release. Ex. 28. He was sentenced to a seven-month consecutive sentence for the violation of his original term of supervised release. Tr. 137, Ex. 29.

74. Three months before Mr. Hall was to be released from prison, he was transferred to the BOP Federal Correctional Center at Butner, North Carolina and has remained confined in the

Maryland Unit. Tr. 138. When asked about the institutional infractions, Mr. Hall testified that until January or February of 2011, the magazines he ordered which later gave rise to an institutional infraction were not considered contraband. Tr. 140. He explained that the photos and drawings found in his cell had been placed there by another inmate. Tr. 141. He admitted that he made a bad decision and viewed the photos and drawings instead of destroying them. Tr. 141-144. He also admitted that he should not have possessed various magazines, such as Teen Vogue, as possession of these materials is inconsistent with the goals of his relapse prevention program. Tr. 157-158.

75. Mr. Hall testified that if released he would like to develop a relationship with a woman who does not have children, to abide by the rules of a halfway house, find employment, and not reoffend. Tr. 145-147. He stated to the Court that he has learned methodologies to prevent reoffending, including being truthful even when admissions are incriminating, and that he is committed to never harming a child. Tr. 196-198.

## VII. CONCLUSIONS OF LAW

76. The Court finds that § 4248 deprives Respondent of equal protection of the law under the Fourteenth and Fifth Amendments to the United States Constitution because there is no rational basis for § 4248's differentiation between individuals in BOP custody and individuals in the general public.

77. The Court finds that Respondent was deprived of his due process rights under the Fifth Amendment of the United States Constitution because the government failed to bring Respondent before the Court for a civil commitment hearing within a reasonable time after they filed the petition seeking commitment pursuant to § 4248.

78.  The Court finds that Respondent has committed acts of child molestation in the past.

79.  The Court finds that Respondent meets the diagnostic criteria for pedophilia and antisocial personality disorder.

80.  The Court finds that pedophilia is a chronic disease but does not carry with it any necessary implications regarding level of volitional control.  The Court finds that the government has not proven by clear and convincing evidence that Respondent suffers from a volitional impairment such that he would have "serious difficulty refraining from sexually violent conduct of child molestation if released."

81.  The United States Supreme Court precedent makes clear that the "serious difficulty" language does not require total or complete lack of control, but does require that it must be difficult, if not impossible, for the person to control his dangerous behavior.  *See Kansas v. Crane*, 534 U.S. 407, 411 (2002) (citing *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997)).  The conflicting evidence concerning the probability of Mr. Hall's reoffending cannot support a finding that he would have "serious difficulty" in refraining from child molestation.

82.  The Court has been presented with three opinions about Respondent's risk of reoffense in the event he is released.  The Court has considered the information and finds this information relevant to its determination of Respondent's sexual dangerousness.  For the following reasons the Court finds that the government has not proven dangerousness by clear and convincing evidence sufficient to justify commitment.

83.  The Court accords the opinion of Dr. Demby less weight than the other expert opinions.  It is unclear to the Court if her opinion is based on an actuarial instrument, the Static-99, which has been replaced by the Static-99R, a newer version of the instrument.  Mr. Hall's scores

on the newer actuarial instrument place him in the moderate range of reoffending.  Further, her opinion either fails or discounts the time Mr. Hall spent in the community without committing a new sexual offense, his twenty-three years of sobriety,  and the fact that if released he will be under supervision for twenty-five years.

84.  Dr. Arnold concluded that Respondent poses a high risk of recidivism.  In reaching his opinion he relied on his clinical judgment of Mr. Hall, several actuarial instruments utilized to predict rates of recidivism for groups of sex offenders who achieve the same score as Mr. Hall on the test, and several psychological tests that have been found to assist in predicting risk or recidivism.  The Court notes that the actuarial instruments relied upon by Dr. Arnold predicted only a moderate to a moderate-high rate of recidivism for a group of individuals who achieve the same score as Mr. Hall.  The tests cannot predict Mr. Hall's individual rate of recidivism.  The Court also notes that Dr. Arnold limited his comparison to the high risk/high need sample group who have the highest recidivism rates for these actuarial instruments.  He failed to comment on the statistical rate of  false predictions that can occur with these actuarial instruments.  These actuarial instruments have limited value in this instance because they do not account for Mr. Hall's time in community without a hands-on sexual offense nor do they account for the fact that if released, he will be under supervision for a term of twenty-five years and if violated, faces the possibility of a life sentence.   The Court notes that Dr. Arnold appeared to discount Mr. Hall's time in the community with no new hands on offense and the impact of a twenty-five-year term of supervision with stringent conditions.  Furthermore, the Court finds a "moderate" or "moderately high risk" is insufficient to justify commitment.

85. The Court finds the opinion of Dr. Rosell to be the most well reasoned and persuasive. Dr. Rosell, like Dr. Arnold, based his opinion on clinical judgment, actuarial instruments, and psychological tests. The Court is persuaded that Dr. Rosell's method of synthesizing the available data and applying it to Mr. Hall has given the Court a more accurate depiction of Mr. Hall's risk of reoffending. Dr. Rosell utilized the same actuarial instruments and psychological tests as Dr. Arnold and Dr. Demby; however, he provided a more complete discussion of the tests' strengths and weaknesses. For instance, not only did he provide a scholarly comment on the false/negative aspects of the actuarial instruments, but he did not limit his analysis of the recidivism rates to only one or two sample groups but provided recidivism rates for all sample groups. He gave more credence to the fact that Mr. Hall spent a considerable time in the community with no new hands-on sex offenses which the Court finds to be a persuasive factor that Mr. Hall will not recidivate. Lastly, he correctly acknowledged that if released Mr. Hall will be under supervision for twenty-five years. This Court finds the lengthy and onerous conditions that will be imposed on Mr. Hall if released give further assurance that Mr. Hall will not reoffend.

86. The Court notes that Mr. Hall's last conviction of child molestation occurred in 1999. Following his release from prison he was in the community for approximately 28 months and did not commit a new sexually violent offense or child molestation. Further, if released, Mr. Hall will be under the supervision of a U.S. Probation officer for a term of twenty-five years. The conditions of his supervision are stringent and he faces a potential life sentence if he commits a new sexual offense. This Court finds Mr. Hall to be a credible witness and that he appears to understand the severe consequences he faces if convicted of a new sexual offense. He appears to understand the

harm he has done to his victims, the methods he must employ to ensure that he does not molest children, and appears to be committed to not reoffending.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in this matter that Clyde M. Hall is not a "sexually dangerous person" and order his release from the custody of the federal Bureau of Prisons so that he may commence his term of supervised release.

Respectfully submitted this 10th day of August, 2011.

THOMAS P. MCNAMARA
Federal Public Defender

/s/ *Suzanne Little*
SUZANNE LITTLE
Assistant Federal Public Defender
E-mail: Suzanne_little@fd.org
VA State Bar No. 31344

/s/ *Joseph H. Craven*
JOSEPH H. CRAVEN
Assistant Federal Public Defender
E-mail: Joseph_Craven@fd.org
N.C. State Bar No. 26116

ATTORNEYS FOR RESPONDENT
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236; Fax: 919-856-4477
LR 57.1 Counsel, Appointed

*CERTIFICATE OF SERVICE*

I HEREBY CERTIFY that a copy of the foregoing was served upon:

**Joshua B. Royster**                     **Michael Bredenberg**
**G. Norman Acker, III**                  Bureau of Prisons, Legal Dept.
**R.A. Renfer, Jr.**                      P.O. Box 1600, Old Highway 75
**Mike James**                            Butner, NC 27509
U. S. Attorney's Office                   Email: mbredenberg@bop.gov
Rm. 800, 310 New Bern Ave.
Raleigh, NC 27601
Email: joshua.royster@usdoj.gov
Email: norman.acker@usdoj.gov
Email: rudy.renfer@usdoj.gov
Email: mike.james@usdoj.gov

by electronically filing the foregoing with the Clerk of Court on August 10, 2011 using the CM/ECF system which will send notification of such filing to the above:

This the 10th day of August, 2011.

/s/ *Suzanne Little*
SUZANNE LITTLE
Assistant Federal Public Defender
Attorney for Respondent
Office of the Federal Public Defender
150 Fayetteville Street
Suite 450, Wachovia Capital Center
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Suzanne_Little@fd.org
VA. State Bar No. 31344
LR 57.1 Counsel
Appointed